# EXHIBIT A

**Miles Smith Broking Limited**

| |
|---|
| **Insured:** |
| Emerson Equity, LLC. |
| **Policy Period:** |
| From:    25 October 2021<br>To:       25 October 2022<br><br>Both days inclusive at Local Standard Time at the Address of the Insured |
| **Type:** |
| Securities Broker/Dealer Professional Liability Insurance |
| **UMR:** |
| B074021F3121 |

**MARKET REFORM CONTRACT**

| |
|---|
| FOR L.P.S.O. USE: |
| FOR I.L.U. USE: |
| FOR I.U.A. USE: |

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

## RISK DETAILS

| | |
|---|---|
| UNIQUE MARKET REFERENCE: | B074021F3121 |
| TYPE: | Securities Broker/ Dealer Professional Liability Insurance |
| INSURED: | Emerson Equity, LLC |
| ADDRESS: | 155 Bovet Road, Suite 725<br>San Mateo<br>California<br>CA 94402<br>United States of America |

POLICY PERIOD:     From:   25 October 2021
                   To:      25 October 2022

                   Both at 12.01 a.m at Local Standard Time at the Address of the Insured

| | |
|---|---|
| INTEREST: | Securities Broker/ Dealer Professional Liability Insurance |
| LIMIT OF LIABILITY: | USD5,000,000          in the aggregate |
| RETENTION: | USD250,000          each and every Claim, but USD 100,000 each and every Claim in respect of the Professional Services as defined under 3(I)(2) and 3(I)(3) |
| TERRITORIAL LIMITS: | Worldwide |

CONDITIONS:

1. Securities Broker/ Dealer Professional Liability Insurance Policy Wording, as attached, plus:
2. Prior and Pending Litigation Date: 11 November 2004, but 25 October 2019 in respect of USD 4,000,000 aggregate limit of liability in excess of USD 1,000,000 aggregate limit of liability
3. Limit of Liability Retroactive Date(s) Endorsement
4. Professional Services Retroactive Date(s) endorsement
5. Private Placement Coverage Amendatory Endorsement
6. Registered Investment Advisory Endorsement (for approved person)
7. Trouble Investment Exclusion (GBP Capital Holdings, LLC. Fund(s))
8. Defense, Investigation and settlement amendatory Endorsement
9. NMA1256 – Nuclear Incident Exclusion Clause – Liability – Direct (BROAD) (U.S.A)
10. NMA1477 – Radioactive Contamination Exclusion Clause – Liability – Direct (U.S.A)
11. NMA2918 – War and Terrorism Exclusion Endorsement, as attached
12. NMA1998 – Service of Suit Clause
13. LMA5479 – Cyber Affirmative Endorsement
14. LMA3100 – Sanction Limitation and Exclusion clause

| | |
|---|---|
| NOTICES: | 1. LMA9098A – California Notice |
| SUBJECTIVITIES: | None |

Contract Leader

1

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

CHOICE OF LAW
JURISDICTION: This Insurance shall be governed by and construed in accordance with the law of California and each party agreed to submit to the exclusive jurisdiction of the Courts of California in the event of a dispute hereunder.

The language used for policy interpretation shall be English as set out in the policy wording

PREMIUM: ▮▮▮▮▮▮▮  100% in full for the period, plus any applicable taxes

PAYMENT TERMS: LSW3001 - 60 day Premium Payment Clause, as attached

TAXES PAYABLE
BY INSURED AND
ADMINISTERED
BY INSURERS: None

TAXES PAYABLE
BY INSURERS AND
ADMINISTERED
BY POLICYHOLDER
OR THEIR AGENT: None

RECORDING,
TRANSMITTING
& STORING
INFORMATION: Where Miles Smith Broking Limited maintains risk and claims data/information/documents Miles Smith Broking Limited may hold data/information/documents electronically.

INSURER CONTRACT
DOCUMENTATION: This document details the contract terms entered into by the insurer(s) and constitutes the contract documentation.

This contract is subject to US state surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the insured. In the event that the surplus lines notice is not affixed to the contract document the insured should contact the surplus lines broker.

Any further documentation changing this contract, agreed in accordance with the contract change provisions set out in this contract, shall form the Evidence of such change.

Contract Leader

| **Policy Number:** | **MSB** |
|---|---|
| MSB/0740/21F3121 | **0740** |

NOTICE OF
CANCELLATION
PROVISIONS:

Where (re)insurers have the right to give notice of cancellation, in accordance with the provisions of the contract, then:

To the extent provided by the contract, the Slip Leader is authorised to issue such notice on behalf of all participating (re)insurers; and

Any (re)insurer may issue such notice in respect of its own participation.

The content and format of any such notice should be in accordance with the 'Notice of Cancellation' standard, as published by the London Market Group (LMG), or their successor body, on behalf of London Market Associations and participants. However, failure to comply with this standard will not affect the validity of the notice given.

The notice shall be provided to the broker by the following means:

By an email to: fps@srinternational.co.uk & claims@srinternational.co.uk

Failure to comply with this delivery requirement will make the notice null and void. Satisfactory delivery of the notice will cause it to be effective irrespective of whether the broker has acknowledged receipt.

Contract Leader

| **Policy Number:** | **MSB** |
|---|---|
| MSB/0740/21F3121 | **0740** |

**INFORMATION:**

The following Information was provided to insurer(s) to support the assessment of the risk at the time of underwriting.

Disposition Letter - Emerson Equity LLC (130032) **–** 20200660782
Finanicals
List of Approved Products
Securities BD application form Antares
Securities Shield Coronavirus Supplemental Questionnaire Apr-20-2020
EE DD NON DST Product Blotter 2021-2[1]

Contract Leader

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

**SECURITY DETAILS**

(RE)INSURER'S
LIABILITY:

**(Re)Insurer's liability Clause**
The Liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract.  A (re)insurer is liable only for the proportion of liability it has underwritten.  A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer.  Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp.  This is subject always to the provisions concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer.  Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together).  The liability of each member of the syndicate is several and not joint with other members.  A member is not jointly liable for any other member's proportion.  Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.  The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA.  The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**
Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333

| Contract Leader |
|---|

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

ORDER HEREON:           100% of 100%

BASIS OF WRITTEN
LINES:                          Percentage of whole

BASIS OF SIGNED
LINES:                          100%

SIGNING
PROVISIONS:             In the event that the written lines hereon 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the (re)insurers.

However:

a)  in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b)  the disproportionate signing of Insurers' lines can be effected without further specific agreement of Insurers, providing that any such variation is made prior to the commencement date of the period of Insurance, and that lines written 'to stand' may not be varied without the documented agreement of those Insurers;

c)  the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the (re)insured and all (re)insurers whose lines are to be varied. The variation to the contracts will take effect only when all such (re)insurers have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

Contract Leader

| **Policy Number:** | **MSB** |
|---|---|
| MSB/0740/21F3121 | **0740** |

**INSURER'S WRITTEN LINES:**

**As per PPL Security**

Contract Leader

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

**SUBSCRIPTION AGREEMENT**

OVERALL
SLIP LEADER:    Lloyd's Syndicate Antares AUL 1274

BUREAU
SLIP LEADER:    Not Applicable

BASIS OF
AGREEMENT
TO CONTRACT
CHANGES:    General Underwriting Agreement (February 2014) incorporating GUA Professional Indemnity Schedule – May 2005 except as amended in this Subscription Agreement or in the submission to Insurers.

Wherever practicable, between the broker and each Insurer which have at any time the ability to send and receive ACORD message:

1.   the broker agrees that any proposed contract change will be requested via an 'ACORD message' or using an ACORD enabled electronic trading platform.

2.   Whilst the parties may negotiate and agree any contract change in any legally effective manner, each relevant Insurer agrees to respond via an appropriate 'ACORD message' or using an ACORD enabled electronic trading platform.

3.   Where an Insurer has requested to receive notification of any contract change the broker agrees to send the notification via an 'ACORD message' or using an ACORD enabled electronic trading.

Net equivalent brokerage (downwards only) and/or other deductions from Premium and/or any amendments to the Order Hereon to be agreed by Slip Leader only on behalf of all Insurers hereon.

All extensions to the effective payment date and/or cancellation provisions contained in any premium payment condition clause or warranty, are to be agreed by Slip Leader Only on behalf of all Insurers hereon.

Signing slips, signing slip endorsements, time on risk signings and annual re-signings are to be agreed by Slip Leader Only.

When details of an agreed endorsement are required to be provided to following Insurers, electronic transmission or fax may be used by Miles Smith Broking Limited, as they may deem appropriate. If such information is sent electronically, Miles Smith Broking Limited is not to be held responsible for the message failing to arrive, or being corrupted or distorted during transmission.

If required, Slip Leader is authorized to agree a final version of the agreed slip, and/or endorsement(s) thereto, on behalf of all Insurers.

As Evidence of Cover to the client, Miles Smith Broking Limited has the option of providing a Broker Insurance Document comprising a copy of the Risk Details and Information, together with a summary of the security and signed lines. Unless requested by the Insured or Insurers, no formal policy is to be issued.

| |
|---|
| Contract Leader |

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

OTHER AGREEMENT
PARTIES FOR
CONTRACT CHANGES,
IF ANY, FOR PART
2 GUA CHANGES
ONLY:                    Slip Leader only to agree Part 2 GUA Changes.

AGREEMENT PARTIES
FOR CONTRACT
CHANGES, FOR THEIR
PROPORTION ONLY:        None

BASIS OF CLAIMS
AGREEMENT:              Claims to be managed in accordance with:

i)       The SINGLE CLAIMS AGREEMENT PARTY ARRANGEMENTS –
         LMA9150 for claims or circumstances assigned as Single Claims
         Agreement Party Claims (SCAP Claims) or, where it is not applicable,
         then the following shall apply as appropriate:

ii)      The Lloyd's Claims Scheme (combined), or as amended or any
         successor thereto.

iii)     IUA claims agreement practices.

iv)      The practices of any company(ies) electing to agree claims in respect of
         their own participation.

CLAIMS AGREEMENT
PARTIES:                Advice and Settlement as follows (where applicable):

A.       Claims falling within the scope of the LMA9150 to be agreed by Slip Leader
         Only on behalf of all (re) insurers subscribing (1) to this Contract on the same
         contractual terms (other than premium and brokerage) and (2) to these
         Arrangements.

B.       For all other Claims:

(i)      For Lloyd's syndicates:

         The leading Lloyd's syndicate and, where required by the applicable
         Lloyd's Claims Scheme, the second Lloyd's syndicate and/or the
         Scheme Service Provider.

         The leading Lloyd's syndicate is the Slip Leader.

         The second Lloyd's syndicate (if applicable) is the Lloyd's syndicate
         whose stamp sequentially follows the Lloyd's Leader (disregarding
         any non-Lloyd's syndicate stamps).

(ii)     Those IUA companies acting in accordance with the IUA claims
         agreement practices, excepting those that may have opted out via
         ii) below.

(iii)    Those companies that have specifically elected to agree claims in
         respect of their own participation, being as follows:

Contract Leader

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

(iv)    All other subscribing Insurers that are not party to the Lloyd's/IUA claims agreement practices agree to follow the settlement and/or settlement decisions o the Slip Leader.

CLAIMS
ADMINISTRATION:    Current Xchanging Claims Services claims procedures to be followed, where applicable.

IUA Contractual Condition to apply in respect of CLASS circulations to IUA following market.

Broker is to enter claim advices, via ECF, onto CLASS system as appropriate, for agreement by Insurers.

Distribution of claim file information to Insurers by Miles Smith Broking Limited may be by electronic (or paper) means, as they may deem appropriate.

Unless specified otherwise by Miles Smith Broking Limited or within the Risk Details upon submission of a collecting to Miles Smith Broking Limited, such Insurers agree to make payment to Miles Smith Broking Limited within 10 working days following agreement by all applicable Claims Agreement Parties of the Main Market Placement.

Miles Smith Broking Limited and Insurers agree that any claims hereunder (including any claims related costs/fees) may be notified and administered via ECF with any payment(s) processed via CLASS.

All non-bureau and overseas markets are to settle by electronic transfer.

RULES AND EXTENT
OF ANY OTHER
DELEGATED
CLAIMS AUTHORITY:    None, unless otherwise specified here by any of the Claims Agreement Parties Shown Above.

EXPERT(S) FEE
COLLECTION:    Miles Smith Broking Limited to collect any fees

SETTLEMENT
DUE DATE:    24 December 2021

BUREAUX
ARRANGEMENTS:    Premium and/or accounts to be presented to Xchanging Ins-sure Services. Accounts to be presented on a delinked basis, where considered appropriate.

Premium Payment requirements are deemed met if premium and/or accounts are presented and/or correctly released for settlement to Xchanging Ins-sure Services in line with bureaus procedures on or before the Settlement Due Date (SDD). Where the SDD or due date falls upon a weekend or public holiday, presentation to Xchanging Ins-sure Services or Insurers hereon as applicable on the next working day thereafter will be deemed to be in compliance with the SDD and/or any Premium Payment Warranty (PPW) or Premium Condition (PPC).

Xchanging Ins-sure Services Ltd. Are authorised to sign all subsequent instalments as additional premiums.

Contract Leader

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

In the event of partial premium being received from the Insured by Miles Smith Broking Limited, Insurers agree to accept such premium and Xchanging Ins-sure Services are authorised to take down such premium including from individual insureds and/or territories as required.

Xchanging Ins-sure Services are authorised to accept annual premium resigning and to allocate annual premiums to their respective years of account. Alternatively, premium in respect of subsequent years of account. Alternatively, premium in respect of subsequent periods beyond the first annual period may be paid to the first year of account.

Xchanging Ins-sure Services are authorised to accept and settle accounts, received by Miles Smith Broking Limited in convertible currencies, at rates of exchange declared by Miles Smith Broking Limited.

Premiums additional premiums, return premiums, adjustments, cancellations, non-premiums endorsements and/or claims may be agreed and collected on certified copies of slips, signing slips, off-slip and/or to accept renewal receipt, all without production of the policy or the expiring slip, as required.

Where any PPW or PPC is extended beyond, or requires payment by a later date than, the SDD, the SDD is deemed to have been automatically amended to the same date as the PPW or PPC due date and shall not be recorded as late signed.

If an Insured or Insurer request a formal policy, Xchanging Ins-sure Services are authorised to sign policy (ies) in multiple copies, as required, for purposes designated therein, and to issue separate policies as required.

Contract Leader

| Policy Number: | MSB |
|---|---|
| MSB/0740/21F3121 | 0740 |

## FISCAL AND REGULATORY

**TAX PAYABLE BY
INSURER(S):**  None applicable

**COUNTRY OF ORIGIN:**  United States of America

**REGULATORY RISK
LOCATION:**  United States of America

**OVERSEAS BROKER:**  Crystal & Co
32 Old Slip
New York NY 10005
United States of America

**SURPLUS LINES
BROKER:**  Crystal & Co
32 Old Slip
New York NY 10005
United States of America

Surplus Lines License Number:  OK19767

**STATE OF FILING**:  California

**US CLASSIFICATION:**  US Surplus Lines

**ALLOCATION OF
PREMIUM TO CODING:**  F2 – 100%

**REGULATORY CLIENT
CLASSIFICATION:**  Large Risk

Contract Leader

12

| Policy Number: | **MSB** |
| --- | --- |
| MSB/0740/21F3121 | **0740** |

**BROKER REMUNERATION & DEDUCTIONS**

FEE PAYABLE
BY CLIENT:                    No

TOTAL
BROKERAGE:               22.50%

OTHER DEDUCTIONS
FROM PREMIUM:          None

Contract Leader

This contract is subject to US state surplus lines requirements. It is the responsibility of the surplus lines broker to affix a surplus lines notice to the contract document before it is provided to the insured. In the event that the surplus lines notice is not affixed to the contract document the insured should contact the surplus lines broker.

# CALIFORNIA SURPLUS LINES NOTICE 1 (POST BIND)

NOTICE:

1.    THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA.    THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2.    THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3.    THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4.    THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357 OR INTERNET WEB SITE WWW.INSURANCE.CA.GOV . ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER.  YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEBSITE AT WWW.NAIC.ORG .

5.    FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6.    FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL

INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV .

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

LMA9098A
04 May 2017

**SECURITIES BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE**

**In consideration of the payment of the premium specified, Insurers agree to provide insurance to the extent and in the manner set out in this document.  This document should be read as a whole, in conjunction with the attached contract wording(s), clauses and schedule(s).**

**DECLARATIONS**

Policy No: B074021F3121

1. **Broker/Dealer**:          Emerson Equity, LLC.

   Address:             155 Bovet Road, Suite 725, San Mateo, CA 94402.

2. **Policy Period**:       From:  25 October 2021
                              To:     25 October 2022

                              Both days inclusive Local Standard Time at address above.

3. Limits of Liability:    USD 5,000,000 each **Claim** and in the aggregate.

                              New York **Registered Representative** Coverage: Not Applicable

4. Retention:             USD 250,000 each and every **Claim** but USD 100,000 each and every **Claim** in respect of the **Professional Services** as defined under 3(l)(2) and 3(l)(3)

5. Retroactive Date: 11th November 2004, but 25th October 2019 in respect of USD 4,000,000 aggregate limit of liability in excess of USD 1,000,000 aggregate limit of liability.

6. Premium: ▮▮▮▮▮▮▮

   Payment Terms: 60 Day premium payment condition in accordance with the Premium Payment Clause (LSW 3001).

7. Notice of **Claim** to:   Insurers via:
                              Miles Smith Broking Limited
                              One America Square
                              London
                              EC3N 2LB

                              fps@srinternational.co.uk & claims@srinternational.co.uk

8. Notice of Election
   of Discovery to:       Miles Smith Broking Limited
                              One America Square
                              London
                              EC3N 2LB
                              fps@srinternational.co.uk & claims@srinternational.co.uk

9. Service of Suit:        Stefan Dandelles, Managing Partner
                              Kaufman Dolowich & Voluck LLP
                              55 E. Monroe, Suite 2950
                              Chicago, IL 60603
                              United States of America

10.    Discovery Terms: Additional Premium: 150% of the "full annual premium"
                      Discovery Period:    12 months

11.    Choice of Law: California

Forms and Endorsements attached hereto: As attached.


**Governing Law & Jurisdiction of this Contract**:

Any dispute between the Insured and Insurers concerning the interpretation of this Policy shall be subject
to the laws of California and to the exclusive jurisdiction of any competent court within USA.

## SECURITIES BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the application and its attachments and the material incorporated therein, and subject to the Limit of Liability and all other terms and conditions contained herein, Underwriters at Lloyd's, hereinafter called the "Insurer", agrees as follows:

1.   **INSURING AGREEMENTS**

    **A.**   **BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE      (INCLUDING FAILURE TO SUPERVISE)**

        This policy shall pay on behalf of the **Broker/Dealer Loss** arising from a **Claim** first made against the **Broker/Dealer** during the **Policy Period** or the Discovery Period  (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Broker/Dealer**:

        1.   in the rendering or failure to render **Professional Services** by the **Broker/Dealer**; or

        2.   in **Failing to Supervise** a **Registered Representative** in the rendering or failure to render **Professional Services** by such **Registered Representative** on the behalf of the **Broker/Dealer.**

    **B.**   **REGISTERED REPRESENTATIVE PROFESSIONAL LIABILITY INSURANCE**

        This policy shall pay on behalf of a **Registered Representative Loss** arising from a **Claim** first made against the **Registered Representative** during the **Policy Period** or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Registered Representative** in the rendering or failure to render **Professional Services** on behalf of the **Broker/Dealer**.

2.   **DEFENSE, INVESTIGATION AND SETTLEMENT (INCLUDED IN THE LIMITS OF LIABILITY) A. Defense.**

        The Insurer shall have the right and duty to defend, subject to and as part of the Limits of Liability, any **Claim** made against an **Insured** during the **Policy Period** or Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** for which coverage is afforded by this policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent.

    **B.**   **Investigation and Settlement**

        The Insurer shall have the right to make any investigation it deems necessary with respect to any **Claim** or notice of circumstances under this policy. The Insurer shall have the right to make any settlement of a **Claim** under this policy it deems expedient.

        In the event an opportunity arises whereby any **Claim** can be settled within the applicable retention and the **Insured**(s) refuse to settle such **Claim**, the Insurer shall not be liable for any **Loss** in respect of such **Claim**. Further, in the event the **Insured**(s) refuse to consent to a settlement agreeable to both the claimant/plaintiff and the Insurer, then the Insurer's liability for all **Loss** including **Defense Costs** on account of such **Claim** shall not exceed the total sum of the amount for which the **Claim** could have been settled plus **Defense Costs** incurred up to the date of the **Insured's** refusal to consent to such settlement.

In all events, the Insurer shall not be obligated to settle any **Claim**, pay any **Loss** or undertake or continue defense of any **Claim** after the applicable Limit of Liability has been exhausted by settlement of a **Claim**(s) or payment of **Loss**. In each such case, the Insurer shall have the right to withdraw from the further defense of the **Claim** by tendering control of the defense to the **Insured**(s).

The **Insured**(s) shall not admit liability for or settle any **Claim** or incur any **Defense Costs** without the Insurer's prior written consent. The **Insured**(s) shall give the Insurer and defense counsel full cooperation and such information as the Insurer and defense counsel reasonably request; including upon the Insurer's request, assisting in making settlements in the conduct of **Claims**, attending hearings, trials, arbitrations, mediations, and assisting in securing and giving evidence and obtaining the attendance of witnesses.

If all **Insured** defendants are able to dispose of all **Claims** which are subject to one retention amount for an amount not exceeding the retention amount (inclusive of **Defense Costs**), then the Insurer's consent to such disposition shall not be required for such **Claims**.

3.   **DEFINITIONS**

(a)   **"Approved Activity"** means a service or activity performed by the **Registered Representative** on behalf of the **Broker/Dealer** which:

   (1)   has been approved in writing in advance of such service or activity by the **Broker/Dealer** to be performed by the **Registered Representative**, and is

   (2)   in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the **Broker/Dealer** to be transacted through the **Registered Representative**, and for which

   (3)   the **Registered Representative** has obtained all licenses required by the **Broker/Dealer** or applicable law or regulation.

(b)   **"Broker/Dealer"** means the **Broker/Dealer** designated in Item 1 of the Declarations and any **Subsidiary** thereof; in addition, solely for purposes of coverage under Insuring Agreement A, **Broker/Dealer** shall also mean any director, officer, partner or employee of the **Broker/Dealer** against whom a **Claim** is made in his or her supervisory capacity.

(c)   **"Claim"** means the following brought by an **Insured's** customer or client in such capacity:

   (1)   a written demand for monetary relief; or

   (2)   a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:

      (i)   service of a complaint or similar pleading; or

      (ii)   receipt or filing of an arbitration demand or statement of claim.

(d)   **"Covered Call Options"** means only exchange-traded short call options on stock actually owned by the **Insured's** client throughout the option's life.

(e)   "**Defense Costs**" means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured**(s), but excluding salaries of any **Insured**.

(f)  "**Failing to Supervise**" means the failure to create, implement, enact or enforce any applicable supervisory procedures required by law, common or statutory, regulation, governmental authority or regulation authority or self-regulatory authority, including but not limited to the procedures established by the Financial Industry Regulatory Authority ("FINRA") as outlined in Section 3000 of the FINRA Rules, and any amendments thereto.

(g)  "**Insured**" means:

   (1)  the **Broker/Dealer**

   (2)  any past, present or future director, officer, partner or employee of the **Broker/Dealer** (other than a **Registered Representative**), but only if covered under Insuring Agreement B.; and

   (3)  any **Registered Representatives** of the **Broker/Dealer.**

(h)  "**Interrelated Wrongful Act(s)**" means **Wrongful Acts** which are the same, related or continuous, or **Wrongful Act**s which arise from the same, related or common nexus of facts regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.  Further, and without limiting the aforementioned, the following **Claims** shall automatically be deemed to allege **Interrelated Wrongful Acts**:

   1.  **Claims** in connection with securities of any entity (or affiliated entities) which become(s) the subject of any bankruptcy, insolvency, receivership, liquidation or reorganization proceeding, or

   2.  **Claims** in connection with securities purchased in connection with an offering (or series of offerings) of securities issued by the same entity or affiliated entities;

(i)  "**Investment Banking Activity**" means, but is not limited to, the underwriting, syndicating or promotion of any security or partnership interest in connection with any of the following: any actual, alleged or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, reorganization (voluntary or involuntary), capital restructuring, recapitalization, spin-offs, primary or secondary offerings of securities (regardless of whether the offering is a public offering or private placement), dissolution or sale of all or substantially all of the assets or stock of a business entity, or effort to raise or furnish capital or financing for any enterprise or entity, or any acquisition or sale of securities by the **Broker/Dealer** for its own account, or any activity by any **Insured** as a specialist or market maker (including the failure to make a market) for any securities, or any disclosure requirements in connection with any of the foregoing. **Investment Banking** also includes the rendering of advice or recommendations or the rendering of a written opinion in connection with any of the foregoing.

(j)  "**Loss**" means damages, judgments, settlements and **Defense Costs**; however, **Loss** shall not include:

   1.  salaries of any **Insured**;

   2.  the cost of complying with any settlement for or award of non-monetary relief;

   3.  civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amounts for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed; not withstanding the foregoing, **Loss** shall include awards of punitive or exemplary

damages (where insurable by law) in an amount not greater than the amount of the compensatory damages award; and

4. the return of fees, commissions, or other compensation for any **Professional Services** rendered or required to be rendered by the **Insured** or that portion of any settlement or award in an amount equal to such fees, commissions, or other compensation.

(k) "**Policy Period**" means the period from the inception date of this policy shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

(l) "**Professional Services**" means the following services if rendered in connection with an **Approved Activity** for or on the behalf of a customer or client of the **Broker/Dealer** pursuant to a written agreement between the **Broker/Dealer** and the customer or client:

1. purchase or sale of securities, including investment companies,

2. purchase or sale of fixed annuities, variable annuities and indexed annuities,

3. purchase or sale of life or accident and health insurance,

4. providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployee welfare arrangements),

5. advice provided to a Client in accordance with the Investment Advisors Act 1940, as amended, concerning securities and products provided that such securities and products are approved and authorized by the **Broker/Dealer** and only to the extent such coverage is added to this policy by specific endorsement attached hereto;

and in connection with or incidental to any of the foregoing 5 activities:

(i) providing economic advice, financial advice or investment advisory services, or

(ii) providing financial planning advice including without limitation any of the following activities in conjunction therewith:  the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or taxes.

(m) "**Registered Representative**" means an individual who is registered with FINRA, including a registered principal, and who for compensation engages in the business of rendering **Professional Services** on behalf of the **Broker/Dealer** pursuant to a valid written contract in force at the time a **Claim** is first made.

For purposes of coverage under Insuring Agreement A.2., **Registered Representative** shall include a former **Registered Representative** if acting on behalf of the **Broker/Dealer** at the time of the alleged **Wrongful Act**.

For purposes of New York **registered Representative** coverage, **Registered Representative** shall also include a **Registered Representative** who is domiciled and/or maintains a principal place of business in the State of New York

(n)   "**Subsidiary**" means:

    1.   a corporation of which the **Broker/Dealer** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its subsidiaries;

    2.   automatically a corporation created, or acquired during the **Policy Period** if the number of **Registered Representative**s of such other corporation total less than 10% of the total number of **Registered Representative**s of the **Broker/Dealer** as of inception date of this policy.  The **Broker/Dealer** shall provide the Insurer with full particulars of the new within 30 days of creation or acquisition or before the end of the **Policy Period** whichever comes first;

    3.   a corporation created, or acquired during the **Policy Period** (other than a corporation described in paragraph (2) above) but only upon the condition that within 30 days of its becoming a **Subsidiary**, the **Broker/Dealer** shall have provided the Insurer with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new **Subsidiary**.  Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Broker/Dealer** paying when due any additional premium required by the Insurer relating to such new **Subsidiary**.

    A **Broker/Dealer** creates or acquires a **Subsidiary** when the **Broker/Dealer** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.  A corporation ceases to be a **Subsidiary** when the **Broker/Dealer** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.

    In all events, coverage as is afforded with respect to a **Claim** made against a **Subsidiary** or any director, officer, employee or **Registered Representative** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

(o)   "**Wrongful Act**" means any negligent act, error or omission by the **Broker/Dealer**, any director, officer, partner or employee thereof, or by any **Registered Representative** thereof and solely in their respective capacities as such.

**4.    EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from a **Claim** made against the estates, legal heirs, or legal representatives of any deceased individual **Insured**, and the legal representatives of such individual **Insured** in the event of incompetency, insolvency or bankruptcy, who were individual **Insured** at the time the **Wrongful Act**s upon which such **Claims** are based were committed.

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from a **Claim** made against the lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an individual **Insured** for a **Claim** arising solely out of his or her status as the spouse or domestic partner of an individual **Insured**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the individual **Insured** and the spouse or domestic partner, or property transferred from the individual **Insured** to the spouse or domestic partner; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act**s of the spouse or domestic partner, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Act**s of an individual **Insured**, subject to the policy's terms, conditions and exclusions.

5. **EXCLUSIONS**

The Insurer shall not be liable for **Loss** in connection with any **Claim** made against an **Insured**:

a) alleging, arising out of, based upon or attributable to the gaining in fact any profit or advantage to which the **Insured** was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

b) alleging, arising out of, based upon or attributable to the committing in fact of: any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

c) for bodily injury, sickness, disease, death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from libel or slander or defamation or disparagement, or for injury from a violation of a person's right of privacy.

d) alleging, arising out of, based upon or attributable to any bankruptcy, insolvency, conservatorship, receivership or liquidation of, or suspension of payment or refusal to pay by any broker or dealer in securities or commodities, clearing agency, or any bank or banking firm, or any insurance or reinsurance entity or any **Insured**; provided, however, this exclusion will not apply to **Wrongful Acts** solely in connection with any **Insured's** investment on the behalf of the claimant in the stock of any of the foregoing entities;

e) alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the inception date of the first Securities **Broker/Dealer's** Errors And Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the **Broker/Dealer** designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any **Insured** knew or could have reasonably forseen that such **Wrongful Act** could lead to a **Claim**, or alleging, arising out of, based upon or attributable to any subsequent **Interrelated Wrongful Act**;

f) alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent **Interrelated Wrongful Act**;

g) alleging, arising out of, based upon or attributable to any: (i) employee benefit plan or trust sponsored by any **Insured** or sponsored by any business enterprise that is operated or managed or owned, directly or indirectly, in whole or in part, by any **Insured**; or (ii) any plan in which an **Insured** is a participant or is a named fiduciary; or arising out of, based upon or attributable to any services performed by any **Insured** acting in fact as a trustee, administrator or fiduciary under the Employee Retirement Income Security Act of 1974, or amendments thereto, or any similar federal or state statutory law or any regulation or order issued pursuant thereto;

h) brought by or on behalf of any **Insured**, or the successors or assigns of any **Insured**; or by or on behalf or any enterprise, trust or other entity that is operated or managed or owned, directly or indirectly, in whole or in part, by any **Insured**; or for which any **Insured** is a trustee, fiduciary, director or officer thereof;

i) alleging, arising out of, based upon or attributable to, in whole or in part, any **Investment Banking Activity** by an **Insured**, including but not limited to any disclosure requirements in connection with such **Investment Banking Activity**;

j) alleging, arising out of, based upon or attributable to the facts alleged, or arising out of the same or **Interrelated Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

k) brought by or on behalf of any clearing agency, or alleging, arising out of, based upon or attributable to any function of any **Insured** as a clearing agency;

l) alleging, arising out of, based upon or attributable to any: use by any **Insured** of, or aiding or abetting by any **Insured** in the use of, or participating after the fact by any **Insured** in the use of, non-public information in a manner prohibited by the laws of the United States, including, but not limited to, the Insider Trading and Securities Fraud Endorsement Act of 1988 (as amended), Section 10(b) of the Securities Exchange Act of 1934 (as amended) and Rule 10b-5 thereunder, any state, commonwealth, territory or subdivision thereof, or the laws of any other jurisdiction, or any rules or regulations promulgated under any of the foregoing;

m) alleging, arising out of, based upon or attributable to the purchase or sale of (or failure to purchase or sell) any of the following, or any advice in connection therewith:

    1) commodities, futures contracts, forwards contracts or any type of option or futures contract, or any similar investment or investment product, except **Covered Call Options**;

    2) any collectible, including but not limited to stamps, art, cards, jewellery, antiques or any other tangible personal property; or

    3) any equity security priced under USD5.00 at the time that the **Wrongful Act** triggering such **Claim** arose; however, this exclusion shall not apply if the security is:

        (i) registered, or approved for registration upon notice of issuance, on a national securities exchange; or

        (ii) authorized, or approved for authorization upon notice of issuance, for quotation in the NASDAQ National Market System or the NASDAQ Capital Market; or

        (iii) issued by an investment company registered under the Investment Company Act of 1940 (as amended); or

    4) any security in any market outside of the United States of America and its territories and possessions and Canada; or

    5) annuities used in connection with any structured settlement;

n) alleging, arising out of, based upon or attributable to any mechanical or electronic failure, breakdown or malfunction of machines or systems;

o) brought by or on behalf of, or instigated or continued with the solicitation, assistance, participation or intervention of, any State or Federal regulatory or administrative agency or bureau or any other governmental, quasi-governmental or self-regulatory entity ("Governmental Entity"), whether directly or indirectly, and whether brought in its capacity as trustee, liquidator, or assignee of the **Broker/Dealer**, or in any other capacity and whether brought in its own name or in the name of any other entity; however, this exclusion shall not apply to any **Claim** brought solely in such Governmental Entity's capacity as a customer or client of the **Broker/Dealer** and instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured**.

p) alleging, arising out of, based upon or attributable to the rendering of or failure to render any of the following services or activities:

    (i) actuarial,
    (ii) accounting,

(iii)   legal,

(iv)   real estate agent or broker, or

(v)   tax preparation or appearing before the Internal Revenue Service as an enrolled agent;

q)   for any actual or alleged **Wrongful Act** in rendering or failure to render **Professional Services** to any securities broker/dealer; however this exclusion shall not apply if the **Professional Service** is solely the purchase or sale of securities to such broker/dealer for its own account;

r)   with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the **Registered Representative** other than a covered **Professional Service**, including but not limited to "selling away";

s)   alleging, arising out of, based upon or attributable to an **Insured** exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any **Insured's** purchase or sale of no-load investment company or variable annuities in which there is no initial or contingent sales charge or commission; further, this exclusion shall not to apply to **Registered Investment Advisors** where the customer has authorized the exercise of discretionary authority or control in writing, prior to the exercise of such discretion or control taking place;

t)   alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an **Insured**, in part or in whole, of any entity other than the **Broker/Dealer** including but not limited to general partnerships, including but not limited to **Claims** arising out of an **Insured** acting as a general partner of any limited partnership and/or managing general partner of any general partnership;

u)   alleging, arising out of, based upon or attributable to any liability assumed by the **Insured** under any indemnification contract or agreement, either oral or in writing; however, this exclusion does not apply to liability that would exist in the absence of such contract or agreement;

v)   alleging, arising out of, based upon or attributable to employment or work place practices, including **Claims** arising under worker compensation laws or **Claims** in respect of alleged discrimination, retaliation, harassment, wrongful termination or inappropriate employment conduct of any sort;

w)   alleging, arising out of, based upon or attributable to the presence or actual, alleged, or threatened discharge, seepage, dispersal, migration, release, escape, generation, transportation, storage, or disposal of pollutants at any time, including any request, demand or order that the **Insured** or others test for, monitor, clean up, remove, assess, or respond to the effects of pollutants.  Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, odors, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed;

x)   arising from any **Claim** based upon or attributable to any failure or omission on the part of the **Insured** to effect and maintain adequate insurance;

y)   alleging, arising out of, based upon, or attributable to depreciation (or failure to appreciate) in value of any investments, including but not limited to securities, leased products, commodities, currencies, options and futures transactions as to which the **Insured** has expressly or implicitly made a guarantee, representation or warranty as to the performance of such investments;

z)   arising out of an act, error or omission arising out of **Professional Services** for which the **Insured**, its Employees, Agents or Representatives did not hold a correct and valid license issued by the appropriate regulatory authority.

aa)   based upon, arising out of, directly or indirectly from or in consequence of, or in any way involving any actual or alleged:

1)     solicitation or receipt of any excessive, additional, undisclosed, improper or illegal Compensation relating to an Offering, or Compensation greater than that disclosed in the prospectus or registration statement relating to the Offering;

2)     improper solicitations or agreements, whether express or implied, relating to any Offering, including, but not limited to, solicitations or tie-in agreements to purchase: (i) additional shares of a company's stock at pre-determined prices; or (ii) shares of another corporation's stock; or

3)     violation of Regulations S-K or M of the Securities Exchange Commission, or Conduct Rules 2110 and 2440 of the National Association of Securities Dealers.

For the purpose of this Exclusion, the term "Offering" shall mean the public or private sale of a company's stock, including, but not limited to, an initial public offering, secondary offering or a private placement.

For the purposes of this Exclusion, the term "Compensation" shall mean any commissions, payments, fees, compensation or any other type of remuneration. "Compensation" shall also mean kickbacks, bribes or any other similar type of payments.

bb)   arising directly or indirectly out of, or in any manner related to:

1)     the manufacture, mining, processing, distribution, testing, remediation, removal, storage, disposal, sale, use of or exposure to asbestos or materials or products containing asbestos whether or not there is another cause of **Loss** which may have contributed concurrently or in any sequence to a **Claim**, or

2)     "Fungi" whether or not there is another cause of **Loss** which may have contributed concurrently or in any sequence to a **Claim**; "Fungi" as utilized herein shall mean any fungus or mycota or any by-product or type of infestation produced by such fungus or mycota, including but not limited to mold, mildew, mycotoxins, spores or any biogenic aerosols, or

3)     lead or lead containing products.

cc) arising out of, in connection with, or in any way related to any intentional, Corporate or Business Policy.

For purposes of this Exclusion, "Corporate or Business Policy" shall mean any policy which as been expressly or impliedly approved, ratified, condoned or endorsed by two or more of the **Insured's** Management and which results in:

1)     a financial disadvantage to two or more of the **Insured's** clients or any group or class of the **Insured's** clients, and

2)     the **Insured** making a financial gain to which they were not entitled, whether or not such gain is returned to the client(s).

The **Insured's** Management shall be deemed to be the **Insured's** executive level officers, including but not limited to the CEO, President, COO, CCO, CFO and General Counsel.

dd) for the reimbursement of fees, commissions, costs or other charges paid or payable to the **Insured** or any third party claim based upon allegations against the **Insured** of excessive fees, commissions, costs or other charges.

6.    **LIMITS OF LIABILITY**

A.    The Limit of Liability stated in Item 3of the Declarations as "each **Claim**" is the limit of the Insurer's liability for all **Loss** arising out of all **Claims** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts**. This "each **Claim**" limit shall be part of and not in addition to the "aggregate for all **Claims**" limit set forth in Items 3 of the Declarations as well as the "Policy Aggregate" limit set forth in Item 3 of the Declarations, as described below.

B.    The Limits of Liability stated in Items 3 and 3 of the Declarations as "aggregate for all **Claims**" is the total limit of the Insurer's liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein.  This "aggregate for all **Claims**" limit shall be part of and not in addition to the "Policy Aggregate" limit set forth in Item 3 of the Declarations, as described below.

C.    The Limits of Liability stated in Item 3 of the Declarations whether as "each **Claim**" or "aggregate for all **Claims**" shall apply to **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein for which coverage is provided, in whole or in part, under Insuring Agreement A.1. and A.2.

D.    The Limits of Liability stated in Item 3 of the Declarations whether as "each **Claim**" or "aggregate for all **Claims**" shall apply to **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein for which coverage is provided by this policy other than a **Claim** for which coverage is provided, in whole or in part, under Insuring Agreement B.

E.    The Limit of Liability stated in Item 3 of the Declarations is the aggregate total limit of the Insurer's liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein under this policy.

F.    In the event of the total erosion of Limit of Liability stated in Item 3 of the Declarations, the Limit of Liability for a **Registered Representative** domiciled or with a principal place of business in New York as stated in Item 3 of the Declarations shall be made available to each such New York **Registered Representative**.

The total limit of liability available to any one New York **Registered Representative** following the total erosion of the Limit of Liability in Item 3 of the Declarations will be the "aggregate for all **Claims**" Limit of Liability as stated in Item 3 of the Declarations for each such New York **Registered Representative**.

The "each **Claim**" and "aggregate for all **Claims**" Limit of Liability set forth in Item 3 of the Declarations is only available to the number of New York **Registered Representatives** as identified in Item 3 of the Declarations.

G.    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts**, regardless of the causes of action plead or the number or identity of claimants involved, shall be deemed to constitute a single **Claim**, and shall be deemed to have been made at the earliest of the following times:

1.    the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

2.    the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section 8 below.

H.    The Limit of Liability for the Discovery Period shall be part of, and not in addition to, the applicable Limit of Liability for the **Policy Period**.  Further, a **Claim** which is made subsequent to the **Policy Period** or the Discovery Period (if applicable) which pursuant to Clause 8(b) or

8(c) is considered made during the **Policy Period** or the Discovery Period shall also be subject to the aggregate Limit of Liability stated in Item 3 of the Declarations.

l.       **Defense Costs** are not payable by the Insurer in addition to the Limit of Liability. **Defense Costs** are part of **Loss** and as such are subject to the applicable Limit of Liability.

**7.       RETENTION**

The Insurer shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention Amount stated in Item 4 of the Declarations, such Retention Amount to be borne by the **Insureds** and shall remain uninsured with regard to all **Loss** arising from any **Claim**.

The Retention stated in Item 4A of the Declarations as the "**Broker/Dealer** Retention" shall apply to **Claims** for which coverage is provided under Insuring Agreement A of this policy.
The Retention stated in Item 4B of the Declarations as the "**Registered Representative** Retention" shall apply to **Claims** for which coverage is provided under Insuring Agreement B of this policy.

In the event of a **Claim** (or **Claims** alleging **Interrelated Wrongful Acts**) for which more than one retention amount set forth in Item 4 of the Declarations is applicable, then all such retentions shall apply to the **Claim**(s); provided, however, that the maximum retention amount shall not exceed the highest applicable single retention amount.

**8.       NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the person or entity identified in Item 7 of the declarations page.  If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a)       The **Broker/Dealer** or the **Insured** shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a **Claim** made against an **Insured** as soon as practicable during the **Policy Period** or during the Discovery Period (if applicable) and in no event more than 30 days after the date such **Claim** was first made against an **Insured**.

(b)       If written notice of a **Claim** has been given to the Insurer pursuant to Clause 8 (a) above, then a **Claim** which is subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be considered made at the time such notice was given.

(c)       If during the **Policy Period** or during the Discovery Period (if applicable) the **Broker/Dealer** or the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

**9.**   **PROTECTION FOR INNOCENT INSURED**

Whenever coverage under this policy would be excluded under Exclusion a) or b) because an **Insured** committed a criminal or deliberately fraudulent act; or wilfully violated the law or gained a profit or advantage to which the **Insured** was not legally entitled, the coverage otherwise afforded under this policy to a natural person **Insured** will continue to apply to each such **Insured** who did not personally commit or personally participate in committing such criminal or deliberately fraudulent act; did not wilfully violate the law or gain a profit or advantage; and did not personally acquiesce in or remain passive after having personal knowledge or becoming aware of one or more such acts, wilful violation or improper gain as set forth in Exclusions a) and b).

**10.**   **DISCOVERY CLAUSE**

Except as indicated below, if the Insurer shall cancel or refuse to renew this policy, the **Broker/Dealer** shall have the right, upon payment of the additional premium specified in Item 10 a) of the Declarations, to the period specified in Item 10 b) of the Declarations, following the effective date of such cancellation or nonrenewal (herein referred to as the Discovery Period) in which to give to the Insurer written notice of **Claims** first made against the **Insured** during said one year period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the **Policy Period**. The rights contained in this paragraph shall terminate, however, unless written notice of such election, together with the additional premium due is received by the Insurer within thirty (30) days of the effective date of cancellation or non-renewal.

In the event of a Transaction, as defined in Clause 12, the **Broker/Dealer** shall have the right, within thirty (30) days of the end of the **Policy Period**, to request an offer from the Insurer of a Discovery Period (with respect to **Wrongful Act**s occurring prior to the effective time of the Transaction) for a period of one year. The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide. In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph."
The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period. The Discovery Period is not cancellable. This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The offer by the Insurer of renewal terms, conditions, Limits of Liability and/or premiums different from those of the expiring policy shall not constitute a refusal to renew.

**11.**   **CANCELLATION CLAUSE**

This policy may be cancelled by the **Broker/Dealer** first named in Item 1 of the Declarations at any time only by mailing written prior notice to the Insurer stating when thereafter such cancellation shall be effective, or by surrender of this policy to the Insurer or its authorized agent. This policy may also be cancelled by or on behalf of the Insurer by delivering to the **Broker/Dealer** or by mailing to the **Broker/Dealer**, by registered, certified, or other first class mail, at the **Broker/Dealer's** address as shown in Item 1 of the Declarations, written notice stating when, not less than sixty (60) days thereafter, or ten (10) days thereafter in the event of nonpayment of premium when due, the cancellation shall be effective. The mailing of such notice as aforesaid shall be sufficient proof of notice. The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be cancelled by the **Broker/Dealer**, the Insurer shall retain the customary short rate proportion of the premium hereon.

If this policy shall be cancelled by the Insurer, the Insurer shall retain the pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.  If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

## 12.   CHANGE IN CONTROL OF BROKER/DEALER

If during the **Policy Period**:

a.     the **Broker/Dealer** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

b.     any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the **Broker/Dealer**, or acquires the voting rights of such an amount of such securities;

(either of the above events herein referred to as the "Transaction")

then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be cancelled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The **Broker/Dealer** shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The **Broker/Dealer** shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

## 13.   SUBROGATION

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the **Broker/Dealer's** and the **Insureds'** rights of recovery thereof, and the **Broker/Dealer** and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Broker/Dealer** and/or the **Insured**s.  In no event, however, shall the Insurer exercise its rights to subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been judicially determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such **Insured** was not legally entitled, or arising out of an act other than a covered **Professional Service**.

## 14.   OTHER INSURANCE

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

## 15.   NOTICE AND AUTHORITY

It is agreed that the **Broker/Dealer** first named in Item 1 of the Declarations shall act on behalf of **Insureds** with respect to the giving of notice of **Claim** or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.  Notice to any agent or knowledge possessed by any agent or any other person shall not effect a waiver or a change in any part of this

policy or stop the Insurer from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed except by endorsement issued to form a part of this policy and signed by an authorized representative of the Insurer.

16. **TERRITORY**

This policy applies to **Claims** which are brought anywhere in the World.

17. **ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

18. **ALTERNATIVE DISPUTE RESOLUTION PROCESS**

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the Insurer or the **Insured(s)** may elect the type of ADR discussed below; provided, however, that the **Insureds** shall have the right to reject the Insurer's choice of ADR at any time prior to its commencement, in which case the **Insureds'** choice of ADR shall control.

The Insurer and **Insured(s)** agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and **Insureds** shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing commercial arbitration rules, in which the arbitration panel shall be composed of three disinterested individuals.  In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.  The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the **Broker/Dealer** is incorporated in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even handed fashion in the manner most consistent with the relevant terms, conditions, provisions or exclusions of the policy.  In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs.  In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation.  In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the **Broker/Dealer**.  The **Broker/Dealer** shall act on behalf of all **Insureds** in deciding to proceed with ADR under this clause.

19. **ACTION AGAINST INSURER**

Except as provided in Clause 18 of this policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.  No person or organization shall have any right under this policy to join the

Insurer as a party to any action against the **Insureds** or the **Broker/Dealer** to determine the **Insureds'** liability, nor shall the Insurer be impleaded by the **Insured**s or the **Broker/Dealer** or their legal representatives.  Bankruptcy or insolvency of the **Broker/Dealer** or the **Insureds** or of their estates shall not relieve the Insurer of any of its obligations hereunder.

20.   **HEADINGS**

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

21.   **SERVICE OF SUIT CLAUSE (U.S.A.)**

This Clause is not intended to conflict with or override the parties' obligation to arbitrate their disputes in accordance with Clause 18.

It is agreed that in the event of the failure of the Insurer hereon to pay any amount claimed to be due hereunder, the Insurer hereon, at the request of the **Insured**, will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Insurer's right to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. The **Insured** likewise agrees to submit to the jurisdiction of any court of competent jurisdiction.

It is further agreed that service of process in such suit may be made upon the person or entity identified in Item 9 of the Declarations, and that in any suit instituted against the Insurer, the Insurer will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of the Insurer in any such suit and/or upon the request of the **Insured** to give a written undertaking to the **Insured** that they will enter a general appearance upon the Insurer's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore the Insurers hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

22.   **CHOICE OF LAW**

This insurance shall be governed by and construed in accordance with the law of the State identified in Item 11 of the Declarations

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 01

**DEFENSE, INVESTIGATION AND SETTLEMENT AMENDATORY ENDORSEMENT**

It is hereby understood and agreed that the following amendment has been made to the policy:

1) Section **2. Defense, Investigation and Settlement (Included in the Limits of Liability)**, **B. Investigation and Settlement**, paragraph 2 is deleted in its entirety and replaced with the following:

   In the event the **Insured**(s) refuse to consent to a Settlement Opportunity, the Insurer shall have the right but not the obligation to continue the defense of the **Claim** after the date of the refusal to settle and may in such a case, at any time after the date of the refusal to settle, withdraw from the further defense of the **Claim** by tendering control of the defense to the **Insured**.

All other terms and conditions remain unchanged.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 02

## <u>PRIVATE PLACEMENT COVERAGE AMENDATORY ENDORSEMENT</u>

In consideration of the premium charged, it is hereby understood and agreed that Section 3. DEFINITIONS l) is amended to include:

(6) the purchase or sale of private placements, Reg D products, public non-traded REIT's, hedge funds, private equity funds, limited partnerships, or other unregistered securities,

(7) advisory or consulting services with respect to mergers & acquisitions and capital raising.

In consideration of the premium charged, it is hereby understood and agreed that 5. EXCLUSIONS i) is deleted and replaced with the following:

i)     Alleging, arising out of, based upon or attributable to, in whole or in part, any **Investment Banking Activity** by an **Insured**, including but not limited to any disclosure requirements in connection with the foregoing; provided, however, that this exclusion shall not apply to **Claims** arising out of:

    1. The sale by an **Insured** to a particular client or customer of any open-ended investment company or variable annuity which alleges that a client or customer of the **Broker/Dealer** was unsuitable for and wrongfully placed into such investment or variable annuity or;

    2. Private placements or whilst the **Insured** acts as a placement agent in conjunction with private placements transactions.

    3. Advisory or consulting services with respect to mergers & acquisitions and capital raising.

In consideration of the premium charged, it is hereby understood and agreed that 5. EXCLUSIONS m)3) is amended to include following:

(iv) involved in, connected to, or in any way related to a private placement transaction by any **Insured**.

The limit of liability afforded by this endorsement shall be USD 5,000,000 each **Claim** and in the aggregate which shall form part of and not in addition to the overall aggregate limit of liability as stated in Item 3 of the Policy Declarations.

The retention applicable to coverage provided by this endorsement shall be USD 250,000 each and every **Claim.**

All other terms, conditions and limitations of this policy remain unchanged.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 03

### REGISTERED INVESTMENT ADVISORY ENDORSEMENT
### (for Approved Activities)

In consideration of the premium charged it is hereby understood and agreed that, in accordance with Section 2. (I) (5), coverage as is provided under this policy is extended to include coverage to the **Insured**(s) in connection with **Approved Activities** while acting in their capacity as a registered investment advisor, subject to the terms, conditions, exclusions and endorsements of this policy. Solely with respect to the coverage provided by this endorsement, the policy is amended as follows:

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 04

## INSURING AGREEMENT

1. Insuring Agreement is amended to include the following:

**C.     REGISTERED REPRESENTATIVE PROFESSIONAL LIABILITY INSURANCE**

This policy shall pay on behalf of a **Registered Representative** acting in his/her capacity as a Registered Investment Advisor **Loss** arising from a **Claim** first made against the **Registered Representative** during the **Policy Period** or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Registered Representative** in the rendering or failure to render **Professional Services**.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 05

## DEFINITIONS

Solely with respect to Coverage provided by this endorsement, Section 3. Definitions, (a) **"Approved Activity"** shall be deleted in its entirety and replaced by the following:

> **"Approved Activity"** means a service or activity performed by the **Registered Representative** in his capacity as a Registered Investment Advisor that;
>
> (1)    has been approved by the **Broker/Dealer** to be performed by the **Registered Representative**, and is
>
> (2)    in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the **Broker/Dealer** to be transacted through the **Registered Representative**, and for which
>
> (3)    the **Registered Representative** has obtained all licenses required by the **Broker/Dealer** or applicable law or regulation.

Solely with respect to coverage provided by this endorsement, Section 3. Definitions, (m) "**Registered Representatives**" shall be deleted in its entirety and replaced by the following:

(1)    "**Registered Representative**" means an individual who is registered with the National Association of Securities Dealers, Inc., including a registered principal, and who for compensation engages in the business of rendering **Professional Services** on behalf of the **Broker/Dealer**. **Registered Representative** shall also mean a **Registered Representative** Company.

Solely with respect to coverage provided by this endorsement Section 3. Definitions, (l) shall be deleted in its entirety and replaced by the following:

(l)    "**Professional Services**" means the following services if rendered in connection with an **Approved Activity**:

> (1)    purchase or sale of securities, including investment companies.
>
> (2)    purchase or sale of fixed annuities, variable annuities or indexed annuities,
>
> (3)    purchase or sale of life or accident and health insurance
>
> (4)    providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployee welfare arrangements)
>
> (5)    services performed as a registered investment advisor but only if and to the extent such coverage is added to this policy by specific written endorsement attached hereto:

and in connection with or incidental to any of the foregoing 5 activities:

> (6)    providing economic advice, financial advice or investment advisory services, or
>
> (7)    providing financial planning advice including without limitation any of the following activities in conjunction therewith: the preparation of a financial plan or personal financial statements, the

giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or taxes.

Section 3. Definitions, is amended to include the following:

(p)     "**Registered Representative** Company" means any corporation, partnership or other business entity which engages in the conduct of **Professional Services** and which is either owned or controlled by a **Registered Representative** or in which a **Registered Representative** is an employee and then  only with respect to those operations of the business entity related to **Professional Services** provided by the **Registered Representative**.

(q)     "Registered Investment Advisor" means an investment advisor registered with the Securities and Exchange Commission, or (b) a state securities agency in the U.S.A., or (c) a securities agency of the District of Columbia

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 06

<u>**EXCLUSIONS**</u>

Notwithstanding anything contained herein to the contrary, Section 5. Exclusion (s) hereunder is deemed not to apply to Registered Investment Advisors.

The limit of liability afforded by this endorsement shall be USD 5,000,000 each Claim and in the aggregate which shall form part of and not in addition to the overall aggregate limit of liability as stated in Item 3 of the Policy Declarations.

The retention applicable to coverage provided by this endorsement shall be USD 250,000 each and every **Claim.**

All other terms, conditions and limitations remain unchanged.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 07

### LIMIT OF LIABILITY RETROACTIVE DATE(S) ENDORSEMENT.

It is hereby understood and agreed that, with respect to the following Limit(s) of Liability, the Insurer shall not be liable not make payment for **Loss** in connection with any **Claim**, including any **Interrelated Wrongful Act(s)**, occurring prior to 25th October 2019.

USD 4,000,000 each **Claim** and in the aggregate in excess of USD 1,000,000 each **Claim** and in the aggregate.

All other terms, conditions and limitations remain unchanged.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 08

**PROFESSIONAL SERVICES RETROACTIVE DATE(S) ENDORSEMENT**

It is hereby understood and agreed that, in connection with or in any way involving the following **Professional Services**, the Insurer shall not be liable not make payment for **Loss** in connection with any **Claim**, including any **Interrelated Wrongful Act(s)**, occurring prior to 25th October 2019.

- Private Placement activities as more fully defined within the Private Placement Coverage Amendatory Endorsement; or
- Registered Investment Advisor Activities as more fully defined within the Registered Investment Advisory Endorsement (for Approved Activities); or
- those Professional Services as more fully defined more fully defined under 3. (I). (1, 4 & 5), including:

    o   purchase or sale of fixed annuities, variable annuities and indexed annuities, or

    o   providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployee welfare arrangements), or

    o   advice provided to a Client in accordance with the Investment Advisors Act 1940, as amended, concerning securities and products provided that such securities and products are approved and authorized by the **Broker/Dealer** and only to the extent such coverage is added to this policy by specific endorsement attached hereto.

All other terms, conditions and limitations remain unchanged.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 09

### TROUBLED INVESTMENT EXCLUSION (GBP CAPITAL HOLDINGS, LLC. FUND(S)).

It is hereby understood and agreed that the Insurer shall not be liable to make payment for **Loss** in connection with any **Claim**, including any **Interrelated Wrongful Act(s)**, alleging, arising out of, based upon or attributable to any investment made into any of the following fund(s):

- GPB Automotive Portfolio.
- GPB Holdings II.
- GBP Holdings III.
- GPB Waste Management.

All other terms, conditions and limitations remain unchanged.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 10

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.    Under any Liability Coverage, to injury, sickness, disease, death or destruction:

    (a)    with respect to which an **Insured** under the Policy is also an **Insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an **Insured** under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.    Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.    Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    (a)    the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an **Insured** or (2) has been discharged or dispersed therefrom;

    (b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

    (c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a)   any nuclear reactor,

(b)   any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)   any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)   any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 11

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 12

## WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes **Loss**, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the **Loss**;

1.    war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2.    any act of terrorism.

For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes **Loss**, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any **Loss**, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 13

## **PREMIUM PAYMENT CLAUSE**

Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 60 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 60th day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing.  In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker.  If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked.  If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 14

## LMA CYBER AND DATA EXCLUSION FOR PROFESSIONAL INDEMNITY (FINANCIAL INSTITUTIONS)

1    Notwithstanding any provision to the contrary within this Policy or any endorsement thereto this Policy excludes any loss, damage, liability, claim, cost, defence cost, expense, fine, penalty, mitigation cost, or any other amount arising out of:

    1.1    a **Cyber Incident,** unless subject to the provisions of paragraph 2;
    1.2    a **Cyber Act**; or
    1.3    a breach of **Data Protection Law** by the Insured, or parties acting for the Insured, involving access to, processing of, use of or operation of any **Computer System** or **Data**.

2    Subject to all the terms, conditions, limitations and exclusions of this Policy or any endorsement thereto, sub-paragraph 1.1 shall not apply to any claim arising out of any actual or alleged **Wrongful Act** [1] involving access to, processing of, use of or operation of any **Computer System** or **Data.**

### Definitions

3    **Computer System** means any computer, hardware, software, communications system, electronic device (including, but not limited to, smart phone, laptop, tablet, wearable device), server, cloud or microcontroller including any similar system or any configuration of the aforementioned and including any associated input, output, data storage device, networking equipment or back up facility, owned or operated by the Insured or any other party.

4    **Cyber Act** means an unauthorised, malicious or criminal act or series of related unauthorised, malicious or criminal acts, regardless of time and place, or the threat or hoax thereof involving access to, processing of, use of or operation of any **Computer System**.

5    **Cyber Incident** means:
    5.1    any error or omission or series of related errors or omissions involving access to, processing of, use of or operation of any **Computer System**; or
    5.2    any partial or total unavailability or failure or series of related partial or total unavailability or failures to access, process, use or operate any **Computer System**.

6    **Data** means information, facts, concepts, code or any other information of any kind that is recorded or transmitted in a form to be used, accessed, processed, transmitted or stored by a **Computer System**.

7    **Data Protection Law** means all applicable data protection and privacy legislation, regulations in any country, province, state, territory or jurisdiction which governs the use, confidentiality, integrity, security and protection of personal data, and any guidance or codes of practice issued by any data protection regulator or authority from time to time (all as amended, updated or re-enacted from time to time).

LMA 5479
13 November 2020

---

[1] Please note that Wrongful Act may be substituted by Civil Liability or Neglect, Error or Omission to match your policy language.

Attaching to and forming part of Policy No.: B074021F3121

Issued to: Emerson Equity, LLC.

Endorsement No.: 15

### SANCTION LIMITATION AND EXCLUSION CLAUSE

No (re)insurer shall be deemed to provide cover and no (re)insurer shall be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose that (re)insurer to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union, United Kingdom or United States of America.

LMA3100
15 September 2010

Policy Number: (UMR) B074021F3121

## SECURITY DETAILS

**REFERENCES**

UMR (Unique Market Reference): B074021F3121

Date contract printed to PDF: 15:24 11 October 2021

## SIGNED UNDERWRITERS

**Forge Underwriting Limited**



| 37.500000% **Written** | 2 | 1 | B | F | 1 | 0 | 5 | 4 | 1 | 0 | 3 | 0 | 1 | 0 | 9 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

37.500000% **Signed**
09:29 08 October 2021
Forge Underwriting Security: PartnerRe Ireland Insurance dac (100%)
Paul Betts
**Bound as Slip Leader**

**Antares Syndicate 1274**



| 25.000000% **Written** | 3 | 0 | 2 | 9 | 2 | 9 | 5 | 0 | 0 | 0 | 2 | 1 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

25.000000% **Signed**
17:45 07 October 2021
Lloyd's Underwriter Syndicate No. 1274 AUL, London, England
Martin Campbell
**Bound**

**Volante International Limited**



| 37.500000% Written | V | F | P | 0 | 4 | 0 | 6 | 0 | 2 | 0 | 1 | 9 | 3 | 0 | | VFP/FL/04060/2019/3/PS/0/NonEEA-F2 |

37.500000% **Signed**

15:07 11 October 2021
Volante Financial & Professional Lines (a trading name of Volante International Ltd) B087519V02Z5009
2019 FI - Liberty Mutual Insurance Europe SE 100%. Premium/claims settled direct with Volante
Financial & Professional Lines
Sam Waltier
**Bound**

**Line Conditions**

Volante to agree all claims in respect of their proportion only.

Volante to agree all contract changes in respect of their proportion only.

All claims to be notified to: claims@volanteglobal.com