**KAUFMAN DOLOWICH & VOLUCK LLP**
LOUIS H. CASTORIA (State Bar No. 95768)
STEFAN R. DANDELLES (*pro hac vice*)
425 California Street, Suite 2100
San Francisco, California 94104
Telephone: (415) 926-7638
Facsimile: (415) 926-7601
Email: lcastoria@kdvlaw.com

Attorney for Defendants
FORGE UNDERWRITING LIMITED; VOLANTE
INTERNATIONAL LIMITED; CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON SUBSCRIBING TO SECURITIES
BROKER/DEALER PROFESSIONAL LIABILITY
INSURANCE POLICY NO. B074021F3121

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| EMERSON EQUITY, LLC, <br><br> Plaintiff, <br><br> v. <br><br> FORGE UNDERWRITING LIMITED, and unknown entity; VOLANTE INTERNATIONAL LIMITED, an unknown entity; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO SECURITIES BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE POLICY NO. B074021F3121, an unknown entity; and DOES 1-10 inclusive, <br><br> Defendants. | Case No. 4:22-CV-06037-HSG <br><br> [Assigned to Hon. Haywood S. Gilliam, Jr.] <br><br> **DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM; DEMAND FOR JURY TRIAL** <br><br> Courtroom: 2, Oakland Courthouse <br> Complaint Filed:  September 12, 2022 <br> (San Mateo County Superior Court) <br> Complaint Served:  September 15, 2022 <br> Notice of Removal:  October 13, 2022 |

## I.       ANSWER TO PLAINTIFF'S COMPLAINT

Defendants Forge Underwriting Limited ("Forge"), Volante International Limited ("Volante"), and Lloyd's syndicate AUL 1274 ("Antares Syndicate") (collectively, the "Insurers"), answer the Complaint filed by Plaintiff Emerson Equity, LLC ("Plaintiff" or "Emerson") as follows:

### AS TO PARTIES AND JURISDICTION:

1.       Plaintiff Emerson Equity LLC ("Emerson" or "Plaintiff") is a California limited liability company with its principal place of business in San Mateo County, California.

**ANSWER:** The Insurers admit the allegations of Paragraph 1.

2.       Defendants Forge Underwriting Limited ("Forge"), Volante International Limited ("Volante") and Certain Underwriters at Lloyd's, London Subscribing to Securities Broker/Dealer Professional Liability Insurance Policy No. B074021F3121 ("Lloyds") (collectively, "Insurers" or "Defendants") are unknown entities in the insurance industry that are not licensed by the State of California to conduct business in the State of California.

**ANSWER:** The Insurers admit subscribing to Securities Broker/Dealer Professional Liability Insurance Policy No. B074021F3121 (the "Policy") that is at issue in this matter and admit that they are non-admitted insurers in the State of California. The Insurers deny any characterization by the allegations of Paragraph 2 that the Policy was improperly issued to Emerson by the Insurers and deny all remaining allegations of Paragraph 2.

3.       Jurisdiction and venue are proper in this Court under California Code of Civil Procedure §§ 395(a), 395.5, *et. seq.* because a substantial part of the events or omissions giving rise to the claims occurred in this County because the relationships, conduct, and misrepresentations at issue occurred in this County.

**ANSWER:** The Insurers admit jurisdiction and venue were proper in the Superior Court of California, San Mateo County. The Insurers also admit that jurisdiction and venue are proper in the United States District Court for the Northern District of California, Oakland Division.

4.       Defendants are subject to jurisdiction and venue in this County because they sold insurance to a Plaintiff in this County and agreed in the insurance policy's forum selection clause to "submit to the exclusive jurisdiction of the Courts of California in the event of a dispute hereunder."

2
**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

1   **ANSWER:** The Insurers admit that the Superior Court of California, San Mateo County had

2   personal jurisdiction over them. The Insurers also admit that the Northern District of California,

3   Oakland Division has personal jurisdiction over them.

4   5.      The insurance policy's choice of law clause applies California law: "This Insurance

5   shall be governed by and construed in accordance with the law of California..."

6   **ANSWER:** The Insurers admit that Paragraph 5 purports to contain a partially quoted

7   provision from the Policy, Dkt. 5.2, Ex. A, which is a written document that speaks for itself.

8   6.      Plaintiff is ignorant of the true names and capacities of the Defendants sued herein

9   as DOES 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names.

10  Plaintiff will amend this Complaint to allege the true names and capacities of DOES 1 through

11  10, inclusive, when Plaintiff ascertains the identity of such Defendants. Plaintiff is informed and

12  believes, and thereon alleges, that each of these Defendants is responsible in some manner for the

13  acts and omissions which damaged Plaintiff, and that Plaintiff's damages as alleged herein were

14  proximately caused by Defendants' actions or omissions.

15  **ANSWER:** The Insurers lack knowledge or information sufficient to form a belief as to

16  Plaintiff's purported ignorance of the true names and capacities of any further putative defendants in

17  this action and on that basis denies each and every allegation contained in Paragraph 6 and demands

18  strict proof thereof.

19  **AS TO FIRST CAUSE OF ACTION:**

20  7.      Plaintiff re-alleges and incorporates by reference all the allegations in the preceding

21  and subsequent paragraphs of this civil complaint.

22  **ANSWER:** The Insurers re-allege and incorporate by reference all their answers to the

23  respective paragraphs.

24  8.      Plaintiff is a United States Securities and Exchange Commission ("SEC") Registered

25  Investment Advisory Firm ("RIA") and a member firm of the Financial Industry Regulatory

26  Authority ("FINRA") bearing Central Registration Depository Number 130032 and SEC Number

27  801-120835, 866296.

28  **ANSWER:** The Insurers admit the allegations of Paragraph 8.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

9.      Plaintiff is a full-service brokerage firm that offers a wide range of investment advisory and brokerage services, private placements and managing broker-dealer services.

**ANSWER:** The Insurers admit that Plaintiff is a brokerage firm that offers certain services with respect to investment advisory and brokerage, private placements, and as managing broker-dealer. The Insurers lack knowledge or information sufficient to form a belief as the characterization by Paragraph 9 that Emerson offers a wide range of such services and on that basis denies each and every other allegation contained therein and demands strict proof thereof.

10.     Plaintiff has been duly licensed with the SEC and FINRA since 2004 and is registered in all, or nearly all, of the United States and its Territories.

**ANSWER:** The Insurers admit that Plaintiff has been licensed with the SEC and FINRA and is registered in many states and/or territories of the United States. The Insurers lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations set out in Paragraph 10 and on that basis denies each and every one of them and demands strict proof thereof.

11.     Defendants are, on information and belief, international reinsurance and insurance companies of unknown domiciles.

**ANSWER:** The Insurers admit that they are insurers foreign to the United States. By way of further answer: (1) Defendant Forge admits that it is a managing general agent that is domiciled in and a citizen of the United Kingdom; (2) Defendant Volante admits that is a managing general agent that is domiciled in and a citizen of the United Kingdom; and (3) Defendant Antares Syndicate admits that it is a syndicate doing business through the Lloyd's, London insurance marketplace through its sole member and only capital contributor, Antares Underwriting Limited, and thus Antares Syndicate is domiciled in and a citizen of the United Kingdom.

12.     Effective October 25, 2021, Defendants issued a "Securities Broker/Dealer Professional Liability Insurance" policy to Emerson Equity LLC bearing "Unique Market Reference: B074021F3121" (the "Policy"), which covered the time period October 25, 2021 to October 25, 2022 (the "policy period").

**ANSWER:** The Insurers admit the allegations of Paragraph 12.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

13.     Plaintiff is the named insured under the Policy and its registered representatives are insureds under the Policy.

**ANSWER:** The Insurers admit that Plaintiff is the Named Insured under the Policy and that the Policy may provide coverage to Plaintiff's Registered Representatives, subject to other terms and conditions of the Policy. The Insurers deny any characterization by Paragraph 13 that the Policy affords coverage to Plaintiff and/or its Registered Representatives with respect to matters underlying this action.

14.     The Policy has a $5,000,000 "Limit of Liability" in the aggregate, and there is no "per claim" limit in the Policy, except for the limited application in Endorsement No. 8 which does not apply.

**ANSWER:** The Insurers admit that the Policy is a written document, which speaks for itself regarding its terms and conditions. The Insurers deny the remaining allegations of and characterizations in Paragraph 14.

15.     The Policy provides coverage for, among other things:

**A.  BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE (INCLUDING FAILURE TO SUPERVISE)**

This policy shall pay on behalf of the **Broker/Dealer Loss** arising from a **Claim** first made against the **Broker/Dealer** during the **Policy Period** or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Broker/Dealer:**
1.  in the rendering or failure to render **Professional Services by the Broker/Dealer;** or
2.  in **Failing to Supervise** a **Registered Representative** in the rendering or failure to render **Professional Services** by such **Registered Representative** on the behalf of the **Broker/Dealer.**

**B.  REGISTERED REPRESENTATIVE PROFESSIONAL LIABILITY INSURANCE**

This policy shall pay on behalf of a **Registered Representative Loss** arising from a **Claim** first made against the **Registered Representative** during the **Policy Period** or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Registered Representative** in the rendering or failure to render **Professional Services** on behalf of the **Broker/Dealer.**

**ANSWER:** The Insurers admit that Paragraph 15 purports to contain quoted provisions from the Policy, which is a written document that speaks for itself.

16.     The policy defined certain terms:

(a) **"Approved Activity"** means a service or activity performed by the **Registered Representative** on behalf of the **Broker/Dealer** which:
(1) has been approved in writing in advance of such service or activity by the **Broker/Dealer** to be performed by the **Registered Representative,** and is
(2) in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the **Broker/Dealer** to be transacted through the **Registered Representative,** and for which
(3) the **Registered Representative** has obtained all licenses required by the **Broker/Dealer** or applicable law or regulation.

(c) **"Claim"** means the following brought by an **Insured's** customer or client in such capacity:
(1) a written demand for monetary relief; or
(2) a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:
(i)  service of a complaint or similar pleading; or
(ii) receipt or filing of an arbitration demand or statement of claim.

(h) **"Interrelated Wrongful Act(s)"** means **Wrongful Acts** which are the same, related or continuous, or **Wrongful Acts** which arise from the same, related or common nexus of facts regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action. Further, and without limiting the aforementioned, the following **Claims** shall automatically be deemed to allege **Interrelated Wrongful Acts:**
1. **Claims** in connection with securities of any entity (or affiliated entities) which become(s) the subject of any bankruptcy, insolvency, receivership, liquidation or reorganization proceeding, or
2. **Claims** in connection with securities purchased in connection with an offering (or series of offerings) of securities issued by the same entity or affiliated;

(j) **"Loss"** means damages, judgments, settlements and **Defense Costs;** however, **Loss** shall not include:
1. salaries of any **Insured;**
2. the cost of complying with any settlement for or award of non-monetary relief;
3. civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amounts for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds,** or matters which may be deemed uninsurable under the law pursuant to which this

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

policy shall be construed; notwithstanding the foregoing, **Loss** shall include awards of punitive or exemplary damages (where insurable by law) in an amount not greater than the amount of the compensatory damages award; and

4. the return of fees, commissions, or other compensation for any **Professional Services** rendered or required to be rendered by the **Insured** or that portion of any settlement or award in an amount equal to such fees, commissions, or other compensation.

(1) **"Professional Services"** means the following services if rendered in connection with an **Approved Activity** for or on the behalf of a customer or client of the **Broker/Dealer** pursuant to a written agreement between the **Broker/Dealer** and the customer or client:

1. purchase or sale of securities, including investment companies,
2. purchase or sale of fixed annuities, variable annuities and indexed annuities,
3. purchase or sale of life or accident and health insurance,
4. providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployee welfare arrangements),
5. advice provided to a Client in accordance with the Investment Advisors Act 1940, as amended, concerning securities and products provided that such securities and products are approved and authorized by the **Broker/Dealer** and only to the extent such coverage is added to this policy by specific endorsement attached hereto;

and in connection with or incidental to any of the foregoing 5 activities:

(i) providing economic advice, financial advice or investment advisory services, or
(ii) providing financial planning advice including without limitation any of the following activities in conjunction therewith: the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or taxes.

(m) **"Registered Representative"** means an individual who is registered with FINRA, including a registered principal, and who for compensation engages in the business of rendering **Professional Services** on behalf of the **Broker/Dealer** pursuant to a valid written contract in force at the time a **Claim** is first made.

(o) **"Wrongful Act"** means any negligent act, error or omission by the **Broker/Dealer,** any director, officer, partner or employee thereof, or by any **Registered Representative** thereof and solely in their respective capacities as such.

**ANSWER:** The Insurers admit that Paragraph 16 purports to contain quoted provisions from

1   the Policy, which is a written document that speaks for itself.

2       17.     Plaintiff paid the full annual Policy premiums and is entitled to the insurance coverage

3   under the Policy's terms.

4       **ANSWER:** The Insurers admit that Plaintiff paid the owed premium for the Policy and,

5   subject to the Policy's terms and conditions, Plaintiff could generally be entitled to coverage

6   thereunder. The Insurers deny any characterization by Paragraph 17 that Plaintiff is entitled to

7   coverage under the Policy for the matters underlying this coverage dispute.

8       18.     When Defendants issued the Policy, it was fully informed, through underwriting the

9   Policy, that Plaintiff was a full-service securities broker-dealer that sold the GWG L Bonds, among

10  other products, offered services as a managing broker-dealer, among other services. These specific

11  products and services were not expressly excluded in the Policy nor did the Policy provide limited

12  coverage for these specific products and services. Rather, the Policy generally and broadly provided

13  comprehensive coverage for Plaintiff's full-service securities broker-dealer.

14      **ANSWER:** The Insurers admit that when the Policy was issued, they understood that Plaintiff

15  was a securities broker-dealer that offered managing broker-dealer services. The Insurers deny the

16  remaining allegations of and characterizations in Paragraph 18.

17      19.     Within the Policy Period, Plaintiff timely submitted to Defendants over fifty (50)

18  Claims (FINRA Statement of Claims) ("SOCs) involving a Loss and a Wrongful Act by the

19  Broker/Dealer or its Registered Representative involving Professional Services.

20      **ANSWER:** The Insurers deny that Plaintiff submitted over 50 SOCs during the Policy Period.

21  By way of further answer, the Insurers admit that Plaintiff has submitted 41 SOCs and one putative

22  class action that involve the events underlying this matter to the Insurers since the inception of the

23  Policy Period but some of which were submitted after the Policy Period ended. The Insurers deny

24  any characterization by Paragraph 19 that the Policy affords coverage for the SOCs and further deny

25  the remaining allegations of Paragraph 19.

26      20.     The crux of the SOCs' allegations, generally, is that Emerson's registered

27  representative Tony Barouti made unsuitable recommendations to Emerson customers to purchase

28  GWG L Bonds and that Emerson failed to conduct reasonable due diligence and supervision of the

securities transactions. Emerson approved and facilitated the non-discretionary sales that are the subject of the SOCs.

**ANSWER:** The Insurers admit the allegations of Paragraph 20 only to the extent that the SOCs comprising the GWG L Bond Matters generally make such allegations. The Insurers admit that Emerson generally approved and facilitated sales of L Bonds to Claimants in the SOCs. The Insurers deny the remaining allegations of Paragraph 20 and any characterization that the Policy affords coverage for the SOCs.

21.   There are no definitive facts that would cause the Defendants to deny coverage of the claims.

**ANSWER:** The Insurers deny the allegations of Paragraph 21.

22.   GWG L Bonds, issued by GWG Holdings, Inc., were deemed an "approved for sale" product to certain qualified Emerson customers. GWG Holdings, Inc. exercised the right to accept these customers as investors in the GWG L Bonds thereby becoming customers of GWG Holding, Inc.

**ANSWER:** The Insurers lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 22 and on that basis deny each and every one of them and demands strict proof thereof.

23.   All the claims, on information and belief, involved Emerson customers.

**ANSWER:** The Insurers deny that Plaintiff lacks firsthand knowledge of whether the matters underlying this action all involve Plaintiff's customers. The Insurers lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 23 and on that basis deny each and every one of them and demands strict proof thereof.

24.   All the claims, on information and belief, involved Emerson and its duly appointed registered representatives.

**ANSWER:** The Insurers deny that Plaintiff lacks firsthand knowledge of whether the matters underlying this action all involve Plaintiff and/or its duly registered representatives. The Insurers lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

1  allegations in Paragraph 24 and on that basis deny each and every one of them and demands strict

2  proof thereof.

3       25.    GWG Holdings, Inc., is a financial service company engaged in life insurance and

4  related business. It is a publicly reporting company that filed the periodic SEC filings including Form

5  8-K and Form 10-Q. GWG L Bonds was deemed a public investment. It was not a "private

6  placement."

7       **ANSWER:** The Insurers admit that GWG Holdings, Inc. ("GWG") is a public financial

8  services company that offered life settlement investment strategies to prospective investors. The

9  Insurers admit that GWG L Bonds were offered to prospective investors pursuant to a registration

10 statement on file with the SEC for at least part of the relevant period. The Insurers deny any

11 characterization by Paragraph 25 that GWG L Bonds were publicly traded investments. The Insurers

12 also deny any characterization by Paragraph 25 that GWG L Bonds did not meet the Policy's

13 definition as to Private Placement activities. The Insurers lack knowledge or information sufficient

14 to form a belief as to the truth or falsity of the remaining allegations in Paragraph 25 and on that basis

15 deny each and every one of them and demands strict proof thereof.

16      26.    Tony Barouti was a duly licensed FINRA associated person and affiliated with

17 Emerson at all relevant times.

18      **ANSWER:** The Insurers admit that Tony Barouti is affiliated with Emerson. The Insurers

19 lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

20 allegations in Paragraph 26 and on that basis denies each and every one of them and demands strict

21 proof thereof.

22      27.    Emerson was notified of all the SOCs within the Policy Period, timely reported all the

23 SOCs within the Policy Period and alleges that the occurrences were all within the Policy Period,

24 and after October 25, 2019, the Policy's retroactive date.

25      **ANSWER:** The Insurers deny the allegations of Paragraph 27.

26      28.    On February 22, 2022 Emerson tendered the first SOC to Defendants for a coverage

27 determination.

28      **ANSWER:** The Insurers deny the allegations of Paragraph 28.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

29.     Defendants failed to timely respond to Plaintiffs requests for coverage of the first SOC.

**ANSWER:** The Insurers deny the allegations of Paragraph 29.

30.     Plaintiff continued to timely tender the SOCs, but Defendants failed to timely respond to Plaintiff's requests for coverage.

**ANSWER:** The Insurers admit that Plaintiff submitted notice of additional SOCs for coverage. The Insurers deny the remaining allegations of and characterizations in Paragraph 30.

31.     Finally, on May 6, 2022, the Defendants, through outside counsel, issued a "Preliminary Coverage Discussion — Reservation of Rights" letter ("ROR Letter").

**ANSWER:** The Insurers admit to issuing coverage correspondence to Plaintiff dated May 6, 2023, which is a written document that speaks for itself, and that Paragraph 31 purports to quote the title of a section therein. The Insurers deny the remaining allegations of and characterizations in Paragraph 31.

32.     On May 8, 2022, the Defendants, through the same counsel, issued an updated letter suddenly denying coverage for all "GWG L Bond Matters" entirely ("Denial Letter 1").

**ANSWER:** The Insurers deny the allegations of Paragraph 32. By way of further answer, the Insurers admit they issued correspondence dated June 8, 2022, which is a written document that speaks for itself and in which counsel for the Insurers advised Plaintiff that there would be no coverage for the matters comprising the "L Bond Claim."

33.     Defendants not only failed to timely respond to Plaintiff's requests for coverage, but Defendants failed to explain what events transpired in the two calendar days between the ROR Letter and the Denial Letter 1.

**ANSWER:** The Insurers deny the allegations of Paragraph 33.

34.     On July 15, 2022, the Defendants, through the same counsel, reissued the letter denying coverage in a section titled "Reaffirmation of Coverage Denial" for all "GWG L Bond Matters" entirely ("Denial Letter 2"). Denial Letter 2 confirmed that the Policy is subject to a $5,000,000 per claim limit.

1  **ANSWER:** The Insurers admit that their counsel issued coverage correspondence dated July

2  15, 2022, which is a written document that speaks for itself and in which counsel for the Insurers

3  affirmed that there is no coverage for the L Bond Claim under the Policy. The Insurers deny the

4  remaining allegations of Paragraph 34.

5  35.     Defendants summarily denied the covered Claims without good cause on May 8,

6  2022, after conducting a perfunctory investigation and erroneously concluding, among other

7  things, that the GWG L Bonds was a private placement, that the transactions involved capital

8  raising, that the occurrence date was before October 25, 2019 and that the claims do not meet the

9  definitions of Claims, Loss or Professional Services, among other erroneous defenses.

10  **ANSWER:** The Insurers deny the allegations of Paragraph 35.

11  36.     Defendants restated their summarily denial of the covered Claims without good

12  cause on July 15, 2022, after conducting a perfunctory investigation and erroneously concluding,

13  among other things, that the GWG L Bonds was a private placement, that the transactions involved

14  capital raising, that the occurrence date was before October 25, 2019 and that the claims do not meet

15  the definitions of Claims, Loss or Professional Services, among other erroneous defenses.

16  **ANSWER:** The Insurers deny the allegations of Paragraph 36.

17  37.     The facts and circumstances that Defendants relied on to summarily deny coverage

18  are erroneous. A reasonably competent investigation would have concluded that the conclusions

19  were erroneous.

20  **ANSWER:** The Insurers deny the allegations of Paragraph 37.

21  38.     The SOCs should have been covered under the Policy.

22  **ANSWER:** The Insurers deny the allegations of Paragraph 38.

23  39.     Plaintiff was forced to engage outside counsel to assert its rights as against

24  Defendants.

25  **ANSWER:** The Insurers lack knowledge or information sufficient to form a belief as to

26  Plaintiff's engagement of outside counsel to pursue this action and on that basis denies each and every

27  allegation of Paragraph 39 and demands strict proof thereof.

28  40.     Defendants' coverage positions were made in bad faith.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

1    **ANSWER:** The Insurers deny the allegations of Paragraph 40.

2       41.       Defendants' conclusion that no coverage exists under the Retroactive Date

3    Endorsement is erroneous. There were no determinative facts that the occurrences were before

4    October 25, 2019. Defendants' reliance on this endorsement to wholesale deny coverage for every

5    independently filed SOC renders the entire Policy illusory.

6       **ANSWER:** The Insurers deny the allegations of Paragraph 41.

7       42.       On information and belief, GWG L Bonds missed its first interest and principal

8    payment in January 2022.

9       **ANSWER:** The Insurers deny that Plaintiff only has secondhand knowledge as to when GWG

10   first missed interest and principal payments on L Bonds. The Insurers lack knowledge or information

11   sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 42 and

12   on that basis deny each and every one of them and demands strict proof thereof.

13      43.       The first claims were made on February 16, 2022, served on Plaintiff on or around

14   February 18, 2022 and reported to Defendants on February 22, 2022.

15      **ANSWER:** The Insurers lack knowledge or information sufficient to form a belief as to when

16   the first SOCs were filed against and served upon Plaintiff. The Insurers deny that the first SOC was

17   reported to them on February 22, 2022.

18      44.       There was no Claim, Loss or Wrongful Act made or reported before the retroactive

19   date.

20      **ANSWER:** The Insurers deny that no Wrongful Acts occurred before the retroactive date.

21   The Insurers lack knowledge or information sufficient to form a belief as to the remaining allegations

22   of and characterizations in Paragraph 44 and on that basis deny each and every one of them and

23   demands strict proof thereof.

24      45.       The retroactive date, of October 25, 2019, does not apply. The "occurrence" date for

25   all the claims at issue were within the Policy Period. None of the claims were made and reported

26   before the retroactive date.

27      **ANSWER:** The Insurers deny the allegations of Paragraph 45.

28

46.    Because the term "occurrence" in connection with the retroactive date in the Policy is left undefined, it must receive an ordinary and plain meaning in the most broad manner in favor of coverage. The ordinary and plain meaning is arguably when the complaining party was actually damaged.

**ANSWER:** The Insurers admit that the term "occurrence" as used in Endorsement No. 8 is not specifically defined in the Policy. The Insurers deny the remaining allegations of Paragraph 46.

47.    If the term "occurrence" is considered ambiguous, *i.e.* capable of two or more constructions, the ambiguity must be construed against the Defendants and most broadly in favor of coverage. Exclusions and limitations on coverage must be narrowly construed.

**ANSWER:** Paragraph 47 states conclusions of law for which no response is required. To the extent a response is deemed required, the Insurers deny the allegations of Paragraph 47.

48.    Here, the claims' occurrence was after the retroactive date and Defendants' conclusion that all the claims are uncovered in reliance on the retroactive date is erroneous, intentional, willful and in bad faith.

**ANSWER:** The Insurers deny the allegations of Paragraph 48.

49.    Defendants also denied coverage in reliance on the believe [sic] that the GWG L Bonds are private placements, subject to the Policy Endorsement No. 2. They are not private placements as a matter of fact, law and logic.

**ANSWER:** The Insurers deny the allegations of Paragraph 49.

50.    Defendants' claim to [sic] that they are private placements is intentional, willful and in bad faith.

**ANSWER:** The Insurers deny the allegations of Paragraph 50.

51.    Defendants also denied coverage in reliance on the believe [sic] that Emerson was raising capital as an investment bank. They were not. Emerson was a fully disclosed managing broker-dealer that facilitated securities transactions consistent with its fully disclosed business lines.

**ANSWER:** The Insurers admit that they reserved rights to deny coverage for the L Bond Claim under Exclusion (i), which pertains to Investment Banking activities. The Insurers also admit

that Emerson provided managing broker-dealer activities to its customers. The Insurers deny the remaining allegations of and characterizations in Paragraph 51.

52.    Defendants' claim to [sic] that Emerson was raising capital as an investment bank is intentional, willful and in bad faith. A cursory inquiry would have shown that this defense is erroneous and bad faith.

**ANSWER:** The Insurers deny the allegations of Paragraph 52.

53.    Defendants' other bases for denying coverage to Emerson are erroneous, intentional, willful and in bad faith.

**ANSWER:** The Insurers deny the allegations of Paragraph 53.

54.    The events met the stated standard for a covered Claim under the Policy.

**ANSWER:** The Insurers deny the allegations of Paragraph 54.

55.    Defendants breached the Policy by failing to timely provide coverage for the covered Claims. Defendants failed to timely indemnify Plaintiff for the covered Claims.

**ANSWER:** The Insurers deny the allegations of Paragraph 55.

56.    Defendants ignored Plaintiff's requests for acceptance of coverage.

**ANSWER:** The Insurers deny the allegations of Paragraph 56.

57.    Plaintiff fully paid all required premiums, and all other pertinent conditions to coverage have been satisfied, excused, or waived.

**ANSWER:** The Insurers admit that Plaintiff paid the required premiums on the Policy. The Insurers deny the remaining allegations of Paragraph 57.

58.    Plaintiff timely and diligently performed under the Policy. Plaintiff promptly tendered the covered Claims and cooperated with the initial, although perfunctory, investigation. Plaintiff promptly furnished Defendants with multiple rounds of requested information. Plaintiff has acted in good faith throughout the process.

**ANSWER:** The Insurers admit that Plaintiff provided notice of certain of the SOCs that comprise the L Bond Claim within the Policy Period. The Insurers also admit that Plaintiff provided the Insurers with some of the information requested as part of its coverage investigation. The Insurers deny the remaining allegations of and characterizations in Paragraph 58.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

59.     Defendants, on the other hand, breached the Policy and engaged in intentionally dilatory and bad faith acts.

**ANSWER:** The Insurers deny the allegations of Paragraph 59.

60.     If there is any term in the Policy that is unclear or ambiguous, the Policy's terms and conditions must be viewed in the light most favorable to Plaintiff.

**ANSWER:** Paragraph 60 states a conclusion of law for which no response is deemed required. To the extent a respond is deemed required, the Insurers deny the allegations of Paragraph 60.

61.     Plaintiff are [sic] forced to borrow money to defend and reimburse the losses on the covered Claims. Plaintiff has suffered economic damages, reputational damages, and loss of the use of the funds that were proximately caused by Defendants' breaches.

**ANSWER:** The Insurers deny that they have breached the Policy and/or damaged Plaintiff. The Insurers lack knowledge or information sufficient to form a belief as to the remaining allegations of and characterizations in Paragraph 61 and on that basis deny each and every one of them demands strict proof thereof.

**AS TO SECOND CAUSE OF ACTION:**

62.     Plaintiff re-alleges and incorporates by reference all the allegations in the preceding and subsequent paragraphs of this civil complaint.

**ANSWER:** The Insurers re-allege and incorporate by reference all their answers to the respective paragraphs.

63.     Implied in every contract, including the Policy, is a covenant of good faith and fair dealing which also incorporates, but is not limited to, the obligation of Defendants not to interfere with Plaintiff's rights to receive benefits due under the Policy, and not to commit any unfair business practices designed to deny the benefits of coverage to Plaintiff in the Policy.

**ANSWER:** Paragraph 63 states a legal conclusion for which no response is required. To the extent a response is deemed required, the Insurers admit that each contract implicitly contains a covenant of good faith and fair dealing. However, the Insurers deny any allegations of or characterizations by Paragraph 63 that they violated same.

64.     Defendants also had a duty under the Policy, the law, and insurance industry custom, practice, and standards to conduct a prompt and thorough investigation, including all the bases that might support Plaintiff's claim for coverage, before asserting coverage defenses or denying coverage. Defendants also had the duty under the Policy, the law, and insurance industry custom, practice, and standards to cure any erroneous or incorrect finding that might have supported Plaintiff's claim for coverage.

**ANSWER:** Paragraph 64 states a legal conclusion for which no response is required. To the extent a response is deemed required, the Insurers admit that they have certain duties before potentially denying coverage. The Insurers deny the remaining allegations of or characterizations by Paragraph 64.

65.     Instead of complying with these duties, Defendants acted in bad faith, by among other things,

    (a)     Failing to promptly conduct a full and thorough investigation of Plaintiff's request for insurance coverage;

    (b)     Failing to promptly and fully inquire into possible bases that might support insurance coverage;

    (c)     Failing to promptly and fully respond to Plaintiff's submission of the evidence that support insurance coverage;

    (d)     Refusing to engage in substantive communications with Plaintiff regarding the terms of the Policy;

    (e)     Failing to respond to coverage requests under the Policy in a timely manner;

    (f)     Refusing to articulate grounds for its denial of coverage and failing to articulate further grounds for a final coverage position;

    (g)     Abrupt position change in two calendar days from the ROL Letter on May 6, 2022 followed by the Denial Letter 1 on May 8, 2022 and the restated Denial Letter 2 on July 15, 2022;

    (h)     Taking positions through its conduct and inaction that it knows are not supported by, and in fact are contrary to, its express representations and custom and practice;

    (i)     Unreasonably failing and refusing to honor its promises and representations in the Policy;

    (j)     Engaging in an unreasonable and arbitrary interpretation of the Policy;

    (k)     Failing to timely provide coverage and indemnity for the covered Claims;

    (l)     Putting its interests above that of its insured; and

    (m)    Otherwise acting as alleged above.

**ANSWER:** The Insurers deny the allegations of Paragraph 65.

1    66.    Defendants' actions are inconsistent with Plaintiff's reasonable expectations, are

2    contrary to established insurance industry custom, standard and practice, are in contravention of the

3    expressed public policy of this State, are contrary to the express terms of the Policy, and constitute

4    bad faith.

5        **ANSWER:** The Insurers deny the allegations of Paragraph 66.

6    67.    As a direct, proximate, and foreseeable result of Defendants' breaches of the implied

7    covenant of good faith and fair dealing, Plaintiff has sustained, and continues to sustain, damages,

8    in an amount to be proven at trial. Also, pursuant to *Brandt v. Superior Court* (1985) 37 Ca1.3d

9    813, Plaintiff is entitled to recover all attorneys' fees that it has reasonably incurred, and continues

10   to incur, in its efforts to obtain the benefits due under the Policy that Defendants wrongfully has

11   withheld, and is withholding, in bad faith. Plaintiff also is entitled to interest thereon at the

12   maximum legal rate. Plaintiff continues to suffer damages because of Defendants' bad faith and

13   will seek said damages once it ascertains the full extent of its damages.

14       **ANSWER:** The Insurers deny the allegations of Paragraph 67.

15   68.    Plaintiff is informed and believes, and on that basis alleges, that Defendants — acting

16   through one or more of its authorized agents (including underwriters, claims personnel and attorneys),

17   officers, directors or corporate employees with substantial independent and discretionary authority

18   over significant aspects of Defendants' business — performed, authorized, and/or ratified the bad

19   faith conduct alleged above.

20       **ANSWER:** The Insurers deny the allegations of Paragraph 68.

21   69.    Defendants' conduct is despicable and has been done with a conscious disregard of

22   Plaintiff's rights, constituting oppression, fraud, and/or malice. Defendants have engaged in a

23   series of acts designed to deny Plaintiff the benefits due under the Policy. Specifically, Defendants,

24   by acting as alleged above, consciously disregarded Plaintiff's rights and forced Plaintiff to incur

25   substantial financial losses, thereby inflicting substantial financial damage. Defendants ignored

26   Plaintiff's interests and concerns with the requisite intent to injure within the meaning of California

27   Civil Code section 3294. Therefore, Plaintiff is entitled to recover punitive damages from

28

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

1   Defendants in an amount sufficient to punish and to make an example of Defendants and to deter

2   similar conduct in the future.

3        **ANSWER:** The Insurers deny the allegations of Paragraph 69.

4        **AS TO THIRD CAUSE OF ACTION:**

5        70.     Plaintiff re-alleges and incorporates by reference all the allegations in the preceding

6   and subsequent paragraphs of this civil complaint.

7        **ANSWER:** The Insurers re-allege and incorporate by reference all their answers to the

8   respective paragraphs.

9        71.     An actual, present, and justiciable controversy now exists between Plaintiff and

10  Defendants with respect to Plaintiff's rights and Defendants' duties under the Policy. Plaintiff

11  contends as follows:

12       (a) The claims at issue are Covered Losses within the Policy's terms;
         (b) The claims at issue have occurrences after October 25, 2019 thereby making the
13           retroactive date irrelevant;
         (c) The claims at issue should not be interrelated, but if they are interrelated, the $5,000,000
14           aggregate policy limit of liability applies with one $250,000 retention;
         (d) If the claims are interrelated and the retroactive date does not apply, the only limit of
15           liability that applies is the $5,000,000 with one $250,000 retention;
         (e) Defendants were, and are, obligated to indemnify Plaintiff in connection with the Covered
16           Loss pursuant to the Policy;
         (f) Plaintiff is entitled to reimbursement by Defendants for all attorneys' fees, costs, and
17           expenses incurred during this action and in connection with the Covered Losses;
         (g) Defendants have engaged in insurance bad faith, and
18       (h) Defendants are obligation [sic] to act in good faith toward Plaintiff in connection with the
             Covered Loss and otherwise.
19

20

21       **ANSWER:** The Insurers admit that an actual and justiciable controversy presently exists

22  between the parties concerning their purported rights and duties under the Policy. The Insurers deny

23  the remaining allegations of and characterizations in Paragraph 71.

24       72.     Plaintiff is informed and believes, and thereon alleges that Defendants dispute the

25  aforesaid contentions and contends otherwise and/or refuses to address to make a finding despite

26  ample time and resources to do so.

27

28

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

1    **ANSWER:** The Insurers admit that they dispute Plaintiff's position regarding coverage

2    under the Policy for the L Bond Claim. The Insurers deny the remaining allegations of and

3    characterizations in Paragraph 72.

4    73.    Plaintiff is now entitled to a declaration of its rights and Defendants' duties under

5    the Policy: (a) to avoid a multiplicity of actions; (b) so that the parties will know their rights,

6    duties, and obligations under the Policy; and (c) so that Plaintiff will receive the benefits to which

7    it is entitled under the Policy. Specifically, Plaintiff is entitled to a declaration that its contentions

8    that these are Covered Losses are correct.

9    **ANSWER:** The Insurers deny the allegations of Paragraph 73.

10   **II.    AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

11   BY WAY OF FURTHER ANSWER, the Insurers state as follows for their affirmative

12   defenses to Plaintiff's Complaint and reserves the right to amend or assert additional affirmative

13   defenses as appropriate.

14   **FIRST AFFIRMATIVE DEFENSE**

15   **(Waiver and Estoppel)**

16   1.    Emerson offers Investment Advisory & Brokerage Services; Private Placements

17   (including secondary transactions, alternative investments and other private placements); and

18   Managing Broker-Dealer Services (inception to closing private placement platform for sponsor

19   companies).

20   2.    According to Emerson's submission to the Insurers in October 2019 for procurement

21   of the Policy, Emerson derived $27,332,007 of its $29,403,457 revenue in 2018 from commissions.

22   *See* Exhibit A.

23   3.    Further, Emerson derived 45% of its commission income from direct private

24   placements; 45% from 1031 exchange transactions; 2.5% from investment banking/M&A advisory;

25   3% from hedge funds; 2.5% from mutual funds; and 2% from "ancillary," including .25% from listed

26   stocks, .25% from variable annuities, .25% from equity indexed annuities, .25% from listed bonds,

27   .25% from fixed annuities, and .25% from life insurance.

28

4.      By way of reference, Emerson sold over $90 million in L Bonds during the relevant period.

5.      Given the amount of L Bonds sold by Emerson, as well as its activities as managing broker-dealer for GWG, and the resulting commission revenue from same, it is clear that Emerson considered the sale of L Bonds to be "direct private placements" in submitting its application for insurance in 2019 and seeking coverage for same.

6.      At no time between Emerson's 2019 application for insurance and the binding of the Policy did Emerson seek to advise the Insurers that it did not consider L Bonds to be "direct private placements."

7.      Emerson cannot now argue that L Bonds do not fall under the definition of Private Placement activities.

8.      As such, Emerson's claims are barred, in whole or in part, under the doctrines of waiver and estoppel.

## SECOND AFFIRMATIVE DEFENSE

### (*In Pari Delicto* and Unclean Hands)

1.      With the initial binding of Endorsement Nos. 2, 7, and 8, Emerson represented to the Insurers that its managing broker-dealer activities were in respect of "private placements." *See* Exhibit B.

2.      As noted above in Paragraphs 1 through 7 of the Insurers' First Affirmative Defense, Emerson represented to the Insurers that L Bonds fell within the ambit of Private Placement activities as contemplated by the Policy.

3.      Yet, Emerson now contends that L Bonds do not fall within the definition of Private Placement activities.

4.      Based upon such misrepresentations, the parties agreed for Endorsement Nos. 2, 7, and 8 to only provide in respect of such activities by Emerson on a go-forward basis.

5.      Emerson now contends that the Retroactive Date in respect of coverage provided by Endorsement Nos. 2, 7, and 8 only applies to "Claims" rather than Emerson's activities giving rise to such Claims.

6.      Yet, Emerson's broker, not the Insurers, drafted the language of Endorsement Nos. 2, 7, and 8.

7.      Because Emerson's broker, its agent, drafted the language of Endorsement Nos. 2, 7, and 8, Emerson is responsible to the extent any ambiguities exist therein. *See* Exhibit C, which includes communications from David Thomas, Emerson's London-based insurance broker representing that he drafted the language at issue.

8.      The doctrine of *in pari delicto* prohibits a plaintiff from recovering damages where plaintiff bears a certain degree of fault for an alleged wrong.

9.      The doctrine of unclean hands prohibits a plaintiff from equitable relief where plaintiff bears a certain degree of fault for an alleged wrong.

10.     Emerson seeks relief from the Insurers despite its apparent misrepresentations in binding the very coverage it alleges is due under the Policy.

11.     As such, Emerson's claims are barred, in whole or in part, under the doctrines of unclean hands and/or *in pari delicto*.

## THIRD AFFIRMATIVE DEFENSE

### (Apportionment and Comparative Fault)

1.      Without admitting that Emerson suffered damages, or that the Insurers were or should be liable for any such damages, whatever loss, injury or damage, if any, Emerson suffered by reason thereof, were proximately caused, in whole or in part, and contributed to by the negligence, fault, breach and/or intentional misconduct of Emerson.

2.      As such, the Insurers assert that their liability and the liability of any other responsible persons or entities, named or unnamed, should be apportioned according to their relative degree of fault, and the Insurers' liability (if any) must be diminished by the portion of negligence, fault, breach and/or intentional misconduct attributable to other individuals and entities.

WHEREFORE, the Insurers respectfully request that this Honorable Court deny the relief sought by Plaintiff in its entirety and award the Insurers their fees and costs in defending this suit and any other relief this Honorable Court deems just.

III.    **INSURERS' COUNTERCLAIM AGAINST EMERSON**

Defendants/Counter-Plaintiffs Forge Underwriting Limited ("Forge"), Volante International Limited ("Volante"), and Lloyd's syndicate AUL 1274 ("Antares Syndicate") (collectively, "Counter-Plaintiffs" or the "Insurers"), for their Counterclaim for Declaratory Judgments and other relief against Plaintiff/Counter-Defendant Emerson Equity, LLC ("Plaintiff" or "Counter-Defendant" or "Emerson"), states as follows:

1.      The Insurers bring this counterclaim for a declaratory judgment that there is no coverage for the L Bond Claim and, in the alternative, reformation of certain provisions of the Policy.

<strong>PARTIES</strong>

2.      Counter-Plaintiff Forge is a United Kingdom private limited company with its principal place of business in London, England.

3.      Counter-Plaintiff Volante is a United Kingdom private limited company with its principal place of business in London, England.

4.      Counter-Plaintiff Antares Syndicate is a syndicate doing business through the Lloyd's, London insurance marketplace with its principal place of business in London, England.

5.      Counter-Defendant Emerson is a Limited Liability Company registered in California with its principal place of business in San Mateo County, California.

6.      Upon information and belief, all members of Emerson are citizens of the state of California.

<strong>JURISDICTION AND VENUE</strong>

7.      This Court has diversity jurisdiction over all of the Insurers' claims pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and the parties are citizens of different states.

8.      Venue is proper in the Northern District of California, Oakland Division, where this action is currently pending pursuant to 28 U.S.C. § 1391(a) as a substantial part of the events giving rise to the claims in this action occurred in this District.

//

//

**BACKGROUND**

    **A.**    **Emerson, GWG, and the L Bonds.**

9.    Emerson is a broker/dealer registered with the SEC and a member of FINRA.

10.    GWG Holdings, Inc. ("GWG") is a publicly traded company (NASDAQ: GWGHQ) currently undergoing a Chapter 11 restructuring that has its principal executive offices in Dallas, Texas.

11.    At all times relevant, GWG conducted its life insurance secondary market business through various wholly owned subsidiaries.

12.    Initially, GWG's stated intent was to purchase life policies at a discount, pay the premiums until the insureds' death, and collect the death benefits, resulting in a profit over the amounts paid for the policies and premiums (the "Life Settlement Strategy").

13.    GWG initially funded the Life Settlement Strategy through offerings of its common shares of stock and/or drawing upon a revolving line of credit.

14.    In or about 2012, GWG began offering "Renewable Secured Debentures" (the "Debentures"), which were debt instruments with varying maturity terms and interest rates, via direct placement to prospective investors through a network of independent broker/dealers.

15.    According to GWG, the Debentures were illiquid, speculative investments that involved a high degree of risk, and lacked a public or secondary market.

16.    In or about 2015, GWG rebranded the Debentures as "L Bonds."

17.    Despite the L Bonds being called "bonds," and the purported purpose being to purchase and service life policies, they were not secured by the life policies or the proceeds thereof.

18.    L Bonds were purportedly secured by GWG's interest in its subsidiaries.

19.    The L Bonds were actually pledged as collateral for loans taken by GWG to finance the purchase and payment of premiums of life policies, resulting in L Bonds constituting junior unsecured debt (although, senior to GWG's common shares).

20.    The L Bonds auto-renewed, so GWG could choose not to repay the principal upon maturity.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

21.     Emerson initially acted as a placement agent but later became the dealer-manager for the L Bond offerings with duties, in part, consisting of conducting due diligence for potential investors as well as GWG.

22.     Prospectuses for the L Bonds stated such were offered as a "covered security" because they were non-traded and senior to GWG's common stock, which was listed on NASDAQ.

23.     According to the L Bond prospectuses, proceeds from the L Bond offerings would be used for servicing life insurance assets (*e.g.*, paying premiums), debt servicing, servicing previously issued L Bonds, and for general working capital for GWG.

24.     From April 2016 to December 2017, Emerson acted as both the placement agent and dealer-manager for the L Bond offerings.

25.     From December 2017 and thereafter, Emerson was the dealer-manager (or, managing broker-dealer) for the L Bond offerings.

26.     Also in December 2017, according to reporting from the Wall Street Journal, one of the founders of GWG was looking for someone to purchase his stake in GWG, and he found a purchaser in Beneficient. *See* Alexander Gladstone, WALL STREET JOURNAL, *Retail Investors Face $1.3 Billion Hit After Asset Manager's Detour Into Startups* (June 24, 2022).

27.     In January 2018, GWG entered into a series of agreements with the Beneficient Company Group, L.P. ("Beneficient"), an unregistered investment company, to invest in Beneficient's platform for providing liquidity to holders of illiquid securities.

28.     This relationship marked a significant departure from GWG's life settlement strategy, as GWG intended to invest in Beneficient rather than purchase and maintain additional life policy assets.

29.     In 2019, GWG and Beneficient finalized a deal pursuant to which GWG would infuse a significant amount of capital into Beneficient but cede control of GWG's operations to the principals of Beneficient. Beneficient gained control of GWG despite being a wholly owned subsidiary.

30.     The founders of GWG received tens of millions of dollars for their stakes in GWG, as well as tens of millions of dollars in funding from GWG for their new venture, while the owner

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

of Beneficient diverted GWG investor funds for his own direct benefit totaling $174 million. *See* Alexander Gladstone, WALL STREET JOURNAL, *An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million* (July 29, 2022).

31.     Shortly after GWG's affiliation with Beneficient, GWG purportedly overhauled its board of directors and failed to timely file financial statements with the SEC, resulting in GWG being suspended from issuing L Bonds from May 2019 to August 2019.

32.     In or about July 2019, GWG's public accounting firm resigned.

33.     As of September 5, 2019, GWG publicly disclosed that it intended to use the net capital raised through the sale of L Bonds to enlarge Beneficient's alternative asset financing business, primarily through investments in Beneficient in the form of equity investments or loans, and to meet [GWG's] other obligations, including servicing the portfolio of life settlements, servicing existing L Bond obligations, and servicing debt.

34.     On October 21, 2019, GWG issued a press release announcing that it would reduce the size of its board of directors "in prepar[ation] for the future following the finalization of a number of initiatives between [Beneficient] and [GWG]."

35.     According to the Wall Street Journal, GWG had raised over $1 billion since 2018 from the sale of L Bonds, of which $813 million went to repay prior investors, $230 million went to Beneficient (and its owner), $197 million was lost through operating expenses, $43 million went to the founders of GWG, and $28 million went to a company started by the owner of Beneficient.

36.     Emerson, as dealer manager and/or placement agent, as well as a seller of L Bonds, was charged with conducting due diligence on GWG (and its transaction with Beneficient) and knew or should have known of the significant ongoing issues at GWG prior to October 25, 2019.

**B.     Relevant underwriting history of the Policy.**

37.     Prior to October 25, 2019, Emerson's professional liability coverage was limited only to services including insurance and annuities and was subject to a $1 million limit of liability. *See* Exhibit D (2018 Policy).

38.     In or about October 2019, shortly after the suspension by GWG of the sale of L Bonds, the resignation of GWG's public accounting firm, and the public disclosure of a significant

shift in GWG's stated business purpose (resulting in alleged corporate pillaging by Beneficient and public scrutiny), Emerson – GWG's dealer manager for offering L Bonds, sought significantly broader coverage for its business activities (including its activities as a dealer manager, which it described as Private Placement activities), and to increase the limit from $1 million to $5 million (the "New Coverage"). *See* Exhibit E, which includes correspondence from D. Thomas, Emerson's London-based insurance broker (Emerson's "London Broker") regarding the type of coverage sought by Emerson.

39.     Emerson described its business activities with respect to the New Coverage, which were not previously covered, as follows:

- Investment Advisory & Brokerage (investment advisory, traditional brokerage, annuities & life insurance);
- Private Placements (secondary transactions, alternative investments and other private placements); and
- Managing Broker Dealer (inception to closing private placement platform for sponsor companies).

40.     Emerson also told the Insurers in October 2019 that its 2018 revenue was approximately $29 million, of which $27 million derived from commissions, as follows: 45% from direct private placements; 45% from 1031 exchange transactions; 2.5% from investment banking/M&A advisory; 3% from hedge funds; 2.5% from mutual funds; and 2% from "ancillary," including 0.25% from listed stocks, .25% from variable annuities, 0.25% from equity indexed annuities, 0.25% from listed bonds, 0.25% from fixed annuities, and 0.25% from life insurance.

41.     In response to Emerson's query regarding increased coverage and the impact the increase scope of coverage would have on the premium (over a 10x increase), Emerson's broker confirmed that the coverage in force at that time was only for a very small portion of Emerson's business and sought premium options in respect of different limits and different retentions.

42.     More specifically, Emerson had insurance coverage for only 1% of its business at that time, according to its application for broader coverage submitted in October 2019, and it sought coverage for the other 99% of its business after significant issues arose with GWG in mid-2019.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

43.     Ultimately, Emerson and the Insurers agreed to terms of a new policy, which Emerson wanted to incept immediately (on October 25, 2019) prior to the expiration of its 2018-2019 Policy, which would have otherwise ended on November 10, 2019.

44.     According to Emerson's broker – its agent – the agreement to bind the 2019-2020 Policy was based, at least in part, on the following:

> One last and final item I need to get to is to to [sic] retain a 100k retention for the current services offered, i.e. annuities (variable, fixed & indexed, life or accident and health insurance[,] ( [sic]which currently carries a 75k retention under their in force policy), all other services will be at 250k and on and [sic] RDI basis, as quoted.

45.     The acronym "RDI" is a well-known term in the insurance industry and stands for "Retroactive Date Inception," which means that the specific coverage(s) bound on an RDI basis only apply to Wrongful Acts occurring after the inception date of the policy. Here, Emerson and the Insurers agreed to bind the New Coverage based on the inception date of the new policy being issued on October 25, 2019, which would also serve as the retroactive date for the purpose of the New Coverage and the increased limits.

46.     Similarly, a retroactive date is a common insurance industry term referring to a date certain prior to which Wrongful Acts occurring cannot lead to covered Claims. For example, if a Claims-made policy includes a retroactive date of October 25, 2019, Claims first made during the policy period but arising from Wrongful Acts occurring prior to October 25, 2019 would not be covered.

47.     The RDI basis for the New Coverage (including Emerson's work as a dealer-manager, placement agent, etc.) was a material term and required by the Insurers, without which the New Coverage would not have been bound. *See* Exhibit C, which includes the Insurers' agreement based on the RDI nature of the new coverage.

48.     In addition, Emerson's brokers drafted the endorsement language to reflect the New Coverage and that same would only apply in respect of Wrongful Acts going forward, necessitating the "RDI/Exclusionary language" contained in Endorsements No. 7 and No. 8. *See* Exhibit C.

49. The policy incepting on October 25, 2019 was bound pursuant to the parties' agreements regarding the changes in coverage and with the RDI language drafted by Emerson's brokers.

50. The language of Endorsement Nos. 7 and 8 was carried over to policies incepting in 2020 and 2021 (the Policy at issue in this litigation) without change and with the same retroactive date, October 25, 2019. The L Bond Claim is the first instance in which this language has been implicated.

**C.    Relevant Policy provisions.**

51. The Insurers issued the Policy at issue in this matter to Emerson on a claims-made and reported basis for the Policy Period of October 25, 2021 to October 25, 2022. Dkt. 5-2, Ex. A, pg. 24.

52. In relevant part, coverage is subject to a $5 million each Claim and in the aggregate Limit of Liability, excess of a $250,000 per Claim retention and subject to certain conditions explained below. *Id.* at 22.

53. The Policy provides that California law applies to coverage disputes arising therefrom. *Id.* at 23.

54. The Policy, in relevant part, provides coverage for **Loss** sustained by the **Broker/Dealer** arising from a **Claim** first made against the **Broker/Dealer** during the Policy Period … for any actual or alleged **Wrongful Act** committed by the **Broker/Dealer** in: (1) the rendering or failure to render Professional Services by the **Broker/Dealer**; or (2) **Failing to Supervise** a **Registered Representative** in the rendering or failure to render **Professional Services** by such **Registered Representative** on the behalf of the **Broker/Dealer**. *Id.* at 24.

55. The Policy also provides coverage for **Loss** arising from a "**Claim** first made against the **Registered Representative** during the Policy Period … for any actual or alleged **Wrongful Act** committed by the **Registered Representative** in the rendering or failure to render **Professional Services** on behalf of the **Broker/Dealer**." *Id.*

56.     **Loss**, in relevant part, "means damages, judgments, settlements, and **Defense Costs**" but does not include punitive damages, taxes, penalties, or "the return of any fees, commissions, or other compensation for any **Professional Services** rendered." *Id.*

57.     **Claim**, in relevant part, means "a written demand for monetary relief" or "a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by" receipt or filing of a statement of claim "brought by an **Insured's** customer or client in such capacity." *Id.* at 25.

58.     **Professional Services**, as defined and amended by Endorsement No. 2, "Private Placement Coverage Amendatory Endorsement," includes the following if rendered in connection with an approved activity: the "purchase or sale of securities," "the purchase or sale of private placements, Reg D products, public non-traded REITs, hedge funds, private equity funds, limited partnerships, or other unregistered securities," and "advisory or consulting services with respect to mergers & acquisitions and capital raising." *Id.* at 27, 40.

59.     The language described in the foregoing Paragraph was first added in the 2019-2020 Policy as part of the additional coverage sought by Emerson.

60.     **Approved Activity** "means a service or activity performed by the **Registered Representative** on behalf of the **Broker/Dealer**" that "has been approved in writing by the **Broker/Dealer**, in connection with the purchase or sale of a specific security" approved "to be transacted through the **Registered Representative**," and "for which the **Registered Representative** has obtained all necessary licenses required by the Broker/Dealer." *Id.* at 25.

61.     **Investment Banking Activity**, in relevant part, means, but is not limited to, the underwriting, syndicating or promotion of any securities or partnership interest in connection with any of the following: any primary or secondary offering of securities (regardless of whether the offering is a public offering or private placement), or effort to raise or furnish capital or financing or any enterprise or entity, or any acquisition or sale of securities by the **Broker/Dealer** for its own account, or any disclosure requirements in connection with any of the foregoing. *Id.* at 26.

62.     **Wrongful Act** "means any negligent act, error or omission by the **Broker/Dealer**, any director, officer, partner or employee thereof, or by any **Registered Representative** thereof, solely in their respective capacities as such." *Id.* at 28.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

63.     The Policy defines **Interrelated Wrongful Acts** as "**Wrongful Acts** which are the same, related or continuous, or **Wrongful Acts** which arise from the same, related or common nexus of facts regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action." *Id*. at 26.

64.     In addition, the Policy expressly deems the following to automatically involve **Interrelated Wrongful Acts**:

1.  **Claims** in connection with securities of any entity (or affiliated entities) which become(s) the subject of any bankruptcy, insolvency, receivership, liquidation or reorganization proceeding, or
2.  **Claims** in connection with securities purchased in connection with an offering (or series of offerings) of securities issued by the same entity or affiliated entities.

*Id*.

65.     The Limit of Liability Provision sets forth that more than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts**, regardless of the causes of action plead or the number of claimants involved, shall be deemed to constitute a single **Claim**. *Id*. at 33.

66.     With respect to the applicable limit of liability, the Declarations set forth a Retroactive Date of 11 November 2004 for a $1 million aggregate limit and 25 October 2019 for a $5 million aggregate limit. *Id*. at 22.

67.     Endorsement No. 7, "Limit of Liability Retroactive Date(s) Endorsement," sets forth that:

> It is hereby understood and agreed that, with respect to the following Limit(s) of Liability, the **Insurer** shall not be liable not make payment for Loss in connection with any **Claim**, including any **Interrelated Wrongful Act(s)**, occurring prior to 25th October 2019.
>
> USD 4,000,000 each **Claim** and in the aggregate in excess of USD 1,000,000 each **Claim** and in the aggregate.

*Id*. at 46.

68.     Exclusion (i), as amended by Endorsement No. 2, precludes coverage for **Loss** in connection with any **Claim** made against an **Insured**:

> Alleging, arising out of, based upon or attributable to, in whole or in part, any

**Investment Banking Activity** by an **Insured**, including but not limited to any disclosure requirements in connection with the foregoing; provided, however, that this exclusion shall not apply to **Claims** arising out of:

1. The sale by an **Insured** to a particular client or customer of any open-ended investment company or variable annuity which alleges that a client or customer of the **Broker/Dealer** was unsuitable for and wrongfully placed into such investment or variable annuity or;
2. Private placements or whilst the **Insured** acts as a placement agent in conjunction with private placements transactions.
3. Advisory or consulting services with respect to mergers & acquisitions and capital raising.

*Id*. at 40.

69.     The Professional Services Retroactive Date(s) Endorsement (Endorsement No. 8), provides that:

It is hereby understood and agreed that, in connection with or in any way involving the following **Professional Services**, the Insurer shall not be liable not make payment for **Loss** in connection with any **Claim**, including any **Interrelated Wrongful Act(s)**, occurring prior to 25th October 2019.

-   Private Placement activities as more fully defined within the Private Placement Coverage Amendatory Endorsement; or
-   Registered Investment Advisor Activities as more fully defined within the Registered Investment Advisory Endorsement (for **Approved Activities**); or
-   those **Professional Services** as more fully defined more fully defined under 3. (l). (1, 4 & 5), including:
    •   purchase or sale of fixed annuities, variable annuities and indexed annuities, or
    •   providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployee welfare arrangements), or
    •   advice provided to a Client in accordance with the Investment Advisors Act 1940, as amended, concerning securities and products provided that such securities and products are approved and authorized by the **Broker/Dealer** and only to the extent such coverage is added to this policy by specific endorsement attached hereto.

*Id*. at 47.

70.     The Private Placement Coverage Amendatory Endorsement (Endorsement No. 2) provides, in relevant part, that the definition of **Professional Services** "includes the purchase or sale of private placements, Reg D products, public non-traded REITs, hedge funds, private equity funds,

1  limited partnerships, or other unregistered securities," as well as "advisory or consulting services
2  with respect to mergers & acquisitions and capital raising." *Id.* at 40.

3         **D.      The L Bond Claim is made, and the coverage dispute arises.**

4         71.     Shortly after GWG's affiliation with Beneficient, GWG purportedly overhauled its
5  board of directors and failed to timely file financial statements with the SEC, resulting in GWG being
6  suspended from issuing L Bonds from May 2019 to August 2019.

7         72.     In October 2020, the SEC began investigating GWG regarding the sale of L Bonds
8  and issued a subpoena to GWG regarding same.

9         73.     In December 2021, GWG was unable to make interest or principal payments on
10  outstanding L Bonds and announced it would pause the issuance of additional L Bonds.

11         74.     Also in 2021, the head of Beneficient and GWG resigned from his post at GWG and
12  separated Beneficient from GWG, despite combining the entities only two to three years prior.

13         75.     In January 2022, GWG formally advised investors no interest or principal payments
14  would be made, and no redemption requests would be accepted.

15         76.     Emerson never disclosed any circumstances with GWG or Beneficient that could
16  potentially give rise to a **Claim** to the Insurers.

17         77.     On February 28, 2022, Emerson, via its London insurance broker, provided notice of
18  the first L Bond-related Statement of Claim ("SOC") to the Insurers and requested coverage under
19  the Policy for the defense of same.

20         78.     The Insurers retained U.S. counsel to provide legal advice regarding interpretation of
21  the Policy in connection with the L Bond Claim.

22         79.     Thereafter, Emerson provided notice of additional SOCs regarding identical events
23  and allegations to the Insurers and requested coverage under the Policy.

24         80.     In April 2022, GWG filed for Chapter 11 bankruptcy, which remains pending in the
25  Southern District of Texas, Houston Division (Case No. 22-90032 (MI)).

26         81.     Counsel for the Insurers issued a reservation of rights letter dated May 6, 2022, to
27  Emerson (the "May 6th ROR"). Dkt. 5-2, pgs. 59-64.

28

82.     In the May 6th ROR, counsel for the Insurers advised Emerson that the matters arising from Emerson's activities with respect to L Bonds submitted to date involved **Interrelated Wrongful Acts** such that they constituted a single **Claim** subject to a single retention and limit of liability (i.e., L Bond Claim). *Id*. at 62.

83.     In addition, the May 6th ROR expressly advised Emerson that:

> The GWG L Bonds at issue in the SOCs were Private Placements. Thus, to the extent Claimants allege Wrongful Acts in the rendering or failure to render Professional Services prior to October 25, 2019, coverage is precluded pursuant to the Professional Services Retroactive Date(s) Endorsement.

*Id*. at 61.

84.     Emerson did not disagree with any position taken by Underwriters in the May 6th ROR.

85.     Emerson subsequently provided notice of additional SOCs in which Claimants alleged **Wrongful Acts** committed before October 25, 2019 in connection with the sale of L Bonds, in response to which the Insurers issued updated coverage correspondence to Emerson dated June 8, 2022 (the "June 8th Coverage Letter"). *Id*. at 66-72.

86.     In the June 8th Coverage Letter, counsel for the Insurers advised Emerson that the L Bond Claim arose out of **Wrongful Acts** in connection with Private Placement activities occurring prior to October 25, 2019, and **Interrelated Wrongful Acts**, and that there would be no coverage under the Policy for the L Bond Claim based upon the Professional Services Retroactive Date Endorsement. *Id*. at 69-70.

87.     In addition, counsel for the Insurers expressly reserved the Insurers' rights with respect to certain other Policy provisions in the June 8th Coverage Letter, including but not limited to Endorsement No. 7. *Id*. at 70-71.

88.     Via email, Emerson's agents contested the Insurers' coverage position as stated in the June 8th Coverage Letter, in response to which the Insurers reiterated the position and the bases for same via correspondence dated July 15, 2022 (the "July 15th Coverage Letter"). *Id*. at 74-77.

89.     The Insurers have since reiterated their position in respect of additional SOCs that have been submitted for consideration by Emerson in connection with the L Bond Claim.

90.     At no point prior to this litigation has Emerson argued that the matters comprising the L Bond Claim do not involve **Interrelated Wrongful Acts**.

91.     In fact, Emerson's agents expressly advocated to counsel for the Insurers that the matters comprising the L Bond Claim involve **Interrelated Wrongful Acts** and should be treated as a single **Claim**, subject to a single Retention.

92.     In total, the L Bond Claim is now comprised of at least 41 SOCs and one putative class action involving over 90 Claimants that complain of Emerson and/or its **Registered Representative's Wrongful Acts** with respect to investments in L Bonds, such **Wrongful Acts**, or **Interrelated Wrongful Acts**, occurring prior to October 25, 2019.

## FIRST CAUSE OF ACTION

**(Declaratory Judgment – Coverage for the L Bond Claim is precluded in its entirety based upon the Professional Services Retroactive Date Endorsement)**

93.     The Insurers repeat and reallege the allegations set forth in ¶¶ 1 through 92 as if fully set forth herein.

94.     Endorsement No. 8 operates to preclude coverage for **Claims** arising from **Wrongful Acts**, including **Interrelated Wrongful Acts**, occurring prior to October 25, 2019, with respect to "Private Placement activities as more fully defined within the Private Placement Coverage Amendatory Endorsement."

95.     Emerson's sale of L Bonds meets the definition of "Private Placement activities."

96.     The matters that comprise the L Bond Claim involve **Interrelated Wrongful Acts** because all such matters include allegations of Emerson and/or its registered representative's unsuitable investment recommendations to invest in L Bonds, misrepresentations and omissions with respect to same, failure to conduct adequate due diligence on GWG, and/or Emerson's failure to supervise its registered representatives.

97.     The matters that comprise the L Bond Claim also automatically involve **Interrelated Wrongful Acts** because they are **Claims** in connection with securities of GWG, which became the subject of a bankruptcy proceeding in April 2022.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

98.     The matters that comprise the L Bond Claim further automatically involve **Interrelated Wrongful Acts** because they are **Claims** in connection with securities purchased in connection with an offering or series of offerings issued by GWG.

99.     Because the matters comprising the L Bond Claim involve **Interrelated Wrongful Acts**, the Policy deems them a single **Claim** first made at the earlier of: (1) the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or (2) the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section 8.

100.    The Pourzanjani SOC was first SOC within the L Bond Claim that met the Policy's definition of **Claim** and was made against Emerson during the Policy Period.

101.    Therefore, the entirety of the L Bond Claim is deemed a single **Claim** first made against Emerson during the Policy Period.

102.    Various Claimants in the L Bond Claim complain of Emerson's and/or its Registered Representatives' misrepresentations and unsuitable investment recommendations in L Bonds before October 25, 2019.

103.    For example: (1) Claimant Dinani contends Barouti induced a $300,000 investment in L Bonds on August 23, 2018; (2) Claimant Mirmohammadsadeghi induced a $230,000 investment in L Bonds on November 1, 2019 by claiming that the investments were "guaranteed" and "risk free;" (3) Claimant Imani contends Barouti ignored his wish for conservative investments by recommending L Bonds in 2016; (4) Claimants Nowroozi contends that Barouti recommended he invest his entire life savings in L bonds in 2018; (5) Claimants Nasri, Kohanim, Simzar, Keshiyan, and Yaghoubi allege Barouti misrepresented the nature of the L Bonds to induce their investments in same in 2018 and 2019.

104.    The L Bond Claim involves **Wrongful Acts** in connection with or involving Private Placement activities occurring prior to October 25, 2019, and is thus precluded from coverage under the Policy pursuant to the Professional Services Retroactive Date Endorsement.

105.   Because the matters within the L Bond Claim involve **Interrelated Wrongful Acts**, the Professional Services Retroactive Date Endorsement applies to preclude coverage for the entirety of the L Bond Claim.

106.   As such, Emerson is not entitled to coverage under the Policy for the L Bond Claim.

WHEREFORE, the Insurers are entitled to a judicial declaration that the Policy affords no coverage for the L Bond Claim because it involves **Wrongful Acts** in respect of Private Placement activities occurring prior to the applicable retroactive date.

## SECOND CAUSE OF ACTION

**(In the alternative to the First Cause of Action, Reformation of Endorsement No. 8)**

107.   The Insurers repeat and reallege the allegations set forth in ¶¶ 1 through ¶¶ 92 as if fully set forth herein.

108.   Emerson understood and agreed that the New Coverage would be subject to an October 25, 2019 Retroactive Date.

109.   Emerson and the Insurers' purpose and intent in binding the 2019 Policy was for the New Coverage to only apply to **Claims** first made during the Policy Period arising from **Wrongful Acts** (including **Interrelated Wrongful Acts**) that occurred on or after October 25, 2019, and to exclude **Claims** first made during the Policy Period arising from **Wrongful Acts** (including **Interrelated Wrongful Acts**) that occurred prior to October 25, 2019.

110.   The language drafted by Emerson's London Broker to reflect the parties' agreement regarding the New Coverage (as described above) was not correctly reduced to writing with respect to Endorsement No. 8 and is being interpreted by Emerson in a way that is inconsistent with the intentions of the parties or the fundamental nature of a claims-made policy and operation of a retroactive date.

111.   Emerson's interpretation is inconsistent with the fundamental nature of a claims-made policy and/or the operation of a retroactive date.

112.   Emerson's interpretation of Endorsement No. 8 is unreasonable and would render the claims-made nature of the Policy void and the operation of a retroactive date entirely superfluous.

113.   The language of Endorsement No. 8 was carried forward in subsequent policies, including in the Policy at issue in this matter, without change and without implication.

114.   Endorsement No. 8 in the Policy contains a mutual mistake.

115.   Endorsement 8 must be reformed so the Policy expresses the true intentions of the parties, as follows:

> It is hereby understood and agreed that, in connection with or in any way involving the following Professional Services, the Insurer shall not be liable [to] make payment for Loss in connection with any Claim [arising from Wrongful Acts], including any Interrelated Wrongful Act(s), occurring prior to 25th October 2019.
>
> - Private Placement activities as more fully defined within the Private Placement Coverage Amendatory Endorsement; or
> - Registered Investment Advisor Activities as more fully defined within the Registered Investment Advisory Endorsement (for Approved Activities); or
> - those Professional Services as more fully defined more fully defined under 3. (l). (1, 4 & 5), including:
>   - purchase or sale of fixed annuities, variable annuities and indexed annuities, or
>   - providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployee welfare arrangements), or
>   - advice provided to a Client in accordance with the Investment Advisors Act 1940, as amended, concerning securities and products provided that such securities and products are approved and authorized by the Broker/Dealer and only to the extent such coverage is added to this policy by specific endorsement attached hereto.

116.   Reformation of the Endorsement No. 8 as detailed above (*i.e.*, the bracketed language, which reflects the correction of what were obvious typographical errors and/or unintentionally omitted words) is necessary and proper to reflect the mutual understanding of the parties at the time the Policy was bound and give the Endorsement its only reasonable meaning.

117.   Reformation of Endorsement No. 8 as detailed above would correct a mutual mistake in the drafting of the Policy to reflect the agreement of the parties and the give the language the only reasonable meaning and effect to the claim-made nature of the Policy and retroactive date.

118.   Underwriters are entitled to reformation of Endorsement No. 8 due to the mutual mistake of the parties.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

119.     To the extent Emerson argues it did not agree with the Insurers' understanding of the terms of the Policy, Emerson misrepresented its understanding of the terms of the Policy.

120.     The Insurers relied on Emerson's representation that it understood and agreed to the terms of the Policy as brokered.

121.     As a result of the Insurers' reliance on the representations made by Emerson and/or its agents, to the extent Emerson now argues those representations were not true, the Insurers' agreement to bind the Policy was gained by Emerson's misrepresentations as to its business activities and the extent of New Coverage.

122.     If not due to a mutual mistake of the parties necessitating reformation of Endorsement No. 8, the Insurers are entitled to equitable reformation of Endorsement No. 8.

WHEREFORE, the Insurers are entitled, in the alternative, to reformation of the Policy to reflect the parties' true intent with respect to Endorsement No. 8.

## THIRD CAUSE OF ACTION

**(In the alternative to the First and Second Causes of Action, Declaratory Judgment – To the extent not otherwise precluded, coverage is precluded for the L Bond Claim by Exclusion (i))**

123.     The Insurers repeat and reallege the allegations set forth in ¶¶ 1 through ¶¶ 92 as if fully set forth herein.

124.     As dealer manager (or managing broker-dealer, as sometimes referenced) or placement agent, Emerson was in charge of selling the L Bonds on a "best-efforts" basis.

125.     Emerson also entered into participating dealer agreements with other broker-dealers, referred to as "selling group members," to authorize those broker-dealers to sell L Bonds.

126.     GWG paid Emerson a selling commission ranging from .75% to 5% of the principal amount of L Bonds sold.

127.     GWG also paid Emerson additional compensation, including due-diligence expenses, wholesaling fees, non-cash compensation, and up to a 1% reallowance to selling group members.

128.     Per the terms of the Policy, **Investment Banking Activity**, in relevant part, means, but is not limited to, the underwriting, syndicating or promotion of any securities or partnership interest in connection with any of the following: any primary or secondary offering of securities

(regardless of whether the offering is a public offering or private placement), or effort to raise or furnish capital or financing or any enterprise or entity, or any acquisition or sale of securities by the **Broker/Dealer** for its own account, or any disclosure requirements in connection with any of the foregoing.

129.     Exclusion (i), in relevant part, precludes coverage for **Claims** alleging, arising out of, based upon or attributable to, in whole or in part, any **Investment Banking Activity** by an **Insured**, including but not limited to any disclosure requirements in connection with the foregoing; provided, however, that this exclusion shall not apply to **Claims** arising out of acting Private [P]lacements or whilst the **Insured** acts as a placement agent in conjunction with [P]rivate [P]lacements [sic] transactions.

130.     Emerson asserts that the sale of L Bonds were not Private Placement transactions.

131.     Emerson was expressly charged with managing the sales of L Bonds for Emerson in what Emerson asserts was a public offering.

132.     There were four main offerings of L Bonds. Emerson acted as dealer manager for at least three of the offerings (if not all four).

133.     The sales of L Bonds were used to raise capital for GWG's activities and, later, those of Beneficient.

134.     Emerson was also in charge of enlisting and managing other broker-dealers to sell L Bonds, including providing due diligence and disclosure documents to those other broker-dealers in connection with the raising of capital for GWG and Beneficient.

135.     As such, Emerson was engaged in **Investment Banking Activities** in connection with its duties as dealer manager (or managing broker-dealer) and placement agent for GWG and the sale of L Bonds.

136.     Claimants in the L Bond Claim allege that Emerson committed **Wrongful Acts** in connection with its duties as dealer manager and/or placement agent for GWG's offering of L Bonds.

137.     Thus, the L Bond Claim is a **Claim** alleging, arising out of, based upon or attributable to, in whole or in part, any **Investment Banking Activity** by an **Insured.**

138.     As such, Exclusion (i) applies to preclude coverage for the L Bond Claim.

1    WHEREFORE, the Insurers are entitled, in the alternative, to a judicial declaration that

2    Exclusion (i) applies to preclude coverage for the entire L Bond Claim.

3    **FOURTH CAUSE OF ACTION**

4    **(In the alternative to the First through Third Causes of Action, Declaratory Judgment - To**

5    **the extent the Policy affords coverage for the L Bond Claim, coverage is limited to $1 million)**

6    139.   The Insurers repeat and reallege the allegations set forth in ¶¶ 1 through 92 as if fully

7    set forth herein.

8    140.   Endorsement No. 7 operates to limit **Claims** arising from **Wrongful Acts**, including

9    **Interrelated Wrongful Acts**, occurring prior to October 25, 2019 to $1 million in coverage unless

10   such **Claims** are precluded by Endorsement No. 8.

11   141.   The matters that comprise the L Bond Claim involve **Interrelated Wrongful Acts**

12   because all such matters include allegations of Emerson and/or its registered representative's

13   unsuitable investment recommendations to invest in L Bonds, misrepresentations and omissions

14   with respect to same, failure to conduct adequate due diligence on GWG, and/or Emerson's failure

15   to supervise its registered representatives.

16   142.   The matters that comprise the L Bond Claim also automatically involve **Interrelated**

17   **Wrongful Acts** because they are **Claims** in connection with securities of GWG, which became the

18   subject of a bankruptcy proceeding in April 2022.

19   143.   The matters that comprise the L Bond Claim further automatically involve

20   **Interrelated Wrongful Acts** because they are **Claims** in connection with securities purchased in

21   connection with an offering or series of offerings issued by GWG.

22   144.   Because the matters comprising the L Bond Claim involve **Interrelated Wrongful**

23   **Acts**, the Policy deems them a single **Claim** first made at the earlier of: (1) the time at which the

24   earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

25   (2) the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts**

26   shall be deemed to have been made pursuant to Section 8.

27   145.   The Pourzanjani SOC was first SOC within the L Bond Claim that met the Policy's

28   definition of **Claim** and was made against Emerson during the Policy Period.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

146.     Therefore, the entirety of the L Bond Claim is deemed a single **Claim** first made against Emerson during the Policy Period.

147.     Various Claimants in the L Bond Claim complain of Emerson's and/or its Registered Representatives' misrepresentations and unsuitable investment recommendations in L Bonds before October 25, 2019.

148.     For example: (1) Claimant Dinani contends Barouti induced a $300,000 investment in L Bonds on August 23, 2018; (2) Claimant Mirmohammadsadeghi induced a $230,000 investment in L Bonds on November 1, 2019 by claiming that the investments were "guaranteed" and "risk free;" (3) Claimant Imani contends Barouti ignored his wish for conservative investments by recommending L Bonds in 2016; (4) Claimants Nowroozi contends that Barouti recommended he invest his entire life savings in L bonds in 2018; (5) Claimants Nasri, Kohanim, Simzar, Keshiyan, and Yaghoubi allege Barouti misrepresented the nature of the L Bonds to induce their investments in same in 2018 and 2019.

149.     The L Bond Claim involves **Wrongful Acts**, including **Interrelated Wrongful Acts**, occurring prior to October 25, 2019.

150.     Thus, to the extent the Policy is deemed to provide coverage for the L Bond Claim, pursuant to Endorsement No. 7, potential coverage is limited to $1 million.

151.     The Declarations also set forth a Retroactive Date of 11 November 2004 for a $1 million aggregate limit and 25 October 2019 for a $5 million aggregate limit.

152.     To the extent Emerson argues Endorsement No. 7 does not limit the L Bond Claim to $1 million in potential coverage, the Retroactive date in the Declarations operates to limit the L Bond Claim to the maximum of $1 million in potential coverage.

WHEREFORE, the Insurers are entitled, in the alternative, to a judicial declaration that, if the Policy affords coverage for the L Bond Claim, coverage is limited to $1 million in the aggregate.

//

//

//

//

**FIFTH CAUSE OF ACTION**

**(In the alternative to the First through Fourth Causes of Action, Reformation of**

**Endorsement No. 7)**

153.    The Insurers repeat and reallege the allegations set forth in ¶¶ 1 through 92 as if fully set forth herein.

154.    During the underwriting process for the 2019 Policy, Emerson through its agents, sought the New Coverage and confirmed their agreement that same would apply only on a "RDI basis."

155.    Emerson's London Broker confirmed Emerson's understanding and agreement that anything other than the sale/purchase of insurance products or annuities would be bound on an "RDI," or Retroactive Date Inception, basis beginning on October 25, 2019.

156.    Emerson's London Broker also confirmed Emerson's understanding that coverage for **Claims** arising from the services previously covered under Emerson's insurance policy (*i.e.*, sale/purchase of insurance products or annuities) would be subject to a lower retention of $100,000.

157.    Emerson's London Broker further confirmed Emerson's understanding that only **Claims** arising out of **Wrongful Acts** occurring prior to October 25, 2019 could be covered but only if they involved the limited services for which Emerson was previously was covered and that such **Claims** would be subject to a per **Claim** limit of $1 million.

158.     Emerson understood and agreed that **Claims** arising out of **Wrongful Acts** occurring prior to October 25, 2019 would only be covered under the Policy if such **Claims** involved the limited services for which Emerson was previously was covered and that such **Claims** would be subject a $1 million limit of liability and a $100,000 retention on a go-forward basis.

159.    Emerson and the Insurers' purpose and intent in binding the 2019 Policy, at least in part, was to only provide coverage for **Claims** arising out of **Wrongful Acts** occurring prior to October 25, 2019 (and **Interrelated Wrongful Acts**) if those **Claims** were first made during the 2019 Policy Period and involved the limited services for which Emerson previously had insurance coverage.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

160.    The language drafted by Emerson's London Broker to reflect the parties' agreement regarding the limit of liability for **Claims** first made during the 2019 Policy Period but arising from **Wrongful Acts** occurring prior to October 25, 2019 (and **Interrelated Wrongful Acts**) and involving the services for which Emerson previously had coverage was not correctly reduced to writing with respect to Endorsement No. 7 and is being interpreted by Emerson in a way that does not truly reflect the intentions of the parties. Emerson's interpretation of Endorsement No. 7 is unreasonable.

161.    The language of Endorsement No. 7 was carried forward in subsequent policies, including the Policy at issue in this matter, without change and without implication.

162.    To the extent Emerson argues that Endorsement No. 7 (as drafted) does not limit the L Bond Claim to a maximum limit of liability of $1 million, Endorsement No. 7 in the Policy contains a mutual mistake.

163.    Endorsement No. 7 must be reformed so the Policy expresses the true intentions of the parties, as follows:

> It is hereby understood and agreed that, with respect to the following Limit(s) of Liability, the Insurer shall not be liable [to] make payment for **Loss** in connection with any **Claim** [arising from **Wrongful Acts**], including any **Interrelated Wrongful Act(s)**, occurring prior to 25th October 2019.
>
> USD 4,000,000 each Claim and in the aggregate in excess of USD 1,000,000 each Claim and in the aggregate.
>
> All other terms, conditions and limitations remain unchanged.

164.    Reformation of the Endorsement No. 7 as detailed above (*i.e.*, the bracketed language, which reflects the correction of what were obvious typographical errors and/or unintentionally omitted words) is necessary and proper to reflect the mutual understanding of the parties at the time the Policy was bound.

165.    Reformation of Endorsement No. 7 as detailed above would correct a mutual mistake in the drafting of the Policy to reflect the agreement of the parties.

166.    To the extent Emerson argues it did not agree with the Insurers' understanding of the terms of the Policy, Emerson misrepresented its understanding of the terms of the Policy.

167.     The Insurers relied on Emerson's representation that it understood and agreed to the terms of the Policy as brokered.

168.     As a result of the Insurers' reliance on the representations made by Emerson and/or its agents, to the extent Emerson now argues those representations were not true, the Insurers' agreement to bind the Policy was gained by Emerson's misrepresentations as to its business activities and the extent of New Coverage.

169.     Based on their reliance on the representations made by Emerson in binding the Policy(ies), the Insurers are entitled to equitable reformation of Endorsement No. 7.

WHEREFORE, the Insurers are entitled, in the alternative, to reformation of the Policy to reflect the parties' true intent with respect to Endorsement No. 7.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counter-Plaintiffs, the Insurers, respectfully request that this Court enter an order: (1) declaring that coverage for the L Bond Claim is precluded in its entirety based upon Endorsement No. 8; (2) in the alternative to (1), finding that Endorsement No. 8 to the Policy is reformed to clearly reflect the parties stated intent with respect to coverage for Claims involving the Professional Services at issue in the L Bond Claim and Wrongful Acts occurring prior to October 25, 2019; (3) in the alternative to (1) and (2), declaring that coverage for the L Bond Claim is precluded in its entirety based upon Exclusion (i); (4) in the alternative to (1), (2), and (3), declaring that, if the Policy affords coverage for the L Bond Claim, coverage is limited to $1 million in the aggregate; (5) in the alternative to (1), (2), (3), and (4), finding that Endorsement No. 7 to the Policy is reformed to clearly reflect the parties stated intent that coverage for Claims involving Wrongful Acts occurring prior to October 25, 2019, or any Interrelated Wrongful Acts, are subject to a per Claim limit of $1 million; and (6) for any such other relief that this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Defendants/Counter-Plaintiffs, the Insurers, herby demand a trial by jury of all issues so triable.

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

1    DATED: June 12, 2023                          **KAUFMAN DOLOWICH & VOLUCK LLP**

2

3
                                                   By: /s/ Stefan R. Dandelles
4                                                        Louie H. Castoria
                                                         Stefan R. Dandelles (*pro hac vice*)
5                                                        *Attorney for Defendants Forge Underwriting*
                                                         *Limited; Volante International Limited;*
6                                                        *Certain Underwriters At Lloyd's, London*
                                                         *Subscribing To Securities Broker/Dealer*
7                                                        *Professional Liability Insurance Policy No.*
                                                         *B074021F3121*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM**

# **EXHIBIT A**

**Daniel Brainard**

| | |
|---|---|
| **From:** | David Thomas <david.thomas@aflib.com> |
| **Sent:** | Thursday, October 17, 2019 10:56 AM |
| **To:** | Steve Redding |
| **Cc:** | James Urquhart |
| **Subject:** | RE: Emerson Equity, LLC. - BD E&O - 11 November Renewal |
| **Attachments:** | Application for Securities BrokerDealer_Emerson Equity LLC.PDF |

Hi Steve

Application attached, loss run to follow but to confirm these have had no claims in the past 5 years.

**Some additional info from the app**:

- 7 branches (2 OSJs)
- 12 full time producers
- Commission revenue breakdown:
    o 45% direct private placements
    o 45% 1031 exchange transactions
    o 2.5% Investment banking/M&A advisory
    o 3% hedge funds
    o 2.5% mutual funds
    o 2% ancillary
- $85 AUM over 350 accounts

Are you around to chat tomorrow, think you said you might have been WFH? If not, are you able to work on terms or meet to chat through first thing Monday?

Many thanks

David Thomas
Senior Broker **-** Financial Lines



Introducing AFL

**AFL Insurance Brokers**
8 Lloyd's Avenue| London| EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com





**From:** David Thomas
**Sent:** 17 October 2019 12:42
**To:** Steve Redding <Steve.Redding@volanteglobal.com>
**Cc:** James Urquhart <james.urquhart@aflib.com>
**Subject:** Emerson Equity, LLC. - BD E&O - 11 November Renewal

Hi Steve

As discussed, we have just received the BoR (attached) from Crystal on the above.

http://www.emersonequity.com

founded in 2003, Emerson Equity is full-service focused on offering high new worth individuals, institutional clients and sponsor companies that bring private placement offerings to market, quality investment investment opportunities, and managed broker dealer services.

<u>Services</u>:

- Investment Advisory & Brokerage (investment advisory, traditional brokerage, annuities & life insurance)
- Private Placements (secondary transactions, alternative investments and other private placements)
- Managing Broker Dealer (inception to closing private placement platform for sponsor companies)

<u>Current Coverage</u>:

- Coverage in place at the moment is straight Broker Dealer E&O covering DB (including failure to supervise) and Registered Representatives.
- NY registered rep coverage at
- $1m aggregate xs $75k each claim @ $13,500

<u>Requested Coverage:</u>

- $1m expiring and $3m and $5m options
- Option to add on Private Placement coverage (per attached endorsement) with $250k each claim retention
- Option to add on Registered Investment Advisory (RIA) endorsement
- Retain the original definition of professional services contained within the core policy wording, i.e. remove the professional services amendment
- Premium targets: $1m @ $50k; $3m @ $85k; $5m @ $115k.

<u>Attachments</u>:

- BoR
- Financials and P&L
- Current policy
- Exam and focus report
- Supplementary information
- Private placement list
- Registered rep list
- Supervisory procedures
- Template affiliate agreement
- Requested endorsement

<u>Underwriting Info</u>:

- $29,403,457 revenue ($27,332,007 commissions, $503,395 investment advisory fees…)
- $1,796,738 net income
- $2,518,063 total assets

Really need to get something asap to them, can we chat later today or tomorrow to try and get something before the week is out?

Many thanks

David Thomas
Senior Broker - Financial Lines



Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue| London| EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com







## APPLICATION FOR SECURITIES BROKER/DEALER AND REGISTERED REPRESENTATIVE PROFESSIONAL LIABILITY INSURANCE

**NOTICE: THE POLICY BEING APPLIED FOR HEREIN APPLIES, SUBJECT TO ITS TERMS AND PROVISIONS, TO CLAIMS FIRST MADE AND REPORTED IN WRITING DURING THE POLICY PERIOD OR DISCOVERY PERIOD, IF APPLICABLE. IN ADDITION, DEFENSE EXPENSES ARE INCLUDED IN AND WILL REDUCE THE LIMITS OF LIABILITY.**

**Instructions:** Please read this application carefully. Full and complete responses must be made to each question. If a response cannot be fully supplied in the spaces below, attach additional sheets to this application. Such sheets should be refer to the applicable questions and must be signed and dated. In addition, all materials requested herein must be provided with the application. This application, as well as all materials submitted with it, shall be held in confidence.

### A.    General Information

| | | |
|---|---|---|
| 1. Name of Applicant:<br>**Emerson Equity LLC** | 2. Address:<br>**155 Bovet Road, Suite 725**<br>**San Mateo, CA 94402** | |
| 3. Website Address:<br>**www.emersonequity.com** | 4. Telephone: **650.312.0200**<br>Fax: **650.312.0206** | |
| 5. Officer designated to receive correspondence and notices from the Insurer:<br>**Dominic Baldini** | 6. Type of Organization: □ Private □ Corporation<br>□ Partnership  X Other_**LLC**_____ | |
| 7. Parent Company:<br><br>**N/A** | 8. State of Incorporation:<br><br>**California** | 9. Year Firm Established:<br><br>**2003** |
| 10. CRD#:<br>**130032** | 11. Employers ID #:<br>**74-3109983** | |

10. Insurance Amounts Requested:
    a.    Limits: Per Claim:_____Aggregate: _____
    b.    Policy Aggregate:_____
    c.    Retroactive Date:_____
    d.    Retention: Individual:_____Entity:_____

11. Does any shareholder/owner hold more than a 10% ownership interest?          X Yes  No
    If yes, please provide details _Dominic Baldini owns more than 10% of Emerson Equity LLC_
    _____

12. Is there an Affiliated/Subsidiary Company(ies) to be covered?          Yes  X No
    If yes, please provide details_____
    _____

13. Has the Applicant been the subject of, or is currently involved in or discussing, any mergers, acquisitions, divestitures and/or tender offers during the past three (3) years?    Yes  X No If yes, please provide details:
    _____
    _____

14. Please give details of other current insurance carrier (*if none, please indicate*): Lloyd's of London

| | Limit | Deductible | Carrier | Term | Premium |
|---|---|---|---|---|---|
| Professional Liability | $ | $ | | | $ |
| Directors & Officers Liability | $ | $ | | | $ |
| | | | | | |

| | | | | |
|---|---|---|---|---|
| Employment Practices Liability | $ | $ | | $ |
| Fidelity Bond/Crime | $ | $ | | $ |

Has the Broker/Dealer, or any of its parents, subsidiaries or affiliates, or any of their respective directors, officers, or securities principals ever had a professional liability or directors & officers insurance policy or fidelity bond declined, canceled, issued on special terms, renewal refused or had a request that an Application for insurance or for a bond be withdrawn? If "yes", explain on the S.I.F.    ☐ Yes   ☐ No

15. Number of Branches: _____7_____ How many of these are Offices of Supervisory Jurisdiction? ___2___

16. a. Head count of sales force (*Status shall mean employees, independent contractor*):

| Category | Current Year | Prior Year | Status |
|---|---|---|---|
| Full-Time Producers | 12 | 12 | |
| Part-Time Producers | 0 | 0 | |
| Non-Producing Executives/ Managers | 0 | 0 | |
| Other (back office) | 0 | 0 | |
| **TOTAL** | 12 | 12 | |

b. Of the current number, how many are licensed as: Series 6_____ Series 7 __12_____
Series 11_____ Series 22_____ Series 24 or 27___3_____ Other _____

17. a. Is professional liability insurance mandatory? ……………………………………… Yes   X No
b. How many Registered Representatives currently have professional liability insurance? _12_____
c. What is the expected level of participation in this program? _12_____
d. Average length of service of Registered Representatives with the Applicant: _8.5 years_____
e. Attrition rate of Registered Representatives in the first year of contract: _5_%;  In the first five (5) years:_0_%
f. What level of production is mandated for maintaining Registered Representative status with the Applicant? _$50,000.00 GDC_

18. Please indicate the total number of Registered Representatives by state of domicile:

Alabama_____
Alaska_____
Arizona_____
Arkansas_____
California 10
Colorado_____
Connecticut_____
Delaware _____
D.C._____
Florida 1
Georgia_____
Hawaii_____
Idaho _____

Illinois_____
Indiana_____
Iowa_____
Kansas_____
Kentucky_____
Louisiana_____
Maine _____
Maryland_____
Massachusetts_
Michigan_____
Minnesota_____
Mississippi___
Missouri _____

Montana_____
Nebraska_____
Nevada _____
New Hampshire ___
New Jersey _____
New Mexico _____
New York _____
North Carolina ___
North Dakota _____
Ohio _____
Oklahoma _____
Oregon_____
Pennsylvania _____

Rhode Island _____
South Carolina ____
South Dakota _____
Tennessee_____
Texas_____
Utah_____
Vermont_____
Virginia_____
Washington__1
West Virginia ____
Wisconsin_____
Wyoming_____
**TOTAL: 12____**

19. Describe on the S.I.F. the procedures for recruiting, screening and hiring new registered representatives, including pre-hiring background checks. Indicate whether "yes" answers on a registered representative's U-4 prevent him/her from being hired. If "no", describe hiring criteria on S.I.F.    ☐ Yes X No

20. Describe on the S.I.F. any characteristics that Applicant believes distinguish Applicant's registered representatives from those of other broker/dealers. (For example, all are credentialed financial planners.)

B.      **Financial and Product/Service Information**

21.     Net Capital Requirement (Rule 15c3-3 of Securities & Exchange Act of 1934)

     a.      Minimum Net Capital Required _$100,000.00_____

     b.      Current level of Net Capital _$1,596,569.00_____   as of  August 31, 2019

22.     Gross commission revenues for the past three (3) fiscal years:

Year ended: 2016          Year ended: 2017          Year ended: 2018
$14,500,000.00            $14,500,000.00             $29,400,000.00

23.     Please state the percentage (%) of commission revenues which are derived from the following:

| | | |
|---|---|---|
| _.25_ % Listed Stocks | _.25_ % Listed Bonds | _____% Unlisted Stocks |
| _.25_ % Variable Annuities | _.25_ % Fixed Annuities | _____% Unregistered Stocks or Bonds |
| _.25_ % Equity Indexed Annuities | _.25_ % Life Insurance | _____% Short Sales of Stock |
| _____% Commodities | _2.5_ % Mutual Funds | _____% REITs |
| _____% Accident & Health | _3_ % Hedge Funds | _____% 24 Hour Health |
| _____% Disability Income Ins. | _____% Long Term Care | _____% Admin of Employee Benefit  Plans |
| _____% Unit Investment Trusts | _____% Investment Advisory Services | _____% Fee Based Financial Planning |
| _____% Penny Stocks (unlisted securities trading at less than $5) | | |
|    Limited Partnerships: | _____% Proprietary | _45_ %1031 Exchanges/TICs |
| _2.5_ % Investment Banking | | _____% Non-proprietary |
| _.50_ % RIA | | _____% Future/Options |
| _____% Other (Please Specify) | | _____%CMOs |
| | | _____%CDOs |
| | | _____%Auction Rated Securities |
| | | _45_ %Direct Private Placements |

TOTAL:_____100%

24.     a.      Total number of customer accounts during the most recent fiscal year:   ~2,000
      b.      What is the average size investment portfolio for each customer:  $500,000.00
      b.      What percentage (%) are: Margin:  <1 %  Discretionary:  0%
      c.      What percentage (%) are: Individual:  80% Corporate:  15%  Institutional: 4%

25.     a.      Number of securities traded annually through the Applicant:  8,500 plus
      b.      Average dollar value of each securities trade: $15,000.00

26.     Does the Applicant offer any proprietary products?                                    Yes X No
If yes, please describe these products in detail and state what percentage of the Applicant's total annual gross revenue they comprise: _____
_____

27.     Describe the procedures for selecting investments to be included on the approved products list, the procedures for updating the list and procedures for monitoring the performance of approved products:
All products are vetted by a S24 Principal in accordance with FINRA rule and approved by the Chief Compliance Officer.
_____

29.     Do any Registered Representatives sell through or have offices in banks, savings and loans, credit unions or similar institutions?                                                            Yes  X No
If yes, please describe the procedures used to differentiate the securities sold by the Registered Representatives of the Applicant and those sold by the institution and steps taken to ensure that purchasers know risks associated with the products: _____
_____

30.   a.   Is the Applicant registered as an Investment Advisor with the SEC?   Yes  X  No
If yes, how many Registered Representatives provide services under the Applicant's corporate
RIA?  Applicant is registered with the State of California as a RIA

      b.   Does the Applicant allow Registered Representatives to hold individual RIA designations?
                                                     Yes  X   No
If yes, please provide number of RIAs, a description of the services provided by RIAs and related
accounts handled on a discretionary basis:

      c.   How many Registered Representatives and/or partners, directors or officers have discretionary
authority? (indicate names and titles)  As an investment advisory, 15

      d.   Describe the Broker/Dealers' Supervisory Protocol with respect to the outside RIA activity.

Applicant obtains the investment profiles for each client and, on a monthly basis, reviews with all trades done within such client
accounts or account statements or both, reviewing for suitability of trades pursuant to FINRA Rule 3280.

31.   Does the Applicant use a clearing house?                              X Yes    No
If yes, please describe (name, address etc.):  Pershing LLC

32.   a.   Does the Broker/Dealer, directly or through an affiliated registered investment advisor, provide
financial planning services?                                        X Yes ☐ No

If "yes", describe on the S.I.F., the services provided, the qualifications of the
individuals preparing the plans, and the role played by the registered representatives in this process.
(Applicant may refer to an attached Form ADV to answer this question.)

      b.   Do any registered representatives provide financial planning services independent of the
Broker/Dealer and its parents, subsidiaries and affiliates?           X Yes  No

If "yes", does the Broker/Dealer, its parents, subsidiaries or affiliates exercise any supervision or
control over these services?                                    ☐Yes  No

If "yes", explain on the S.I.F.

      c.   Is Insurance requested for these financial planning services?         ☐Yes  X No

33.   a.   Does the Broker/Dealer, directly or through an affiliated insurance agency, sell life, health or
disability insurance?                                        X Yes ☐ No

      b.   What percentage of the Broker/Dealer's registered representatives are licensed to sell life, health or
disability insurance?                                        ~ 20  %

      c.   Do any registered representatives sell life, health or disability insurance independent of the
Broker/Dealer or its affiliated life insurance agency? If "yes", do you want insurance for these
sales?                                                X Yes ☐ No

      d.   Are any of the insurance companies represented by the Broker/Dealer or its affiliated insurance
agency rated less than "A" by A.M. Bests or the equivalent rating by another rating
agency?  If "yes", list the companies and explain on the S.I.F.         ☐ Yes No

      e.   On the S.I.F. describe the due diligence procedures used to place an insurance company and X
its products on the approved list.

34.  a. Are there other products or services offered, (e.g. pension plan administration), in addition to those already listed and described? If "yes", describe these on the S.I.F.  ☐ Yes  X No

b.  Does Applicant anticipate that more than 5% of its income for the next year will come from any product or service not already listed or described above? If "yes", describe the service or the product on the S.I.F.  ☐ Yes  X No

c.  Are there any sources of income that have declined substantially or been discontinued in the last five years, (e.g. limited partnership commission declined from 50% to 5%)?  ☐ Yes  X No
If "yes", describe on the S.I.F.\

## C.  **Business Practices**

35.  a. Does the Applicant have procedures to ensure that new account forms and applications are adequately completed and reflect information actually obtained from customers?  X Yes  No
If "yes", please describe: All applications are reviewed by a S24 principal; account information is verified at least every 3 years.

b.  Does Applicant have any guidelines concerning the maintenance of pertinent account information?  X Yes  No  If "yes", please describe: Confidential client information is maintained in locked filing cabinets.

c.  Describe the Applicant's procedures for verifying customer orders and determining that confirmations are accurate and received on time: All trade orders are reviewed on a daily basis; confirmations are reviewed/compared to trades.

36.  a. Describe the Applicant's procedures for reviewing new accounts and for determining the suitability of mutual funds and variable products: New accounts are approved by a S24 Principal; mutual fund trades are reviewed daily; VAs are approved prior to sending to VA company

b.  Is a computer model used or provided in connection with the review of new accounts and determination of the suitability of mutual funds and variable products?  Yes  X No
If yes, please describe: _____

c.  Describe all procedures the Applicant has for monitoring variable products, mutual fund suitability and/or the volume of transactions with respect to customer accounts and for ensuring that transactions are in accordance with customer objectives and sophistication: Mutual funds are reviewed on a daily/monthly/quarterly basis; VAs are approved prior to sending to VA company.

37.  a. Does the Applicant have: (i) a formal disclosure letter that customers must sign each time they elect to purchase a mutual fund or variable annuity; (ii) regularly issued activity and/or negative consent letters; and (iii) any other disclosure materials provided to customers?  X  Yes  No
If "yes" to any of the foregoing, please describe:

Clients sign a mutual fund disclosure statement outlining the different share classes.

b.  How often are those forms reviewed and or revised to adhere to industry changes? On-going basis.

38.  Does the Applicant require customers to sign a "switch letter" each time they are transferring funds between like investment company or insurance company products?  X  Yes  No

If "yes", does the "switch letter" show any charges that the customer will likely incur due to the switch?

X Yes      No

39.   Does the Applicant have procedures to clarify (i) to prospective customers the advantages of making quantity mutual fund purchases that qualify for break points and purchases under Rights of Accumulation; (ii) that variable products are not the same as mutual funds; and (iii) specific charges that are associated with variable contract transactions (i.e. surrender charges, withdrawals and limitations)?   X  Yes  No
If "yes" to any of the foregoing, please describe:
Applicant utilizes an internal form RRs are required to sign that reflects those items that were disclosed to clients, which is reviewed by s Series 24 Principal.

40.   Does the Applicant have any procedures for the sale and administration of Employee Benefit Plans?
Yes    X  No     If "yes", please describe:

41.   Do customers sign standard contracts with the Applicant?                                      X Yes  No

If yes, what percentage contain mandatory arbitration clauses?:  100%
If no mandatory arbitration clauses are employed, explain why:  N/A

### D.   Compliance

42.   a.   Number of full time employees in the Compliance Department:
        b.   Average length of employment with the Compliance Department:  ~ 8 years
        c.   Describe the job responsibilities, education and previous experiences of the Compliance Department employees:  RRs are assigned to a S24 Principal upon hire; the CCO is responsible for the overall review; the previous experience is consistent with the day-to-day activities supervised.

43.   Describe the Applicant's procedures for training, monitoring and supervising Offices of Supervisory Jurisdiction  There are 2 OSJs (in addition to the main office). The CCO oversees the review of the OSJs.

44.   Describe the Applicant's procedures for monitoring Registered Representatives' compliance with applicable laws, statutes and regulations?  Ongoing email review; ongoing transaction reviews; ongoing compliance discussions; CE training; Annual Compliance Meeting.

45.   Does the Applicant conduct audits of Registered Representatives?                        X Yes    No
If "yes", please describe who conducts the audits, their degree of regularity and manner (including, for example, whether they are scheduled or unscheduled):  In accordance with Supervisory Control Guidelines.

46.   How often is the compliance manual reviewed/updated? Has the compliance manual been reviewed by an outside consultant? Please describe how information contained in the compliance manual is disseminated to Registered Representatives:  Written Supervisory Procedures are reviewed on an ongoing basis, no less than quarterly; Information contained in the Written Supervisory Procedures is disseminated by email.

47.   Describe the Applicant's internal disciplinary measures taken when there is a violation of compliance regulations:

48.   Have any of the Applicant's Registered Representatives been disciplined, fined or suspended by the SEC, NASD, state securities regulatory authorities, state insurance departments or other regulatory bodies within the past three (3) years?  X   Yes    No  I f yes, please provide details:  Instance of unauthorized trading

that occurred at a RR's prior firm, occurrence had nothing to do with Applicant.

49.     In the past three (3) years, has the Applicant terminated any Registered Representatives as a result of a review of their operations or performance?   Yes   X  No   If "yes", please provide details: _____
_____
_____

50.     Describe the Applicant's procedures for handling customer complaints: _Complaints must be forwarded to the main office on the same day as received._____

51.     a.      Number of notices, letters and complaints Applicant has received in the past three (3) years: None._____

        b.      Number of the foregoing notices, letters and complaints that were unsettled within sixty (60) days of receipt: _N/A_____

52.     Within the last five (5) years, has the Applicant or any of its directors, officers or employees been disciplined, fined, suspended or the subject of a formal investigation by the SEC, NASD, state insurance departments or any other regulatory body?   Yes   X  No   If yes, please provide details: _____
_____
_____

E.      **Hiring and Management of Registered Representatives**

53.     Describe the Applicant's procedures for recruiting and selecting Registered Representatives:
Applicant receives referral from existing RRs and sponsor companies._____
_____

54.     How does the Applicant gain new Registered Representatives? (through referrals, job postings or other means, please describe): _Referrals._____

55.     Describe any background checks of new Registered Representatives performed by the Applicant (for example, steps taken to ensure proper licensing, U-4 checks, etc.): _CRD history reviewed via CRD Gateway + FINRA does a comprehensive backup check upon the filing of a Form U4._____

56.     Does the Applicant provide training to new Registered Representatives?                         X   Yes          No
If yes, please describe: _Applicant provides RR with an overview on how it operates; provides the RR with a copy of the WSPs; provides ongoing, continuous compliance input._____

57.     Does the Applicant provide continuing education to Registered Representatives?       X   Yes          No
If yes, please describe: _Annually through a 3rd party provider._____
_____

58.     Does the Applicant provide Registered Representatives with newsletters, updates or other periodicals?
                                                                                Yes   X  No
If yes, please describe:_____

59.     Does the Applicant offer any special incentives or contests based in whole or in part on sales commission figures?  Yes   X  No  If yes, please provide details of the programs offered and the number of Registered Representatives who have attained these goals over the past three years? _____
_____

F.      **Loss Experience**

60.     How many professional liability claims (whether covered or uncovered by insurance) have been made against the Applicant and/or its Registered Representatives within the past five (5) years?
(If None, please check x None) _None_____

If there have been claims, please provide complete details, including but not limited to, the nature of the allegation, names of parties involved, date of error, date claim was made, product involved, resolution, if any, amount of settlement or award, if any, amount of defense costs, reserve amounts for defense costs and indemnity, if applicable and current status, if not resolved:

_____
_____

61.   Does the Applicant or any of its directors, officers, employees or Registered Representatives have knowledge or information of any fact, circumstance or any actual or alleged act, error or omission which may reasonably be expected to give rise to a claim being made against them?        Yes   X        No

If yes, please provide details, including but not limited to, parties involved, dates when the situation arose, specific act, error or omission at issue and status:

_____
_____

62.   ASSETS UNDER MANAGEMENT

|  | Dollar Amount | Total Number of Accounts |
|---|---|---|
| Discretionary | 85,000.000.00 | 350 accounts |
| Non-Discretionary | 0 | 0 accounts |
| Total | 85,000.000.00 | 350 accounts |

1.   Internal Controls
   a.   Are investment objectives reviewed with clients on an annual basis?   ☐ Yes  ☒  No
   b.   How often are statements sent to customers?  Monthly ☒ Quarterly ☐ Yearly ☐
   c.   Is there a compliance officer to address ERISA issues? ☒ Yes ☐ No ☐ N/A
   d.   Is the Applicant currently in compliance with ERISA? ☒ Yes ☐ No
   e.   What procedures has the Applicant implemented to ensure compliance with ERISA? Active, ongoing review of ERISA accounts.
2.   Fees
   a.   How much are the Investment Advisory Fees?  Varies per ADV Part II


**IT IS AGREED THAT ANY CLAIMS ARISING FROM THE MATTERS REFERRED TO IN QUESTIONS 57 AND 58 ABOVE WILL NOT BE COVERED UNDER THE TERMS AND PROVISIONS OF THE POLICY APPLIED FOR HEREIN.**

### G.   Attachments

The following materials must be attached to this signed and dated application. Please check off materials as attached.

1. X   Form BD and/or Focus Reports for the last two (2) quarters.
2. X   Form ADV.
3. X   Two (2) most recent years audited financial statements including Form X-17A-5, Part III (note same information must be provided for Applicant's parent, if any).
4. X   Approved products list including, *inter alia*, mutual funds, life insurance and annuities, proprietary products and limited partnerships.
5. X   New account form and any suitability/disclosure forms or letters.

6. NA  Other contracts offered to clients including but not limited to Financial Planning Agreements, etc.
7. X  Agreement or contract between the Applicant and Registered Representatives.
8. X  Summaries of any SEC, NASD or other regulatory body examinations or audits within the last five (5) years and management's response to each including exit interview summaries of formal examination or audit letters have not yet been received.
9. NA  Description of all professional liability claims against the Applicant and/or its Registered Representatives within the lasts five (5) years (please provide the nature of the allegation, names of parties involved, date of error, date claim made, product involved, resolution, if any, amount of settlement or award, if any, amount of defense costs and current status, if not resolved).
10. NA  Loss runs for the last five (5) years, if currently insured.
11. X  Company brochure or description of services.
12. NA  Product brochures for any products that you sell or any proprietary services offered.
13. X  Supervisory procedures and compliance manual.
14. X  Curriculum vitae for Chief Compliance Officers.

**THE APPLICANT REPRESENTS THAT THE STATEMENTS AND FACTS MADE IN THIS APPLICATION ARE TRUE AND THAT NO MATERIAL FACTS HAVE BEEN OMITTED OR MISSTATED. IT IS FURTHER AGREED BY THE APPLICANT THAT EACH POLICY OR RENEWAL THEREOF, IF ISSUED, IS ISSUED IN RELIANCE UPON THE TRUTH OF THE REPRESENTATIONS AND INFORMATION IN THE APPLICATION.**

The undersigned(s) certifies that he/she is the duly authorized representative(s) of the applicant which submits this application to the Company for a policy of insurance. The statements and information above and all schedules and documents submitted, are deemed parts of the application (all of which schedules and documents shall be deemed attached to the policy as if physically attached thereto), and the word "application" refers to all the foregoing.

Applicant acknowledges a continuing obligation to report to us as soon as practicable any material changes in the facts and statements above, and in each supplemental application, of which applicant becomes aware after signing the application.

Completion of this application does not bind coverage. Applicant's acceptance of the Company's quotation is required prior to binding coverage and policy issuance. It is agreed that this form shall be the basis of the contract should a policy be issued.

### Fraud Prevention – General Warning

**NOTICE**: Any person who knowingly, or knowingly assist another, files an application for insurance or claim containing any false, incomplete or misleading information for the purpose of defrauding or attempting to defraud an Insurance Company may be guilty of a crime and may be subject to criminal and civil penalties and loss of insurance benefits.

**NOTICE TO ARKANSAS APPLICANTS**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit, or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**NOTICE TO CALIFORNIA APPLICANTS**: Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

**NOTICE TO COLORADO APPLICANTS**: It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an Insurance Company for the purpose of defrauding or attempting to defraud the Company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any Insurance Company or agent of an Insurance Company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS**: Warning, it is a crime to provide false or

misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant.

**NOTICE TO FLORIDA APPLICANTS**: Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete or misleading information is guilty of a felony in the third degree.

**NOTICE TO IDAHO APPLICANTS**: Any person who knowingly and with intent to injure, defraud, or deceive any Insurance Company, files a statement of claim containing any false, incomplete or misleading information is guilty of a felony.

**NOTICE TO INDIANA APPLICANTS**: Any person who knowingly and with  intent to defraud an insurer files a statement of claim containing any false, complete or misleading information commits a felony.

**NOTICE TO KENTUCKY APPLICANTS**: Any person who knowingly and with intent to defraud any Insurance Company or other person files an application for insurance containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

**NOTICE TO MAINE APPLICANTS**: It is a crime to provide false, incomplete or misleading information to an Insurance Company for the purpose of defrauding the Company. Penalties may include imprisonment, fines or a denial of insurance benefits.

**NOTICE TO MICHIGAN APPLICANTS**: Any person who knowingly and with intent to defraud or defraud any insurer submits a claim containing any false, incomplete or misleading information shall upon conviction, be subject to imprisonment for up to one year for a misdemeanor conviction or up to ten years for a felony conviction and payment of a fine of up to $5,000.

**NOTICE TO MINNESOTA APPLICANTS**: A person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

**NOTICE TO NEVADA APPLICANTS**: Pursuant to NRS 686A.291, any person who knowingly and willfully files a statement of claim that contains any false, incomplete or misleading information concerning a material fact is guilty of a felony.

**NOTICE TO NEW HAMPSHIRE APPLICANTS**: Any person who with purpose to injure, defraud or deceive any Insurance Company, files a statement of claim containing any false, incomplete or misleading information is subject to prosecution and punishment for insurance fraud, as provided in RSA 638:20.

**NOTICE TO NEW JERSEY APPLICANTS**: Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties.
**NOTICE TO LOUISIANA AND NEW MEXICO APPLICANTS**: Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to civil fines and criminal penalties.

**NOTICE TO NEW YORK APPLICANTS**: Any person who knowingly and with intent to  defraud  any Insurance Company or other person files an application for insurance or statement of claims containing any materially false information, or conceals for the purpose of misleading information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**NOTICE TO OHIO APPLICANTS**: Any person who, with intent to defraud knowingly that he is facilitating a fraud against an insurer submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

**NOTICE TO PENNSYLVANIA APPLICANTS**: Any person who knowingly and with intent to defraud any Insurance Company or other person files an application for insurance or statement of claim containing any fact

materially false information, or conceal for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subject such person to criminal and civil penalties.

**NOTICE TO TENNESSEE & VIRGINIA APPLICANTS:** It is a crime to knowingly provide false, incomplete or misleading information to an Insurance Company for the purpose of defrauding the Company Penalties include imprisonment, fines and denial of insurance benefits.

### Important Reminder

The coverage for which you are applying is written on a CLAIMS-MADE AND REPORTED basis and, subject to its provisions, applies only to claims first made against the Insureds and reported to the Company in writing during the policy period, unless a Discovery Period applies.

I/We hereby declare the above statements and particulars are true and that I/We agree that this application shall be the basis of the contract with the Company.

By:_____

Dominic Baldini, CEO
_____
Name/Title

Date of Application___October 8, 2019_____

**<u>EXHIBIT B</u>**

**Daniel Brainard**

| | |
|---|---|
| **From:** | David Thomas <david.thomas@aflib.com> |
| **Sent:** | Thursday, October 17, 2019 6:42 AM |
| **To:** | Steve Redding |
| **Cc:** | James Urquhart |
| **Subject:** | Emerson Equity, LLC. - BD E&O - 11 November Renewal |
| **Attachments:** | P&L (1).pdf; PRIVATE PLACEMENT COVERAGE AMENDATORY ENDORSEMENT (1).pdf; Supplemental Information (1).pdf; Template Affiliate Agreement (1).pdf; Updated RR List (1).pdf; Written Supervisory Procedures_EE (1).pdf; 2019_09_08 Focus Report copy (1).pdf; BOR for AFL - 2019 (002) (3).doc; Emerson Equity Audited Financials 2018 (1).pdf; Emerson Lloyds - 2018 (5).pdf; Exam Report - Emerson Equity Llc (130032) - 20180564515 (1).pdf; Insurance (1).xlsx |

Hi Steve

As discussed, we have just received the BoR (attached) from Crystal on the above.

http://www.emersonequity.com

founded in 2003, Emerson Equity is full-service focused on offering high new worth individuals, institutional clients and sponsor companies that bring private placement offerings to market, quality investment investment opportunities, and managed broker dealer services.

**Services**:

- Investment Advisory & Brokerage (investment advisory, traditional brokerage, annuities & life insurance)
- Private Placements (secondary transactions, alternative investments and other private placements)
- Managing Broker Dealer (inception to closing private placement platform for sponsor companies)

**Current Coverage**:

- Coverage in place at the moment is straight Broker Dealer E&O covering DB (including failure to supervise) and Registered Representatives.
- NY registered rep coverage at
- $1m aggregate xs $75k each claim @ $13,500

**Requested Coverage:**

- $1m expiring and $3m and $5m options
- Option to add on Private Placement coverage (per attached endorsement) with $250k each claim retention
- Option to add on Registered Investment Advisory (RIA) endorsement
- Retain the original definition of professional services contained within the core policy wording, i.e. remove the professional services amendment
- Premium targets: $1m @ $50k; $3m @ $85k; $5m @ $115k.

**Attachments**:

- BoR
- Financials and P&L

- Current policy
- Exam and focus report
- Supplementary information
- Private placement list
- Registered rep list
- Supervisory procedures
- Template affiliate agreement
- Requested endorsement

**Underwriting Info:**

- $29,403,457 revenue ($27,332,007 commissions, $503,395 investment advisory fees…)
- $1,796,738 net income
- $2,518,063 total assets

Really need to get something asap to them, can we chat later today or tomorrow to try and get something before the week is out?

Many thanks

David Thomas
Senior Broker **-** Financial Lines



Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue| London| EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com





PRIVATE PLACEMENT COVERAGE AMENDATORY ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that 2. DEFINITIONS k) is amended to include:

> (8) the purchase or sale of private placements, Reg D products, public non-traded REIT's, hedge funds, private equity funds, limited partnerships, or other unregistered securities, or

> (9) advisory or consulting services with respect to mergers & acquisitions and capital raising.

In consideration of the premium charged, it is hereby understood and agreed that 4. EXCLUSIONS i) is deleted and replaced with the following:

i)  Alleging, arising out of, based upon or attributable to, in whole or in part, any **Investment Banking Activity** by an **Insured**, including but not limited to any disclosure requirements in connection with the foregoing; provided, however, that this exclusion shall not apply to **Claims** arising out of:

1. The sale by an **Insured** to a particular client or customer of any open-ended investment company or variable annuity which alleges that a client or customer of the **Broker/Dealer** was unsuitable for and wrongfully placed into such investment or variable annuity or;
2. Private placements or whilst the **Insured** acts as a placement agent in conjunction with private placements transactions.
3. Advisory or consulting services with respect to mergers & acquisitions and capital raising.

In consideration of the premium charged, it is hereby understood and agreed that 4. EXCLUSIONS m)3) is amended to include following:

> (iiii) involved in, connected to, or in any way related to a private placement transaction by any **Insured**.

ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED.

<u>Supplemental Information Form</u>:

<u>Instructions</u>:    Use this form to provide additional information or request descriptions or explanations necessary to provide a true and complete response to all questions, statements or requests for information contained in the application.   Please Identify the number of each question or statement on the Application to which your responses relate. If necessary, make additional copies of this form.  Please sign all forms and staple the completed forms to the Application.

S.I.F. 16.a.

Application has other registered representatives affiliated with the firm that engage in activities for which Applicant is not seeking insurance.

S.I.F. 19

Applicant's WSPs provide for the following:

Applicant will take reasonable steps to ascertain by investigation the good character, business reputation, qualifications and experience of all prospective associated persons before the firm applies to register that person with FINRA and before making a representation to that effect on the application for registration by:

1) Obtaining a signed pre-hire authorization form granting the firm permission to access the registered rep's CRD record;

2) Review information contained in Web CRD (if available) on the registered rep, including previously filed Forms U5s, including any amendments thereto, within 60 days of the filing date of an application for registration, disclosure history, CE regulatory requirements, and fingerprint reports;

3) Obtain a copy of Form U5 filed by the registered rep's prior firm from the applicant or print a copy from WEB CRD;

4) Obtain a manually signed Form U4 from the registered rep;

5) Provide written report to CEO or registered rep's intended supervisor if disclosure history exits;

6)      Take reasonable steps to verify (or employ a third party service provider
        to verify) the accuracy and completeness of the information contained in
        the applicant's Form U4 utilizing reasonably available public records).

7)      Approve or disapprove application and draft terms of special supervision
        deemed appropriate (if necessary).

S.I.A.  32a

Two individuals at the firm provide Financial Planning services.  Both
individuals are Certified Financial Planners.

The individuals will review the investment profile of a client and any other relevant
information and will make suggestions based on their analysis.

S.I.F.  33e.

The firm deals only with the top rated insurance companies.  Within this category,
before placing an insurance company and its products on the approved list, the
Applicant will consider such factors as enrollment capabilities, plan design, benefit
features, and pricing, as well as claims processing.

S.I.F.  34.b.

A significant portion of Applicant's revenue is generated from private placement,
including the firm acting as a Managing Broker Dealer.

Applicant is not at this time seeking insurance for the above.

Date:  October 8, 2019

Signed:  _____

Dominic Baldini
Managing Member/CEO
Emerson Equity LLC



October 9, 2019

AFL Insurance Brokers
8 Lloyd's Avenue
London EC3N 3EL

**RE:       Broker of Record**

**Emerson Equity, LLC**
**Errors & Omissions Policy # FL1800083**

To Whom It May Concern:

This letter is to authorize AFL Insurance Brokers, 8 Lloyd's Avenue, London, EC3N 3EL to represent Crystal Financial Institutions, a division of Alliant, Financial Square, 32 Old Slip, New York, New York 10005, as it's representative regarding the Errors & Omissions (including Excess liability) insurance policies, as referenced above, written for Crystal Financial Institutions, a division of Alliant's client Emerson Equity, LLC

Please furnish AFL Insurance Brokers with copies of policies, endorsements, audits, claim statements and any documents they may deem necessary to handle and protect our insurance program interests.

This letter takes effect immediately and rescinds and supersedes any previous broker of record letters, authorization letters, documents or forms we may have given to others which were filed with you.

Sincerely,

*Krystie Zerbo*

Krystie Zerbo
Account Manager – Lead

Thomas Shashaty
DIRECT 646 810-3480
Thomas.shashaty@alliant.com

Crystal Financial Institutions
32 Old Slip, 18th Floor
New York, NY 10005

**EXHIBIT C**

**Daniel Brainard**

---

| | |
|---|---|
| **From:** | David Thomas <david.thomas@aflib.com> |
| **Sent:** | Tuesday, October 29, 2019 9:44 AM |
| **To:** | Steve Redding |
| **Subject:** | RE: Emerson Equity, LLC. - BD E&O - 11 November Renewal - ORDER TO BIND |

Thanks mate and we're binding 25 October now, please Ok?
Cheers

David Thomas
Senior Broker - Financial Lines



Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue| London| EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com





**From:** Steve Redding <Steve.Redding@volanteglobal.com>
**Sent:** 29 October 2019 14:36
**To:** David Thomas <david.thomas@aflib.com>
**Subject:** RE: Emerson Equity, LLC. - BD E&O - 11 November Renewal - ORDER TO BIND

Works for me fella

---

**From:** David Thomas <david.thomas@aflib.com>
**Sent:** 29 October 2019 14:21
**To:** Steve Redding <Steve.Redding@volanteglobal.com>
**Subject:** RE: Emerson Equity, LLC. - BD E&O - 11 November Renewal - ORDER TO BIND

Hi Steve

Are you good to remove all subs per the additional info below?

Also, did you managed to dig out the exclusionary language you were looking to apply, if not, how about something like this – have also drafted all of the RDI/exclusionary language, please can you confirm were good to go here:

**Limit of Liability Retroactive Date(s) Endorsement.**

1

It is hereby understood and agreed that, with respect to the following Limit(s) of Liability, the Insurer shall not be liable not make payment for **Loss** in connection with any **Claim**, including any **Interrelated Wrongful Act(s)**, occurring prior to 25th October 2019.

     USD 4,000,000 in the aggregate in excess of USD 1,000,000 in the aggregate.

All other terms, conditions and limitations remain unchanged.

### Professional Services Retroactive Date(s) Endorsement.

It is hereby understood and agreed that, in connection with the following Professional Services, the Insurer shall not be liable not make payment for **Loss** as a result of any **Claim** including any **Interrelated Wrongful Act(s)**, occurring prior to 25th October 2019.

- Private Placement activities as more fully defined within the Private Placement Coverage Amendatory Endorsement; or
- Registered Investment Advisory Activities as more fully defined within the Registered Investment Advisory Endorsement (for Approved Activities); or
- those Professional Services as defined more fully defined under 3. (k). (1, 4 & 5), including:

  o purchase or sale of fixed annuities, variable annuities and indexed annuities, or

  o providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multiemployee welfare arrangements), or

  o advice provided to a Client in accordance with the Investment Advisors Act 1940, as amended, concerning securities and products provided that such securities and products are approved and authorized by the **Broker/Dealer** and only to the extent such coverage is added to this policy by specific endorsement attached hereto.

All other terms, conditions and limitations remain unchanged.

### Troubled Investment Exclusion (GBP Capital Holdings, LLC).

It is hereby understood and agreed that the Insurer shall not be liable to make payment for **Loss** in connection with any **Claim**, including any **Interrelated Wrongful Act(s)**, alleging, arising out of, based upon or attributable to any investment made into any of the following fund(s):

- GPB Automotive Portfolio.
- GPB Holdings II.
- GBP Holdings III.
- GPB Waste Management.

All other terms, conditions and limitations remain unchanged.

Call with any questions.

Thanks

David Thomas

Senior Broker - Financial Lines



Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue | London | EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com





---

**From:** David Thomas
**Sent:** 28 October 2019 21:15
**To:** Steve Redding <Steve.Redding@volanteglobal.com>
**Subject:** Re: Emerson Equity, LLC. - BD E&O - 11 November Renewal - ORDER TO BIND

Steve, also as agreed I have you down for 37.5% of this
Thanks

David Thomas
AFL Insurance Brokers
07876896226

On 28 Oct 2019, at 21:08, David Thomas <david.thomas@aflib.com> wrote:

Steve

Client sees current coverage as somewhat redundant to the services they provide and as such have instructed us to cancel the current policy and bind our option effective 25 October 2019 for 12 months. Please FON as at this date.

Client is fine with excluding the GBP offerings, let's finalise language tomorrow.

Regarding Item 4, correct, Emerson Equity's participation is comparatively modest to the offerings themselves, typically ranging from ~ 5% to 15% for the average size offerings of 35 mil to 50 mil offerings.

Ok to remove 4?

Thanks

David Thomas
AFL Insurance Brokers
07876896226

On 28 Oct 2019, at 16:53, Steve Redding <Steve.Redding@volanteglobal.com> wrote:

Dave,

Many thanks, firm order duly noted 12 months effective 11th November. With regards to subjectivities can comment as follows:-

1      received with thanks, agree delete.
2      Noted and agreed, agree delete.
3      Noted, however I attach a link to the article where concern is expressed https://www.einnews.com/pr_news/494952611/gpb-capital-holdings-lawsuits-filed-by-investment-fraud-lawyers reference is made to both the Automotive and GBP II Holdings fund. Whilst no notifications received form their clients to date it is not unfeasible that something may come down the turnpike therefore I don't want to see myself exposed to a potential known loss scenario. I therefore do need a specific exclusion in this regard. My suggestion is if the Insured has any coverage which ma pick this exposure up  they put in a precautionary notice on their expiring policy (ies).
4      Noted. For the sake of good order, ordinarily, what participation would Emerson normally accept on these placements, I am assuming comparatively modest in light of the firms size and extent of available insurance coverage.

Regards

Steve

---

**From:** David Thomas <david.thomas@aflib.com>
**Sent:** 28 October 2019 10:31
**To:** Steve Redding <Steve.Redding@volanteglobal.com>
**Cc:** James Urquhart <james.urquhart@aflib.com>
**Subject:** RE: Emerson Equity, LLC. - BD E&O - 11 November Renewal - ORDER TO BIND
**Importance:** High

Hi Steve

Happy to say we've received the order to bind the $5m option at $266k all as quoted. (All retentions at $250k apart from the current annuity and life insurance services).

With regards to the subjectivities please see responses below from Dominic Baldini, CEO of Emerson Equity – can you let me know what you intent to do regarding the GPB exclusion, they do a tiny bit of work with them and have had no issues.

1. Regarding the Due Diligence process with regards to private placements, please find attached a copy of the Emerson Equity's Written Supervisory Procedures attached.
2. Confirmed, all PPMs are thoroughly reviewed by in-house counsel prior to acceptation instructions and entered into a service agreement
3. Regarding GPB, we place a relatively small amount of business with GPB, Emerson clients invested ~ 2.9 mil across 4 vehicles (GPB Automative ($150,000), GPB Holdings II

($857,364), GPB Holdings III ($250,000), and GPB Waste Management ($1,644,750), not involving the entities that are having all the difficulty right now - we are completely comfortable with the DD with did on the offerings and we have not had any complaints nor claims regarding these transactions.

4. Average Size of Offerings is $35 mil to $50 mil and the largest is 1 bil.

Can you let me know if ok the subjectivities can be removed?

Many thanks

David Thomas
Senior Broker - Financial Lines

<image001.png>
Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue | London | EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com

<image002.jpg><image003.jpg>

<image004.png><image005.jpg><image006.png>

---

**From:** David Thomas
**Sent:** 24 October 2019 14:03
**To:** Steve Redding <Steve.Redding@volanteglobal.com>
**Subject:** Re: Emerson Equity, LLC. - BD E&O - 11 November Renewal

All good with this mate just want to confirm final position to Us guys and see what option they go for? Cheers

David Thomas
AFL Insurance Brokers
07876896226

On 23 Oct 2019, at 22:18, David Thomas <david.thomas@aflib.com> wrote:

> Hi Steve
>
> Here are the options we've agreed to date and those that look most appealing to the client, they are leaning towards the higher limit option at the 250k retention level.
>
> 1m x 250k @ 144k
> 3m x 250k @ 216k
> 5m x 250k @ 266k
>
> As we know, as it stands, the retention for all services (BD E&O, private placements and RIA) is at $250k.
>
> One last and final item I need to get to is to to retain a 100k retention for the current services offered, i.e. annuities (variable, fixed & indexed,

life or accident and health insurance (which currently carries a 75k retention under their in force policy)? All other services will be at 250k and on and RDI basis, as quoted.

Please bear in mind these are claims free, we would very much appreciate some flexibility on the retention for these more benign exposures to get this deal across the line?

Thanks

David Thomas
AFL Insurance Brokers
07876896226

On 18 Oct 2019, at 19:36, David Thomas <david.thomas@aflib.com> wrote:

> Steve
>
> Just spoke with the Crystal guys and had a quick chat with Hamilton, you were absolutely right, you wrote a very small portion of the business last year (mainly annuities and life insurance work). Given the revenues are now at $28m and we are looking to include all typical BD work (failure to supervise and RR), private placements and RIA, this looks good.
>
> They want a couple of options applied to a $1, 3 and 5m:
>
> - $100k retention across the board;
> - $100k retention but $250k in respect of private placements;
> - $250k across the board.
>
> If ok let's keep our 10am on Monday to talk through and formalise some numbers. If Antares won't stay on then I'll get Talbot or Aspen to support.
>
> Good weekend.
>
> Thanks
>
> David Thomas
> AFL Insurance Brokers
> 07876896226
>
> On 18 Oct 2019, at 10:19, Steve Redding <Steve.Redding@volanteglobal.com> wrote:
>
>> Dave,

Just run this through the rater and for a
$1m/$1m excess $100K I am coming
out at $160K which is a massive hike on
expiring.  Not sure how this paid $13.5K
but have recollection that we excluded
a large part of their operations.  Maybe
worth speaking to Willett to shed more
light on the risk.

Regards

Steve

**From:** David Thomas
<david.thomas@aflib.com>
**Sent:** 17 October 2019 16:56
**To:** Steve Redding
<Steve.Redding@volanteglobal.com>
**Cc:** James Urquhart
<james.urquhart@aflib.com>
**Subject:** RE: Emerson Equity, LLC. - BD
E&O - 11 November Renewal

Hi Steve

Application attached, loss run to follow
but to confirm these have had no claims
in the past 5 years.

**Some additional info from the app**:

- 7 branches (2 OSJs)
- 12 full time producers
- Commission revenue
  breakdown:
    o 45% direct private
      placements
    o 45% 1031 exchange
      transactions
    o 2.5% Investment
      banking/M&A advisory
    o 3% hedge funds
    o 2.5% mutual funds
    o 2% ancillary
- $85 AUM over 350 accounts

Are you around to chat tomorrow, think
you said you might have been WFH? If
not, are you able to work on terms or
meet to chat through first thing
Monday?

Many thanks

David Thomas
Senior Broker **-** Financial Lines

**<image001.png>**
Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue| London| EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0)
7876 896 226 |
David.Thomas@aflib.com

<image002.jpg><image003.jpg>

<image004.png><image005.jpg><image006.
png>

---

**From:** David Thomas
**Sent:** 17 October 2019 12:42
**To:** Steve Redding
<Steve.Redding@volanteglobal.com>
**Cc:** James Urquhart
<james.urquhart@aflib.com>
**Subject:** Emerson Equity, LLC. - BD E&O
- 11 November Renewal

Hi Steve

As discussed, we have just received the
BoR (attached) from Crystal on the
above.

http://www.emersonequity.com

founded in 2003, Emerson Equity is full-
service focused on offering high new
worth individuals, institutional clients
and sponsor companies that bring
private placement offerings to market,
quality investment investment
opportunities, and managed broker
dealer services.

**Services**:

- Investment Advisory &
  Brokerage (investment
  advisory, traditional brokerage,
  annuities & life insurance)
- Private Placements (secondary
  transactions, alternative

8

- investments and other private placements)
- Managing Broker Dealer (inception to closing private placement platform for sponsor companies)

**Current Coverage**:

- Coverage in place at the moment is straight Broker Dealer E&O covering DB (including failure to supervise) and Registered Representatives.
- NY registered rep coverage at
- $1m aggregate xs $75k each claim @ $13,500

**Requested Coverage:**

- $1m expiring and $3m and $5m options
- Option to add on Private Placement coverage (per attached endorsement) with $250k each claim retention
- Option to add on Registered Investment Advisory (RIA) endorsement
- Retain the original definition of professional services contained within the core policy wording, i.e. remove the professional services amendment
- Premium targets: $1m @ $50k; $3m @ $85k; $5m @ $115k.

**Attachments**:

- BoR
- Financials and P&L
- Current policy
- Exam and focus report
- Supplementary information
- Private placement list
- Registered rep list
- Supervisory procedures
- Template affiliate agreement
- Requested endorsement

**Underwriting Info:**

9

- $29,403,457 revenue
  ($27,332,007 commissions,
  $503,395 investment advisory
  fees…)
- $1,796,738 net income
- $2,518,063 total assets

Really need to get something asap to
them, can we chat later today or
tomorrow to try and get something
before the week is out?

Many thanks

David Thomas
Senior Broker - Financial Lines

**<image001.png>**
Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue| London| EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0)
7876 896 226 |
David.Thomas@aflib.com

<image002.jpg><image003.jpg>

**<image004.png>**<image005.jpg>**<image006.
png>**

**<u>EXHIBIT D</u>**

**Contract Number:   FL1800083**



RKH Specialty Limited
16 Eastcheap
London EC3M 1BD
United Kingdom
Tel:  +44 (0) 20 7623 3806
Fax: +44 (0) 20 7623 3807
enquiry@rkhspecialty.com
www.rkhspecialty.com

**To:      Crystal and Company**
**Financial Square**
**32 Old Slip**
**New York**
**United States of America**

**EMERSON EQUITY LLC**

**12 months at 11th November 2018**

Thank you for choosing to place this Insurance with RKH Specialty Limited This is the definitive evidence of the cover we have placed on your behalf. No further documentation will be issued.

For all notifications under this contract, the address is as shown above

.....................................

**AUTHORISED SIGNATORY**

For and on behalf of RKH Specialty Limited

Date: 7th November 2018

Broker at **LLOYDS**    RKH Specialty Limited, part of the Hyperion Insurance Group, is authorised and regulated by the Financial Conduct Authority in respect of general insurance business. Registered in England and Wales under company registration number 7142031. Registered Office: 16 Eastcheap, London EC3M 1BD.

<u>**IMPORTANT NOTICES FOR THE POLICYHOLDER:**</u>

**It is very important that you read the attached contract fully and with care to ensure you understand all the terms and conditions. The following specific matters are, however, particularly important:**

<u>**Duty of Disclosure**</u>

We take this opportunity to remind you that there is a legal obligation upon us to ensure that policyholders and intermediaries alike are made aware or reminded of the duty of disclosure and the consequences of its breach.

The policyholder must disclose to reinsurers any fact or circumstance which is known to them (or which ought to be known to them or the proposer in the ordinary course of their business, and which may include information known to you) and which is material to the risk.

The duty of disclosure applies before the contract of reinsurance is concluded and may continue for the duration of the contract including any extension or amendment to the reinsurance contract. Failure to disclose relevant information may allow reinsurers to cancel coverage back to inception (ab initio). Reinsurers would also seek to secure reimbursement of any claims already paid. The duty of disclosure and the consequences of its breach may vary to a limited degree from the foregoing dependent upon the law(s) applicable to the reinsurance contract.

Please contact us immediately for assistance if you do not fully understand this duty of disclosure, if you are unsure whether information may be material or if it comes to your attention that full and accurate information may not have been disclosed.

<u>**Warranties:**</u>  Warranties are important provisions contained in your insurance contract and must be exactly complied with at all times.  Breach of a warranty may, depending on the law under which the contract is interpreted, entitle (re)insurers to terminate the contract from the date of that breach, and in some instances may mean that the contract does not come into effect at all.  This is the position regardless of whether there is any connection between the warranty breached and any loss which leads to that breach becoming evident.  A warranty may exist in the contract using other terminology and without reference to the word "warranty".  For example you may have completed a proposal/application form and deemed to have warranted the accuracy of information provided, such that any inaccuracy will constitute a breach of warranty.

<u>**Conditions Precedent to (Re)Insurers' Liability:**</u>  There are two types of condition precedent.  If a condition precedent to the validity of this contract or the commencement of the (re)insurance is not complied with, the insurer will not come on risk.  If a condition precedent to the insurer's liability under this contract is not complied with, the insurer will not be liable for the loss in question.  A condition precedent may exist in the contract using other terminology and without reference to the words "condition precedent".

<u>**Subjectivities:**</u>  Should this (re)insurance be subject to any specific conditions being complied with or information being provided to (re)insurers by a certain date, they will be detailed under the heading "Subjectivities".  Please ensure you comply with any requirements appearing there within the stated timescale as failure to do so may prejudice your coverage.  If you cannot comply with the terms, you must notify (re)insurers in good time.

<u>**Notification of any information**</u>, including as outlined above, or any queries you may have about your insurance contract should, in the first instance, be notified to your Broker.

<u>**Notification of any claims.**</u>
All claims or circumstances which may potentially lead to a claim must be notified promptly.  The prompt notification of claims is a requirement of all insurance contracts. **Please ensure you are familiar with the claims notification procedure contained in this contract and in particular any time constraints as failure to comply with this might prejudice your position should a claim occur.**

## NOTICE:

1. THE INSURANCE POLICY THAT YOU ARE APPLYING TO PURCHASE IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER 1-800-927-4357.  ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT **WWW.NAIC.ORG** .

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. **FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

7. **CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV .**

8. **IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU**

**Date: …………………………………………………………**

**Insured: …………………………………………………**

**07/11**
**LSW1146D**



Forming part of Contract Number:  FL1800083

### SECURITIES BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE

**In consideration of the payment of the premium specified, Insurers agree to provide insurance to the extent and in the manner set out in this document.  This document should be read as a whole, in conjunction with the attached contract wording(s), clauses and schedule(s).**

### DECLARATIONS

Policy No. FL1800083

1.  **Broker/Dealer**:     Emerson Equity LLC

    Address:                155 Bovet Road, Suite 725, San Mateo, CA 94402

2.  **Policy Period**:      From:   11th November 2018
    To:      10th November 2019

    Both days inclusive Local Standard Time at address above.  Without tactic renewal

3.  Limits of Liability:    A)   USD 1,000,000 each **Claim** and USD 1,000,000 in the aggregate for all **Claims** in respect of Insuring Agreements A.1. and A.2.

    B)   USD 1,000,000 each **Claim** and USD 1,000,000 in the aggregate for all **Claims** in respect of Insuring Agreement B.

    C)   USD 1,000,000 in the aggregate for all **Claims** under Insuring Agreements A and B.

    D)   New York **Registered Representative** Coverage:

    Not Applicable

4.  Retention:              A)   **Insuring Agreement A - Broker/Dealer** Retention –  USD 75,000 each and every **Claim**

    B)   **Insuring Agreement B - Registered Representative** Retention – USD 75,000 each and every **Claim**

5.  Retroactive Date:       11th November 2004

6.  Premium:                USD 13,500 per annum

    Payment Terms:          60 days in accordance with the Premium Payment Clause

7.  Notice of **Claim** to:     RKH Specialty Limited
    16 Eastcheap
    EC3M 1BD London
    E-mail: FLnewclaims@rkhspecialty.com

8.  Notice of Election
    of Discovery to:        RKH Specialty Limited
    16 Eastcheap
    EC3M 1BD London

    Tel: +44 (0) 20 7623 3806
    Fax: +44 (0) 20 7623 3807

9.  Service of Suit:        Stefan Dandelles, Managing Partner
    Kaufman Dolowich & Voluck LLP
    55 E. Monroe, Suite 2950
    Chicago, IL 60603

Authorised Signatory

**RKH**
**Specialty**

Forming part of Contract Number:  FL1800083

| 10. | Discovery Terms: | a) | Additional Premium: | 150% of the "full annual premium" |
|     |                  | b) | Discovery Period:   | 12 months |

11.   Choice of Law:         California

Forms and Endorsements attached hereto:

1.  Wording Amendments Endorsement, as attached
2.  NMA 1256 – Nuclear Incident Exclusion Clause – Liability – Direct (BROAD) (U.S.A.)
3.  NMA 1477 – Radioactive Contamination Exclusion Clause – Liability – Direct (U.S.A.)
4.  NMA 2918 – War and Terrorism Exclusion Endorsement
5.  Premium Payment Clause LSW 3001

**Governing Law & Jurisdiction of this Contract**:

Any dispute between the Insured and Insurers concerning the interpretation of this Policy shall be subject to the laws of California and to the exclusive jurisdiction of any competent court within USA.

**Situation:**

This contract provides cover for work you carry out worldwide

**Legal Action:**

This contract provides cover for claims made against you worldwide

**Conformity Clauses:**

Wherever the word "Policy" and "Contract of Insurance" appear, they are deemed to be synonymous.

Wherever the words "Underwriters" and "Insurers" appear, they are deemed to be synonymous.

Wherever the words "Insured" and "Assured" appear, they are deemed to be synonymous

**Contract Wording:**

Securities Broker/Dealer's Professional Liability Insurance wording as attached

**Express Warranties**:

None other than any which may be included in the contract wording.  Please read your contract carefully.  Breach of a warranty could result in termination of this contract.

**Conditions Precedent:**

None other than any which may be included in the contract wording.  Please read your contract carefully.  Breach of a "condition precedent to liability" may entitle Insurers to reduce indemnity for or even reject a claim.  Breach of a "condition precedent to contract" entitles an insurer to avoid the contract entirely.

**Recording, Transmitting and Storing Information**

Where the broker maintains risk and claim data/information/documents the broker may hold data/information/documents electronically

Authorised Signatory



Forming part of Contract Number:  FL1800083

## SECURITY DETAILS

**Insurer's liability several not joint**

The liability of an insurer under this contract is several and not joint with other insurers party to this contract. An insurer is liable only for the proportion of liability it has underwritten. An insurer is not jointly liable for the proportion of liability underwritten by any other insurer. Nor is an insurer otherwise responsible for any liability of any other insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by an insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is an insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**
Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line". The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

LMA3333

Authorised Signatory



Forming part of Contract Number:  FL1800083

**INSURERS**

| **Signed Line** | **Insurer** | **Reference** | **Risk Transfer** |
|---|---|---|---|
| 50% | Lloyd's Syndicate AUL 1274 | 302929500018 | No |
| 50% | Lloyd's Syndicate HAM 3334 | ZE194c18A000 | No |

100% of 100% order

Risk Transfer

Some Insurers, as an added protection to our clients, have agreed that monies collected by us from Clients and held to the account of Insurers (or claims monies held for payment to our Clients) will be considered by those Insurers as their money ('Risk Transfer').  This does mean however that in the case of insolvency of the Insurer we may be required to remit premiums to the Administrator or Liquidator and may be prevented from passing claims monies received to Clients.

Where we act as agents of Insurers for the purposes of holding or receiving claim payments or return premiums we will remit them to such parties as Insurers direct us to pay.

Please refer to your Terms of Business Agreement.

Authorised Signatory

**RKH**
**Specialty**

Forming part of Contract Number:  FL1800083

### WORDING AMENDMENTS ENDORSEMENT

It is hereby understood and agreed that the following amendments have been made to the policy:

1) Section **2. Defense, Investigation and Settlement (Included in the Limits of Liability), B. Investigation and Settlement**, paragraph 2 is deleted in its entirety and replaced with the following:

   In the event the **Insured**(s) refuse to consent to a Settlement Opportunity, the Insurer shall have the right but not the obligation to continue the defense of the **Claim** after the date of the refusal to settle and may in such a case, at any time after the date of the refusal to settle, withdraw from the further defense of the **Claim** by tendering control of the defense to the **Insured**.

2) It is hereby understood and agreed that definition (k) "**Professional Services**" is deleted in its entirety and replaced with the following:

   (k)   "**Professional Services**" means the following services if rendered in connection with an **Approved Activity** for or on the behalf of a customer or client of the **Broker/Dealer** pursuant to a written agreement between the **Broker/Dealer** and the customer or client:

   (1)   purchase or sale of fixed annuities, variable annuities and indexed annuities

   (2)   purchase or sale of life or accident and health insurance,

   and in connection with or incidental to any of the foregoing 5 activities:

   (3)   providing economic advice, financial advice or investment advisory services, or

   (4)   providing financial planning advice including without limitation any of the following activities in conjunction therewith:  the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or taxes.

All other terms and conditions remain unchanged.

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

   Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

**I.**   Under any Liability Coverage, to injury, sickness, disease, death or destruction:

   (a)   with respect to which an **Insured** under the Policy is also an **Insured** under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an **Insured** under any such policy but for its termination upon exhaustion of its limit of liability; or

   (b)   resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the **Insured** is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

Authorised Signatory



Forming part of Contract Number:  FL1800083

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

(a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an **Insured** or (2) has been discharged or dispersed therefrom;

(b)  the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an **Insured**; or

(c)  the injury, sickness, disease, death or destruction arises out of the furnishing by an **Insured** of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.  As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

(a)  any nuclear reactor,

(b)  any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)  any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the **Insured** at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)  any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.  With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60
NMA1256

Authorised Signatory



Forming part of Contract Number:  FL1800083

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

### WAR AND TERRORISM EXCLUSION ENDORSEMENT

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto it is agreed that this insurance excludes **Loss**, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the **Loss**;

1. war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. any act of terrorism.

    For the purpose of this endorsement an act of terrorism means an act, including but not limited to the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organisation(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes **Loss**, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1 and/or 2 above.

If the Underwriters allege that by reason of this exclusion, any **Loss**, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

08/10/01
NMA2918

### PREMIUM PAYMENT CLAUSE

Notwithstanding any provision to the contrary within this contract or any endorsement hereto, in respect of non payment of premium only the following clause will apply.

The (Re)Insured undertakes that premium will be paid in full to (Re)Insurers within 60 days of inception of this contract (or, in respect of instalment premiums, when due).

If the premium due under this contract has not been so paid to (Re)Insurers by the 60th day from the inception of this contract (and, in respect of instalment premiums, by the date they are due) (Re)Insurers shall have the right to cancel this contract by notifying the (Re)Insured via the broker in writing.  In the event of cancellation, premium is due to (Re)Insurers on a pro rata basis for the period that (Re)Insurers are on risk but the full contract premium shall be payable to (Re)Insurers in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this contract.

Authorised Signatory

**RKH**
**Specialty**

Forming part of Contract Number:  FL1800083

It is agreed that (Re)Insurers shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker.  If premium due is paid in full to (Re)Insurers before the notice period expires, notice of cancellation shall automatically be revoked.  If not, the contract shall automatically terminate at the end of the notice period.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

30/09/08
LSW3001

Authorised Signatory



Forming part of Contract Number:  FL1800083

**SECURITIES BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE**

In consideration of the payment of the premium, and in reliance upon the statements made to the Insurer in the application and its attachments and the material incorporated therein, and subject to the Limit of Liability and all other terms and conditions contained herein, Underwriters at Lloyd's, hereinafter called the "Insurer", agrees as follows:

1. **INSURING AGREEMENTS**

   A. **BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE (INCLUDING FAILURE TO SUPERVISE)**

      This policy shall pay on behalf of the **Broker/Dealer Loss** arising from a **Claim** first made against the **Broker/Dealer** during the **Policy Period** or the Discovery Period  (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Broker/Dealer:**

      1. in the rendering or failure to render **Professional Services** by the **Broker/Dealer**; or

      2. in **Failing to Supervise** a **Registered Representative** in the rendering or failure to render **Professional Services** by such **Registered Representative** on the behalf of the **Broker/Dealer.**

   B. **REGISTERED REPRESENTATIVE PROFESSIONAL LIABILITY INSURANCE**

      This policy shall pay on behalf of a **Registered Representative Loss** arising from a **Claim** first made against the **Registered Representative** during the **Policy Period** or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** committed by the **Registered Representative** in the rendering or failure to render **Professional Services** on behalf of the **Broker/Dealer.**

2. **DEFENSE, INVESTIGATION AND SETTLEMENT (INCLUDED IN THE LIMITS OF LIABILITY)**

   A. **Defense**

      The Insurer shall have the right and duty to defend, subject to and as part of the Limits of Liability, any **Claim** made against an **Insured** during the **Policy Period** or Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged **Wrongful Act** for which coverage is afforded by this policy, even if any of the allegations of the **Claim** are groundless, false or fraudulent.

   B. **Investigation and Settlement**

      The Insurer shall have the right to make any investigation it deems necessary with respect to any **Claim** or notice of circumstances under this policy. The Insurer shall have the right to make any settlement of a **Claim** under this policy it deems expedient.

      In the event an opportunity arises whereby any **Claim** can be settled within the applicable retention and the **Insured**(s) refuse to settle such **Claim**, the Insurer shall not be liable for any **Loss** in respect of such **Claim**. Further, in the event the **Insured**(s) refuse to consent to a settlement agreeable to both the claimant/plaintiff and the Insurer, then the Insurer's liability for all **Loss** including **Defense Costs** on account of such **Claim** shall not exceed the total sum of the amount for which the **Claim** could have been settled plus **Defense Costs** incurred up to the date of the **Insured's** refusal to consent to such settlement.

      In all events, the Insurer shall not be obligated to settle any **Claim**, pay any **Loss** or undertake or continue defense of any **Claim** after the applicable Limit of Liability has been exhausted by settlement of a **Claim**(s) or payment of **Loss**. In each such case, the Insurer shall have the right to withdraw from the further defense of the **Claim** by tendering control of the defense to the **Insured**(s).

      The **Insured**(s) shall not admit liability for or settle any **Claim** or incur any **Defense Costs** without the Insurer's prior written consent. The **Insured**(s) shall give the Insurer and defense counsel full cooperation and such information as the Insurer and defense counsel reasonably request; including upon the Insurer's request, assisting in making settlements in the conduct of **Claims**, attending hearings, trials, arbitrations, mediations, and assisting in securing and giving evidence and obtaining the attendance of witnesses.

Authorised Signatory



Forming part of Contract Number:  FL1800083

If all **Insured** defendants are able to dispose of all **Claims** which are subject to one retention amount for an amount not exceeding the retention amount (inclusive of **Defense Costs**), then the Insurer's consent to such disposition shall not be required for such **Claims.**

3.    **DEFINITIONS**

(a)    **"Approved Activity"** means a service or activity performed by the **Registered Representative** on behalf of the **Broker/Dealer** which:

(1)    has been approved in writing in advance of such service or activity by the **Broker/Dealer** to be performed by the **Registered Representative**, and is

(2)    in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the **Broker/Dealer** to be transacted through the **Registered Representative**, and for which

(3)    the **Registered Representative** has obtained all licenses required by the **Broker/Dealer** or applicable law or regulation.

(b)    **"Broker/Dealer"** means the **Broker/Dealer** designated in Item 1 of the Declarations and any **Subsidiary** thereof; in addition, solely for purposes of coverage under Insuring Agreement A, **Broker/Dealer** shall also mean any director, officer, partner or employee of the **Broker/Dealer** against whom a **Claim** is made in his or her supervisory capacity.

(c)    **"Claim"** means the following brought by an **Insured's** customer or client in such capacity:

(1)    a written demand for monetary relief; or

(2)    a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(i)    service of a complaint or similar pleading; or

(ii)    receipt or filing of an arbitration demand or statement of claim.

(d)    **"Covered Call Options"** means only exchange-traded short call options on stock actually owned by the **Insured's** client throughout the option's life.

(e)    **"Defense Costs"** means reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond) resulting solely from the investigation, adjustment, defense and appeal of a **Claim** against an **Insured**(s), but excluding salaries of any **Insured.**

(f)    **"Failing to Supervise**" means the failure to create, implement, enact or enforce any applicable supervisory procedures required by law, common or statutory, regulation, governmental authority or regulation authority or self-regulatory authority, including but not limited to the procedures established by the Financial Industry Regulatory Authority ("FINRA") as outlined in Section 3000 of the FINRA Rules, and any amendments thereto.

(g)    "**Insured**" means:

(1)    the **Broker/Dealer**

(2)    any past, present or future director, officer, partner or employee of the **Broker/Dealer** (other than a **Registered Representative**), but only if covered under Insuring Agreement B.; and

(3)    any **Registered Representatives** of the **Broker/Dealer.**

Authorised Signatory

**RKH Specialty**

Forming part of Contract Number:  FL1800083

(h)  "**Interrelated Wrongful Act(s)**" means **Wrongful Acts** which are the same, related or continuous, or **Wrongful Acts** which arise from the same, related or common nexus of facts regardless of whether such **Claims** involve the same or different claimants, **Insureds** or legal causes of action.  Further, and without limiting the aforementioned, the following **Claims** shall automatically be deemed to allege **Interrelated Wrongful Acts**:

1.  **Claims** in connection with securities of any entity (or affiliated entities) which become(s) the subject of any bankruptcy, insolvency, receivership, liquidation or reorganization proceeding, or

2.  **Claims** in connection with securities purchased in connection with an offering (or series of offerings) of securities issued by the same entity or affiliated entities;

(i)  "**Investment Banking Activity**" means, but is not limited to, the underwriting, syndicating or promotion of any security or partnership interest in connection with any of the following: any actual, alleged or threatened merger, acquisition, divestiture, tender offer, proxy contest, leveraged buy-out, going private transaction, reorganization (voluntary or involuntary), capital restructuring, recapitalization, spin-offs, primary or secondary offerings of securities (regardless of whether the offering is a public offering or private placement), dissolution or sale of all or substantially all of the assets or stock of a business entity, or effort to raise or furnish capital or financing for any enterprise or entity, or any acquisition or sale of securities by the **Broker/Dealer** for its own account, or any activity by any **Insured** as a specialist or market maker (including the failure to make a market) for any securities, or any disclosure requirements in connection with any of the foregoing. **Investment Banking** also includes the rendering of advice or recommendations or the rendering of a written opinion in connection with any of the foregoing.

(j)  "**Loss**" means damages, judgments, settlements and **Defense Costs**; however, **Loss** shall not include:

(1)  salaries of any **Insured**;

(2)  the cost of complying with any settlement for or award of non-monetary relief;

(3)  civil or criminal fines or penalties imposed by law, punitive or exemplary damages, the multiplied portion of multiplied damages, taxes, any amounts for which the **Insureds** are not financially liable or which are without legal recourse to the **Insureds**, or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed; not withstanding the foregoing, **Loss** shall include awards of punitive or exemplary damages (where insurable by law) in an amount not greater than the amount of the compensatory damages award; and

(4)  the return of fees, commissions, or other compensation for any **Professional Services** rendered or required to be rendered by the **Insured** or that portion of any settlement or award in an amount equal to such fees, commissions, or other compensation.

(k)  "**Policy Period**" means the period from the inception date of this policy shown in Item 2 of the Declarations to the earlier of the expiration date shown in Item 2 of the Declarations or the effective date of cancellation of this policy.

(l)  "**Professional Services**" means the following services if rendered in connection with an **Approved Activity** for or on the behalf of a customer or client of the **Broker/Dealer** pursuant to a written agreement between the **Broker/Dealer** and the customer or client:

(1)  purchase or sale of securities, including investment companies,

(2)  purchase or sale of annuities or variable annuities,

(3)  purchase or sale of life or accident and health insurance,

(4)  providing brokerage services for individual retirement accounts (IRA's), Keogh retirement plans and employee benefit plans (other than multiple employer or multi-employee welfare arrangements),

(5)  advice provided to a Client in accordance with the Investment Advisors Act 1940, as amended, concerning securities and products provided that such securities and products are approved and authorized by the **Broker/Dealer** and only to the extent such coverage is added to this policy by specific endorsement attached hereto;

and in connection with or incidental to any of the foregoing 5 activities:

Authorised Signatory

**RKH Specialty**

Forming part of Contract Number:  FL1800083

(6)   providing financial planning advice including without limitation any of the following activities in conjunction therewith:  the preparation of a financial plan or personal financial statements, the giving of advice relating to personal risk management, insurance, savings, investments, retirement planning or taxes.

(m)   "**Registered Representative**" means an individual who is registered with FINRA, including a registered principal, and who for compensation engages in the business of rendering **Professional Services** on behalf of the **Broker/Dealer** pursuant to a valid written contract in force at the time a **Claim** is first made.

For purposes of coverage under Insuring Agreement A.2., **Registered Representative** shall include a former **Registered Representative** if acting on behalf of the **Broker/Dealer** at the time of the alleged **Wrongful Act**.

For purposes of coverage identified in Item 3D of the Declarations, **Registered Representative** shall also include a **Registered Representative** who is domiciled and/or maintains a principal place of business in the State of New York

(n)   "**Subsidiary**" means:

(1)   a corporation of which the **Broker/Dealer** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its subsidiaries;

(2)   automatically a corporation created, or acquired during the **Policy Period** if the number of **Registered Representative**s of such other corporation total less than 10% of the total number of **Registered Representative**s of the **Broker/Dealer** as of inception date of this policy.  The **Broker/Dealer** shall provide the Insurer with full particulars of the new within 30 days of creation or acquisition or before the end of the **Policy Period** whichever comes first;

(3)   a corporation created, or acquired during the **Policy Period** (other than a corporation described in paragraph (2) above) but only upon the condition that within 30 days of its becoming a **Subsidiary**, the **Broker/Dealer** shall have provided the Insurer with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this policy required by the Insurer relating to such new **Subsidiary**.  Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Broker/Dealer** paying when due any additional premium required by the Insurer relating to such new **Subsidiary**.

A **Broker/Dealer** creates or acquires a **Subsidiary** when the **Broker/Dealer** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.  A corporation ceases to be a **Subsidiary** when the **Broker/Dealer** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its Subsidiaries.

In all events, coverage as is afforded with respect to a **Claim** made against a **Subsidiary** or any director, officer, employee or **Registered Representative** thereof shall only apply for **Wrongful Acts** committed or allegedly committed after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

(o)   "**Wrongful Act**" means any negligent act, error or omission by the **Broker/Dealer**, any director, officer, partner or employee thereof, or by any **Registered Representative** thereof and solely in their respective capacities as such.

**4.   EXTENSIONS**

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from a **Claim** made against the estates, legal heirs, or legal representatives of any deceased individual **Insured**, and the legal representatives of such individual **Insured** in the event of incompetency, insolvency or



Forming part of Contract Number:  FL1800083

bankruptcy, who were individual **Insured** at the time the **Wrongful Act**s upon which such **Claims** are based were committed.

Subject otherwise to the terms hereof, this policy shall cover **Loss** arising from a **Claim** made against the lawful spouse or domestic partner (whether such status is derived by reason of statutory law, common law or otherwise of any applicable jurisdiction in the world) of an individual **Insured** for a **Claim** arising solely out of his or her status as the spouse or domestic partner of an individual **Insured**, including a **Claim** that seeks damages recoverable from marital community property, property jointly held by the individual **Insured** and the spouse or domestic partner, or property transferred from the individual **Insured** to the spouse or domestic partner; provided, however, that this extension shall not afford coverage for any **Claim** for any actual or alleged **Wrongful Act**s of the spouse or domestic partner, but shall apply only to **Claims** arising out of any actual or alleged **Wrongful Act**s of an individual **Insured**, subject to the policy's terms, conditions and exclusions.

5.   **EXCLUSIONS**

The Insurer shall not be liable for **Loss** in connection with any **Claim** made against an **Insured**:

a)   alleging, arising out of, based upon or attributable to the gaining in fact any profit or advantage to which the **Insured** was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

b)   alleging, arising out of, based upon or attributable to the committing in fact of: any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

c)   for bodily injury, sickness, disease, death or emotional distress of any person, or damage to or destruction of any tangible property, including the loss of use thereof, or for injury from libel or slander or defamation or disparagement, or for injury from a violation of a person's right of privacy.

d)   alleging, arising out of, based upon or attributable to any bankruptcy, insolvency, conservatorship, receivership or liquidation of, or suspension of payment or refusal to pay by any broker or dealer in securities or commodities, clearing agency, or any bank or banking firm, or any insurance or reinsurance entity or any **Insured**;  provided, however, this exclusion will not apply to **Wrongful Acts** solely in connection with any **Insured's** investment on the behalf of the claimant in the stock of any of the foregoing entities;

e)   alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the inception date of the first Securities **Broker/Dealer's** Errors And Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the **Broker/Dealer** designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any **Insured** knew or could have reasonably forseen that such **Wrongful Act** could lead to a **Claim**, or alleging, arising out of, based upon or attributable to any subsequent **Interrelated Wrongful Act**;

f)   alleging, arising out of, based upon or attributable to any **Wrongful Act** occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent **Interrelated Wrongful Act**;

g)   alleging, arising out of, based upon or attributable to any: (i) employee benefit plan or trust sponsored by any **Insured** or sponsored by any business enterprise that is operated or managed or owned, directly or indirectly, in whole or in part, by any **Insured**; or (ii) any plan in which an **Insured** is a participant or is a named fiduciary; or arising out of, based upon or attributable to any services performed by any **Insured** acting in fact as a trustee, administrator or fiduciary under the Employee Retirement Income Security Act of 1974, or amendments thereto, or any similar federal or state statutory law or any regulation or order issued pursuant thereto;

**RKH Specialty**

Forming part of Contract Number: FL1800083

h) brought by or on behalf of any **Insured**, or the successors or assigns of any **Insured**; or by or on behalf or any enterprise, trust or other entity that is operated or managed or owned, directly or indirectly, in whole or in part, by any **Insured**; or for which any **Insured** is a trustee, fiduciary, director or officer thereof;

i) alleging, arising out of, based upon or attributable to, in whole or in part, any **Investment Banking Activity** by an **Insured**, including but not limited to any disclosure requirements in connection with such **Investment Banking Activity;**

j) alleging, arising out of, based upon or attributable to the facts alleged, or arising out of the same or **Interrelated Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time;

k) brought by or on behalf of any clearing agency, or alleging, arising out of, based upon or attributable to any function of any **Insured** as a clearing agency;

l) alleging, arising out of, based upon or attributable to any: use by any **Insured** of, or aiding or abetting by any **Insured** in the use of, or participating after the fact by any **Insured** in the use of, non-public information in a manner prohibited by the laws of the United States, including, but not limited to, the Insider Trading and Securities Fraud Endorsement Act of 1988 (as amended), Section 10(b) of the Securities Exchange Act of 1934 (as amended) and Rule 10b-5 thereunder, any state, commonwealth, territory or subdivision thereof, or the laws of any other jurisdiction, or any rules or regulations promulgated under any of the foregoing;

m) alleging, arising out of, based upon or attributable to the purchase or sale of (or failure to purchase or sell) any of the following, or any advice in connection therewith:

1) commodities, futures contracts, forwards contracts or any type of option or futures contract, or any similar investment or investment product, except **Covered Call Options;**

2) any collectible, including but not limited to stamps, art, cards, jewelry, antiques or any other tangible personal property; or

3) any equity security priced under USD5.00 at the time that the **Wrongful Act** triggering such **Claim** arose; however, this exclusion shall not apply if the security is:

(i) registered, or approved for registration upon notice of issuance, on a national securities exchange; or

(ii) authorized, or approved for authorization upon notice of issuance, for quotation in the NASDAQ National Market System or the NASDAQ Capital Market; or

(iii) issued by an investment company registered under the Investment Company Act of 1940 (as amended); or

4) any security in any market outside of the United States of America and its territories and possessions and Canada; or

5) annuities used in connection with any structured settlement;

n) alleging, arising out of, based upon or attributable to any mechanical or electronic failure, breakdown or malfunction of machines or systems;

o) brought by or on behalf of, or instigated or continued with the solicitation, assistance, participation or intervention of, any State or Federal regulatory or administrative agency or bureau or any other governmental, quasi-governmental or self-regulatory entity ("Governmental Entity"), whether directly or indirectly, and whether brought in its capacity as trustee, liquidator, or assignee of the **Broker/Dealer**, or in any other capacity and whether brought in its own name or in the name of any other entity; however, this exclusion shall not apply to any **Claim** brought solely in such Governmental Entity's capacity as a customer or

Authorised Signatory



Forming part of Contract Number:  FL1800083

client of the **Broker/Dealer** and instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any **Insured.**

p)    alleging, arising out of, based upon or attributable to the rendering of or failure to render any of the following services or activities:

      (i)      actuarial,
      (ii)     accounting,
      (iii)    legal,
      (iv)    real estate agent or broker, or
      (v)     tax preparation or appearing before the Internal Revenue Service as an enrolled agent;

q)    for any actual or alleged **Wrongful Act** in rendering or failure to render **Professional Services** to any securities broker/dealer; however this exclusion shall not apply if the **Professional Service** is solely the purchase or sale of securities to such broker/dealer for its own account;

r)    with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the **Registered Representative** other than a covered **Professional Service**, including but not limited to "selling away";

s)    alleging, arising out of, based upon or attributable to an **Insured** exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any **Insured's** purchase or sale of no-load investment company or variable annuities in which there is no initial or contingent sales charge or commission; further, this exclusion shall not to apply to **Registered Investment Advisors** where the customer has authorized the exercise of discretionary authority or control in writing, prior to the exercise of such discretion or control taking place;

t)    alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an **Insured**, in part or in whole, of any entity other than the **Broker/Dealer** including but not limited to general partnerships, including but not limited to **Claims** arising out of an **Insured** acting as a general partner of any limited partnership and/or managing general partner of any general partnership;

u)    alleging, arising out of, based upon or attributable to any liability assumed by the **Insured** under any indemnification contract or agreement, either oral or in writing; however, this exclusion does not apply to liability that would exist in the absence of such contract or agreement;

v)    alleging, arising out of, based upon or attributable to employment or work place practices, including **Claims** arising under worker compensation laws or **Claims** in respect of alleged discrimination, retaliation, harassment, wrongful termination or inappropriate employment conduct of any sort;

w)    alleging, arising out of, based upon or attributable to the presence or actual, alleged, or threatened discharge, seepage, dispersal, migration, release, escape, generation, transportation, storage, or disposal of pollutants at any time, including any request, demand or order that the **Insured** or others test for, monitor, clean up, remove, assess, or respond to the effects of pollutants.  Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, odors, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed;

x)    arising from any **Claim** based upon or attributable to any failure or omission on the part of the **Insured** to effect and maintain adequate insurance;

y)    alleging, arising out of, based upon, or attributable to depreciation (or failure to appreciate) in value of any investments, including but not limited to securities, leased products, commodities, currencies, options and futures transactions as to which the **Insured** has



expressly or implicitly made a guarantee, representation or warranty as to the performance of such investments;

z)  arising out of an act, error or omission arising out of **Professional Services** for which the **Insured**, its Employees, Agents or Representatives did not hold a correct and valid license issued by the appropriate regulatory authority.

aa)  based upon, arising out of, directly or indirectly from or in consequence of, or in any way involving any actual or alleged:

1)  solicitation or receipt of any excessive, additional, undisclosed, improper or illegal Compensation relating to an Offering, or Compensation greater than that disclosed in the prospectus or registration statement relating to the Offering;

2)  improper solicitations or agreements, whether express or implied, relating to any Offering, including, but not limited to, solicitations or tie-in agreements to purchase: (i) additional shares of a company's stock at pre-determined prices; or (ii) shares of another corporation's stock; or

3)  violation of Regulations S-K or M of the Securities Exchange Commission, or Conduct Rules 2110 and 2440 of the National Association of Securities Dealers.

For the purpose of this Exclusion, the term "Offering" shall mean the public or private sale of a company's stock, including, but not limited to, an initial public offering, secondary offering or a private placement.

For the purposes of this Exclusion, the term "Compensation" shall mean any commissions, payments, fees, compensation or any other type of remuneration. "Compensation" shall also mean kickbacks, bribes or any other similar type of payments.

bb)  arising directly or indirectly out of, or in any manner related to:

1)  the manufacture, mining, processing, distribution, testing, remediation, removal, storage, disposal, sale, use of or exposure to asbestos or materials or products containing asbestos whether or not there is another cause of **Loss** which may have contributed concurrently or in any sequence to a **Claim**, or

2)  "Fungi" whether or not there is another cause of **Loss** which may have contributed concurrently or in any sequence to a **Claim**; "Fungi" as utilized herein shall mean any fungus or mycota or any by-product or type of infestation produced by such fungus or mycota, including but not limited to mold, mildew, mycotoxins, spores or any biogenic aerosols, or

3)  lead or lead containing products.

cc)  arising out of, in connection with, or in any way related to any intentional, Corporate or Business Policy.

For purposes of this Exclusion, "Corporate or Business Policy" shall mean any policy which has been expressly or impliedly approved, ratified, condoned or endorsed by two or more of the **Insured's** Management and which results in:

1)  a financial disadvantage to two or more of the **Insured's** clients or any group or class of the **Insured's** clients, and

2)  the **Insured** making a financial gain to which they were not entitled, whether or not such gain is returned to the client(s).

The **Insured's** Management shall be deemed to be the **Insured's** executive level officers, including but not limited to the CEO, President, COO, CCO, CFO and General Counsel.

dd)  for the reimbursement of fees, commissions, costs or other charges paid or payable to the **Insured** or any third party claim based upon allegations against the **Insured** of excessive fees, commissions, costs or other charges.

Authorised Signatory

Forming part of Contract Number:  FL1800083

**6.    LIMITS OF LIABILITY**

A.    The Limit of Liability stated in Item 3A and 3B of the Declarations as "each **Claim**" is the limit of the Insurer's liability for all **Loss** arising out of all **Claims** alleging the same **Wrongful Act** or **Interrelated Wrongful Acts**. This "each **Claim**" limit shall be part of and not in addition to the "aggregate for all **Claims**" limit set forth in Items 3A and 3B of the Declarations as well as the "Policy Aggregate" limit set forth in Item 3C of the Declarations, as described below.

B.    The Limits of Liability stated in Items 3A and 3B of the Declarations as "aggregate for all **Claims**" is the total limit of the Insurer's liability for all **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein.  This "aggregate for all **Claims**" limit shall be part of and not in addition to the "Policy Aggregate" limit set forth in Item 3C of the Declarations, as described below.

C.    The Limits of Liability stated in Item 3A of the Declarations whether as "each **Claim**" or "aggregate for all **Claims**" shall apply to **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein for which coverage is provided, in whole or in part, under Insuring Agreement A.1. and A.2.

D.    The Limits of Liability stated in Item 3B of the Declarations whether as "each **Claim**" or "aggregate for all **Claims**" shall apply to **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein for which coverage is provided by this policy other than a **Claim** for which coverage is provided, in whole or in part, under Insuring Agreement B.

E.    The Limit of Liability stated in Item 3C of the Declarations is the aggregate total limit of the Insurer's liability for **Loss** arising out of all **Claims** first made against the **Insureds** during the **Policy Period** and the Discovery Period (if applicable) and reported to the Insurer in accordance with the terms herein under this policy.

F.    In the event of the total erosion of Limit of Liability stated in Item 3C of the Declarations, the Limit of Liability for a **Registered Representative** domiciled or with a principal place of business in New York as stated in Item 3D of the Declarations shall be made available to each such New York **Registered Representative.**

The total limit of liability available to any one New York **Registered Representative** following the total erosion of the Limit of Liability in Item 3C of the Declarations will be the "aggregate for all **Claims**" Limit of Liability as stated in Item 3D of the Declarations for each such New York **Registered Representative.**

The "each **Claim**" and "aggregate for all **Claims**" Limit of Liability set forth in Item 3D of the Declarations is only available to the number of New York **Registered Representatives** as identified in Item 3D of the Declarations.

G.    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts**, regardless of the causes of action plead or the number or identity of claimants involved, shall be deemed to constitute a single **Claim**, and shall be deemed to have been made at the earliest of the following times:

1.    the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** is first made; or

2.    the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section 7(c) below.

H.    The Limit of Liability for the Discovery Period shall be part of, and not in addition to, the applicable Limit of Liability for the **Policy Period**.  Further, a **Claim** which is made subsequent to the **Policy Period** or the Discovery Period (if applicable) which pursuant to Clause 8(b) or 8(c) is considered made during the **Policy Period** or the Discovery Period shall also be subject to the aggregate Limit of Liability stated in Item 3C of the Declarations.

I.    **Defense Costs** are not payable by the Insurer in addition to the Limit of Liability. **Defense Costs** are part of **Loss** and as such are subject to the applicable Limit of Liability.

Authorised Signatory 



7.   **RETENTION**

The Insurer shall only be liable for the amount of **Loss** arising from a **Claim** which is in excess of the applicable Retention Amount stated in Item 4 of the Declarations, such Retention Amount to be borne by the **Insureds** and shall remain uninsured with regard to all **Loss** arising from any **Claim**.

The Retention stated in Item 4A of the Declarations as the "**Broker/Dealer** Retention" shall apply to **Claims** for which coverage is provided under Insuring Agreement A of this policy.
The Retention stated in Item 4B of the Declarations as the "**Registered Representative** Retention" shall apply to **Claims** for which coverage is provided under Insuring Agreement B of this policy.

In the event of a **Claim** (or **Claims** alleging **Interrelated Wrongful Acts**) for which more than one retention amount set forth in Item 4 of the Declarations is applicable, then all such retentions shall apply to the **Claim**(s); provided, however, that the maximum retention amount shall not exceed the highest applicable single retention amount.

8.   **NOTICE/CLAIM REPORTING PROVISIONS**

**Notice hereunder shall be given in writing to the person or entity identified in Item 7 of the declarations page.  If mailed, the date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice.**

(a)   The **Broker/Dealer** or the **Insured** shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a **Claim** made against an **Insured** as soon as practicable during the **Policy Period** or during the Discovery Period (if applicable) and in no event more than 30 days after the date such **Claim** was first made against an **Insured.**

(b)   If written notice of a **Claim** has been given to the Insurer pursuant to Clause 8 (a) above, then a **Claim** which is subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the **Claim** for which such notice has been given, or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged in the **Claim** of which such notice has been given, shall be considered made at the time such notice was given.

(c)   If during the **Policy Period** or during the Discovery Period (if applicable) the **Broker/Dealer** or the **Insureds** shall become aware of any circumstances which may reasonably be expected to give rise to a **Claim** being made against the **Insureds** and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a **Claim,** with full particulars as to dates, persons and entities involved, then a **Claim** which is subsequently made against the **Insureds** and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any **Wrongful Act** which is the same as or related to any **Wrongful Act** alleged or contained in such circumstances, shall be considered made at the time such notice of such circumstances was given.

9.   **PROTECTION FOR INNOCENT INSURED**

Whenever coverage under this policy would be excluded under Exclusion a) or b) because an **Insured** committed a criminal or deliberately fraudulent act; or wilfully violated the law or gained a profit or advantage to which the **Insured** was not legally entitled, the coverage otherwise afforded under this policy to a natural person **Insured** will continue to apply to each such **Insured** who did not personally commit or personally participate in committing such criminal or deliberately fraudulent act; did not wilfully violate the law or gain a profit or advantage; and did not personally acquiesce in or remain passive after having personal knowledge or becoming aware of one or more such acts, wilful violation or improper gain as set forth in Exclusions a) and b).

10.   **DISCOVERY CLAUSE**

Except as indicated below, if the Insurer shall cancel or refuse to renew this policy, the **Broker/Dealer** shall have the right, upon payment of the additional premium specified in Item 10 a) of the Declarations, to the period specified in Item 10 b) of the Declarations, following the effective date of such cancellation or nonrenewal (herein referred to as the Discovery Period) in which to give to the Insurer written notice of **Claims** first made against the **Insured** during said one year period for any **Wrongful Act** occurring prior to the end of the **Policy Period** and otherwise covered by this policy.  As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the **Policy Period**.  The rights contained in this paragraph shall terminate, however,

Authorised Signatory



Forming part of Contract Number:  FL1800083

unless written notice of such election, together with the additional premium due is received by the Insurer within thirty (30) days of the effective date of cancellation or non-renewal.

In the event of a Transaction, as defined in Clause 12, the **Broker/Dealer** shall have the right, within thirty (30) days of the end of the **Policy Period**, to request an offer from the Insurer of a Discovery Period (with respect to **Wrongful Act**s occurring prior to the effective time of the Transaction) for a period of one year.  The Insurer shall offer such Discovery Period pursuant to such terms, conditions and premium as the Insurer may reasonably decide.  In the event of a Transaction, the right to a Discovery Period shall not otherwise exist except as indicated in this paragraph."

The additional premium for the Discovery Period shall be fully earned at the inception of the Discovery Period.  The Discovery Period is not cancellable.  This clause and the rights contained herein shall not apply to any cancellation resulting from non-payment of premium.

The offer by the Insurer of renewal terms, conditions, Limits of Liability and/or premiums different from those of the expiring policy shall not constitute a refusal to renew.

**11.   CANCELLATION CLAUSE**

This policy may be cancelled by the **Broker/Dealer** first named in Item 1 of the Declarations at any time only by mailing written prior notice to the Insurer stating when thereafter such cancellation shall be effective, or by surrender of this policy to the Insurer or its authorized agent.  This policy may also be cancelled by or on behalf of the Insurer by delivering to the **Broker/Dealer** or by mailing to the **Broker/Dealer**, by registered, certified, or other first class mail, at the **Broker/Dealer's** address as shown in Item 1 of the Declarations, written notice stating when, not less than sixty (60) days thereafter, or ten (10) days thereafter in the event of nonpayment of premium when due, the cancellation shall be effective.  The mailing of such notice as aforesaid shall be sufficient proof of notice.  The **Policy Period** terminates at the date and hour specified in such notice, or at the date and time of surrender.

If this policy shall be cancelled by the **Broker/Dealer,** the Insurer shall retain the customary short rate proportion of the premium hereon.

If this policy shall be cancelled by the Insurer, the Insurer shall retain the pro rata proportion of the premium hereon.

Payment or tender of any unearned premium by the Insurer shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.  If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

**12.   CHANGE IN CONTROL OF BROKER/DEALER**

If during the **Policy Period**:

a.   the **Broker/Dealer** shall consolidate with or merge into, or sell all or substantially all of its assets to any other person or entity or group of persons and/or entities acting in concert; or

b.   any person or entity or group of persons and/or entities acting in concert shall acquire an amount of the outstanding securities representing more than 50% of the voting power for the election of directors of the **Broker/Dealer**, or acquires the voting rights of such an amount of such securities;

       (either of the above events herein referred to as the "Transaction")

then this policy shall continue in full force and effect as to **Wrongful Acts** occurring prior to the effective time of the Transaction, but there shall be no coverage afforded by any provision of this policy for any actual or alleged **Wrongful Act** occurring after the effective time of the Transaction. This policy may not be canceled after the effective time of the Transaction and the entire premium for this policy shall be deemed earned as of such time. The **Broker/Dealer** shall also have the right to an offer by the Insurer of a Discovery Period described in Clause 10 of the policy.

The **Broker/Dealer** shall give the Insurer written notice of the Transaction as soon as practicable, but not later than 30 days after the effective date of the Transaction.

Authorised Signatory

**RKH Specialty**

**13.   SUBROGATION**

In the event of any payment under this policy, the Insurer shall be subrogated to the extent of such payment to all the **Broker/Dealer's** and the **Insureds'** rights of recovery thereof, and the **Broker/Dealer** and the **Insureds** shall execute all papers required and shall do everything that may be necessary to secure such rights including the execution of such documents necessary to enable the Insurer effectively to bring suit in the name of the **Broker/Dealer** and/or the **Insured**s.  In no event, however, shall the Insurer exercise its rights to subrogation against an **Insured** under this policy unless such **Insured** has been convicted of a criminal act, or been judicially determined to have committed a deliberate fraudulent act, or obtained any profit or advantage to which such **Insured** was not legally entitled, or arising out of an act other than a covered **Professional Service.**

**14.   OTHER INSURANCE**

Such insurance as is provided by this policy shall apply only as excess over any other valid and collectible insurance.

**15.   NOTICE AND AUTHORITY**

It is agreed that the **Broker/Dealer** first named in Item 1 of the Declarations shall act on behalf of **Insureds** with respect to the giving of notice of **Claim** or giving and receiving notice of cancellation, the payment of premiums and the receiving of any return premiums that may become due under this policy, the receipt and acceptance of any endorsements issued to form a part of this policy and the exercising or declining to exercise any right to a Discovery Period.  Notice to any agent or knowledge possessed by any agent or any other person shall not effect a waiver or a change in any part of this policy or stop the Insurer from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed except by endorsement issued to form a part of this policy and signed by an authorized representative of the Insurer.

**16.   TERRITORY**

This policy applies to **Claims** which are brought anywhere in the World.

**17.   ASSIGNMENT**

This policy and any and all rights hereunder are not assignable without the written consent of the Insurer.

**18.   ALTERNATIVE DISPUTE RESOLUTION PROCESS**

It is hereby understood and agreed that all disputes or differences which may arise under or in connection with this policy, whether arising before or after termination of this policy, including any determination of the amount of **Loss**, shall be subject to the alternative dispute resolution process ("ADR") set forth in this clause.

Either the Insurer or the **Insured(s)** may elect the type of ADR discussed below; provided, however, that the **Insureds** shall have the right to reject the Insurer's choice of ADR at any time prior to its commencement, in which case the **Insureds'** choice of ADR shall control.

The Insurer and **Insured(s)** agree that there shall be two choices of ADR: (1) non-binding mediation administered by the American Arbitration Association, in which the Insurer and **Insureds** shall try in good faith to settle the dispute by mediation under or in accordance with its then-prevailing Commercial Mediation Rules; or (2) arbitration submitted to the American Arbitration Association under or in accordance with its then-prevailing commercial arbitration rules, in which the arbitration panel shall be composed of three disinterested individuals.  In either mediation or arbitration, the mediator(s) or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute.   The mediator(s) or arbitrators shall also give due consideration to the general principles of the law of the state where the **Broker/Dealer** is incorporated in the construction or interpretation of the provisions of this policy; provided, however, that the terms, conditions, provisions and exclusions of this policy are to be construed in an even-handed fashion in the manner most consistent with the relevant terms, conditions, provisions or

Authorised Signatory

**RKH Specialty**

exclusions of the policy.  In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the arbitrators' award shall not include attorneys fees or other costs.  In the event of mediation, either party shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until the mediation shall have been terminated and at least 120 days shall have elapsed from the date of the termination of the mediation.  In all events, each party shall share equally the expenses of the ADR.

Either choice of ADR may be commenced in either New York, New York; Atlanta, Georgia; Chicago, Illinois; Denver, Colorado; or in the state indicated in Item 1 of the Declarations page as the mailing address for the **Broker/Dealer**.  The **Broker/Dealer** shall act on behalf of all **Insureds** in deciding to proceed with ADR under this clause.

## 19.    ACTION AGAINST INSURER

Except as provided in Clause 18 of this policy, no action shall lie against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **Insureds'** obligation to pay shall have been finally determined either by judgment against the **Insureds** after actual trial or by written agreement of the **Insureds**, the claimant and the Insurer.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy.  No person or organization shall have any right under this policy to join the Insurer as a party to any action against the **Insureds** or the **Broker/Dealer** to determine the **Insureds'** liability, nor shall the Insurer be impleaded by the **Insured**s or the **Broker/Dealer** or their legal representatives.  Bankruptcy or insolvency of the **Broker/Dealer** or the **Insureds** or of their estates shall not relieve the Insurer of any of its obligations hereunder.

## 20.    HEADINGS

The descriptions in the headings of this policy are solely for convenience, and form no part of the terms and conditions of coverage.

## 21.    SERVICE OF SUIT CLAUSE (U.S.A.)

This Clause is not intended to conflict with or override the parties' obligation to arbitrate their disputes in accordance with Clause 18.

It is agreed that in the event of the failure of the Insurer hereon to pay any amount claimed to be due hereunder, the Insurer hereon, at the request of the **Insured**, will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Insurer's right to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. The **Insured** likewise agrees to submit to the jurisdiction of any court of competent jurisdiction.

It is further agreed that service of process in such suit may be made upon the person or entity identified in Item 9 of the Declarations, and that in any suit instituted against the Insurer, the Insurer will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of the Insurer in any such suit and/or upon the request of the **Insured** to give a written undertaking to the **Insured** that they will enter a general appearance upon the Insurer's behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefore the Insurers hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** or any beneficiary

Authorised Signatory

Forming part of Contract Number:  FL1800083

hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**22.   CHOICE OF LAW**

This insurance shall be governed by and construed in accordance with the law of the State identified in Item 11 of the Declarations

Authorised Signatory

**EXHIBIT E**

**Daniel Brainard**

---

| | |
|---|---|
| **From:** | David Thomas <david.thomas@aflib.com> |
| **Sent:** | Wednesday, October 23, 2019 4:18 PM |
| **To:** | Steve Redding |
| **Subject:** | Re: Emerson Equity, LLC. - BD E&O - 11 November Renewal |

Hi Steve

Here are the options we've agreed to date and those that look most appealing to the client, they are leaning towards the higher limit option at the 250k retention level.

1m x 250k @ 144k
3m x 250k @ 216k
5m x 250k @ 266k

As we know, as it stands, the retention for all services (BD E&O, private placements and RIA) is at $250k.

One last and final item I need to get to is to to retain a 100k retention for the current services offered, i.e. annuities (variable, fixed & indexed, life or accident and health insurance (which currently carries a 75k retention under their in force policy)? All other services will be at 250k and on and RDI basis, as quoted.

Please bear in mind these are claims free, we would very much appreciate some flexibility on the retention for these more benign exposures to get this deal across the line?

Thanks

David Thomas
AFL Insurance Brokers
07876896226

On 18 Oct 2019, at 19:36, David Thomas <david.thomas@aflib.com> wrote:

> Steve
>
> Just spoke with the Crystal guys and had a quick chat with Hamilton, you were absolutely right, you wrote a very small portion of the business last year (mainly annuities and life insurance work). Given the revenues are now at $28m and we are looking to include all typical BD work (failure to supervise and RR), private placements and RIA, this looks good.
>
> They want a couple of options applied to a $1, 3 and 5m:
>
> - $100k retention across the board;
> - $100k retention but $250k in respect of private placements;
> - $250k across the board.
>
> If ok let's keep our 10am on Monday to talk through and formalise some numbers. If Antares won't stay on then I'll get Talbot or Aspen to support.
>
> Good weekend.

Thanks

David Thomas
AFL Insurance Brokers
07876896226

On 18 Oct 2019, at 10:19, Steve Redding <Steve.Redding@volanteglobal.com> wrote:

> Dave,
>
> Just run this through the rater and for a $1m/$1m excess $100K I am coming out at
> $160K which is a massive hike on expiring.  Not sure how this paid $13.5K but have
> recollection that we excluded a large part of their operations.  Maybe worth speaking to
> Willett to shed more light on the risk.
>
> Regards
>
> Steve
>
> ---
>
> **From:** David Thomas <david.thomas@aflib.com>
> **Sent:** 17 October 2019 16:56
> **To:** Steve Redding <Steve.Redding@volanteglobal.com>
> **Cc:** James Urquhart <james.urquhart@aflib.com>
> **Subject:** RE: Emerson Equity, LLC. - BD E&O - 11 November Renewal
>
> Hi Steve
>
> Application attached, loss run to follow but to confirm these have had no claims in the
> past 5 years.
>
> **<u>Some additional info from the app</u>:**
>
> - 7 branches (2 OSJs)
> - 12 full time producers
> - Commission revenue breakdown:
>   - 45% direct private placements
>   - 45% 1031 exchange transactions
>   - 2.5% Investment banking/M&A advisory
>   - 3% hedge funds
>   - 2.5% mutual funds
>   - 2% ancillary
> - $85 AUM over 350 accounts
>
> Are you around to chat tomorrow, think you said you might have been WFH? If not, are
> you able to work on terms or meet to chat through first thing Monday?
>
> Many thanks
>
> David Thomas
> Senior Broker - Financial Lines
>
> <image001.png>

Introducing AFL

**AFL Insurance Brokers**

8 Lloyd's Avenue | London | EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com

<image002.jpg><image003.jpg>

<image004.png><image005.jpg><image006.png>

---

**From:** David Thomas
**Sent:** 17 October 2019 12:42
**To:** Steve Redding <Steve.Redding@volanteglobal.com>
**Cc:** James Urquhart <james.urquhart@aflib.com>
**Subject:** Emerson Equity, LLC. - BD E&O - 11 November Renewal

Hi Steve

As discussed, we have just received the BoR (attached) from Crystal on the above.

http://www.emersonequity.com

founded in 2003, Emerson Equity is full-service focused on offering high new worth individuals, institutional clients and sponsor companies that bring private placement offerings to market, quality investment investment opportunities, and managed broker dealer services.

**Services**:

- Investment Advisory & Brokerage (investment advisory, traditional brokerage, annuities & life insurance)
- Private Placements (secondary transactions, alternative investments and other private placements)
- Managing Broker Dealer (inception to closing private placement platform for sponsor companies)

**Current Coverage**:

- Coverage in place at the moment is straight Broker Dealer E&O covering DB (including failure to supervise) and Registered Representatives.
- NY registered rep coverage at
- $1m aggregate xs $75k each claim @ $13,500

**Requested Coverage:**

- $1m expiring and $3m and $5m options
- Option to add on Private Placement coverage (per attached endorsement) with $250k each claim retention
- Option to add on Registered Investment Advisory (RIA) endorsement
- Retain the original definition of professional services contained within the core policy wording, i.e. remove the professional services amendment
- Premium targets: $1m @ $50k; $3m @ $85k; $5m @ $115k.

**Attachments**:

- BoR
- Financials and P&L
- Current policy
- Exam and focus report
- Supplementary information
- Private placement list
- Registered rep list
- Supervisory procedures
- Template affiliate agreement
- Requested endorsement

**Underwriting Info**:

- $29,403,457 revenue ($27,332,007 commissions, $503,395 investment advisory fees…)
- $1,796,738 net income
- $2,518,063 total assets

Really need to get something asap to them, can we chat later today or tomorrow to try and get something before the week is out?

Many thanks

David Thomas
Senior Broker - Financial Lines

**<image001.png>**
Introducing AFL

AFL Insurance Brokers
8 Lloyd's Avenue| London| EC3N 3EL
DD: +44 (0) 20 3861 1005 | M: +44 (0) 7876 896 226 | David.Thomas@aflib.com

<image002.jpg><image003.jpg>

<image004.png><image005.jpg><image006.png>